**The WILDERNESS SOCIETY et al.,
Appellants**

v.

**Rogers C. B. MORTON, Secretary of
the Interior, et al.**

**Nos. 72–1796 to 72–1798.**

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc Oct. 6, 1972.

Decided Feb. 9, 1973.

MacKinnon, Circuit Judge, concurred in part and dissented in part and filed opinion.

Robb, Circuit Judge, concurred in part and dissented in part and filed opinion.

Wilkey, Circuit Judge, concurred in part and dissented in part and filed opinion.

Tamm, Circuit Judge, withdrew from participation in the case.

Edward Berlin, Washington, D. C., with whom Gladys Kessler, Washington, D. C., was on the brief, for appellants in No. 72–1796.

Dennis M. Flannery, Washington, D. C., with whom James N. Barnes, Saunders C. Hillyer, John F. Dienelt, Thomas B. Stoel, Jr., Victor H. Kramer, Washington, D. C., James W. Moorman, San Francisco, Cal., and Charles R. Halpern, Washington, D. C., were on the brief, for appellants in No. 72–1797.

Warren W. Matthews, Jr., Anchorage, Alaska, of the bar of the Supreme Court of Alaska, pro hac vice, by special leave of court, with whom Thomas F. Hogan, Rockville, Md., was on the brief, for appellant in No. 72–1798.

Edmund B. Clark, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Kent Frizzell and Herbert Pittle, Thomas L. McKevitt, David W. Miller and William M. Cohen, Attys., Dept. of Justice, were on the brief, for appellee Morton.

Paul F. Mickey and Robert E. Jordan, III, Washington, D. C., with whom Scott R. Schoenfeld and Quinn O'Connell, Washington, D. C., were on the brief, for appellee Alyeska Pipeline Service Co.

John E. Havelock, Atty. Gen., State of Alaska, pro hac vice, by special leave of court, with whom John E. Nolan, Jr., William H. Allen, Richard D. Copaken, and Jay L. Carlson, Washington, D. C., were on the brief, for appellee State of Alaska.

Tilford A. Jones and Earle D. Goss, Bethesda, Md., filed a brief on behalf of United Distribution Companies as amicus curiae.

Before BAZELON, Chief Judge, and WRIGHT, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.*

J. SKELLY WRIGHT, Circuit Judge:

The question before us in these cases is whether a permanent injunction should issue barring appellee Secretary of the Interior from carrying out his stated intention of granting rights-of-way and special land use permits necessary for construction by appellee Alyeska Pipeline Service Company (Alyeska), across lands owned by the United States, of a 48-inch-wide oil pipeline which would stretch some 789 miles from Prudhoe Bay on the North Slope of the State of Alaska to the Port of Valdez on the southern Pacific coast of Alaska.

We are also called upon to determine the legality of a special land use permit issued by the Acting Forest Supervisor of the Chugach National Forest, on behalf of the Department of Agriculture, which would permit construction of an oil tank farm terminal on Chugach National Forest land bordering Prince William Sound at Valdez. The District Court, on April 23, 1970, granted a preliminary injunction against issuance of the permits and rights-of-way. *See* Wilderness Society v. Hickel, D.D.C., 325 F.Supp. 422 (1970). When the question of a permanent injunction came before the District Court on August 15, 1972, the court, in a brief unreported opinion, dissolved the preliminary injunction, denied a permanent injunction, and dismissed the complaints. This expedited appeal followed. We reverse.

While the parties to this action have managed to produce a record and a set of briefs commensurate with the multi-billion-dollar project at stake, the basic contentions of the parties, and our views with respect thereto, may be summarized quite briefly. Appellants contend that issuance of certain rights-of-way and special land use permits by the Secretary of the Interior to Alyeska and to the State of Alaska would violate Section 28 of the Mineral Leasing Act of 1920, 30 U.S.C. § 185 (1970), by exceeding the width limitation of that section. They argue, too, that the permit issued by the Forest Supervisor violates 16 U.S.C. §§ 497 and 497a (1970) by exceeding the 80-acre limitation of those sections. Finally, appellants contend that issuance of any permits or rights-of-way necessary for construction of the trans-Alaska pipeline violates the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970) (hereinafter NEPA). In general they claim that Interior has not prepared an adequate environmental impact statement. More specifically, they charge that the six-volume statement issued by the De-

---

* Circuit Judge Tamm was a member of the court sitting *en banc* at the time this appeal was argued, but withdrew from participation in its consideration after submission but before decision.

partment of the Interior fails adequately to consider either the alternative of a pipeline route through Canada or the alternative of deferral of a decision until more information on the Canadian alternative can be obtained.

Appellees respond that all of the rights-of-way to be issued to the State of Alaska and some of the rights-of-way to be issued to Alyeska are authorized under statutes other than Section 28, that the Secretary's authority to issue the other rights-of-way to Alyeska may be implied under Section 28, and that the special land use permits to be issued to Alyeska are not rights-of-way within the meaning of Section 28 and are thus exempt from Section 28's width limitation. As to the land use permit issued by the Forest Supervisor, appellees first argue that we should not decide the issue because it will soon become moot by reason of the imminent transfer of the land concerned to the State of Alaska under the Alaska Statehood Act, Pub.L. 85–508, 72 Stat. 339, July 7, 1958, as amended. Should we choose to decide the issue, however, appellees maintain that issuance of revocable land use permits does not violate the acreage limitations of Sections 497 and 497a and is independently authorized under 16 U.S.C. § 551 (1970).

On the question of compliance with NEPA, appellees contend generally that their intensive efforts at compliance, involving expenditure of over $9,000,000, have produced a statement that more than meets the requirements of the Act. Focusing on the Canadian alternative and the alternative of deferral, they argue that these matters received sufficient consideration, both in the impact statement itself and by the Secretary of the Interior in making his decision to support the trans-Alaska pipeline, and that given certain problems with the Canadian alternative, the lack of information about other aspects of the alternative, and the high costs of deferral to obtain more information, the Secretary's decision to grant the pipeline permits was not an abuse of discretion.

Before summarizing our holding, we wish to note first that we have brought to these cases an awareness of the severe impacts our ruling will have. Any decision further enjoining construction of this project will impose serious costs on the oil companies who plan to build the pipeline and who have made substantial investments that cannot begin to show a return until oil begins to flow from their wells at Prudhoe Bay. The project means much needed jobs and income to the people of the State of Alaska, and development of Prudhoe Bay oil resources will bring forth badly needed revenues for the Alaska State Treasury. Recognizing these hardships, however, we nevertheless are constrained to enjoin the Secretary of the Interior from issuing one of the permits which all parties recognize is necessary for construction of the pipeline. We have determined that the Secretary of the Interior lacks authority to grant the special land use permit for construction purposes which Alyeska has requested, and that the grant of this permit constitutes a violation of both Section 28 of the Mineral Leasing Act and applicable Bureau of Land Management regulations. We base our decision on a literal reading of the provisions of Section 28, the legislative history of that section, and the settled construction of the administrative regulations. In brief, it is our view that the legislative history clearly indicates that when Congress enacted Section 28 it intended that all construction work take place within the confines of the width limitation of the section—that is, within the area covered by the pipe itself (4 feet) and 25 feet on either side. In addition, the relevant regulations require that all special land use permits be revocable, and we hold that the permit in this case does not meet the requirement as it has previously been construed. Since all parties agree that construction of the proposed 48-inch diameter pipeline is impossible if all construction work must take place within the width limitation of Section 28, we must enjoin issuance of this special land use permit

until Congress changes the applicable law, either by amending Section 28's width limitation or by exempting this project from its provisions.

As to the remaining issues in these cases, our holding is as follows. The Secretary of the Interior has authority to issue to the State of Alaska rights-of-way for a state highway, for several public airports, and for the free use of gravel for these facilities, even though the facilities will probably be used primarily for the construction, maintenance and operation of the proposed pipeline. We rest this holding on our conclusion that Section 28 of the Mineral Leasing Act does not bar resort to other specific statutory grants of rights-of-way. For the same reason we conclude that the Secretary has authority to issue rights-of-way to Alyeska for 26 communication sites along the pipeline route. Also, the Secretary has authority to issue rights-of-way for construction of pumping stations along the pipeline route since our reading of the statute and its legislative history and our recognition of a settled administrative practice in this regard lead us to conclude that pumping stations are part of the "pipeline" within the meaning of Section 28.

■ Although the parties have briefed and argued the legality of permits and rights-of-way covering land on which Alyeska proposes to locate a variety of other facilities, including remote control block valves, construction camps, material sites, permanent and temporary access roads, pipe storage sites, and temporary airstrips, we have decided not to rule on these issues on this appeal, pri-

marily because formal applications for these rights-of-way and permits have not yet been made.[1] With respect to the grant of a special land use permit by the Forest Supervisor, we find that the permit is likely to become moot in the near future and therefore do not decide that issue.

Finally, as to NEPA, since it is desirable that we expedite our decision, since the project will be enjoined in any event under our ruling on the Mineral Leasing Act issues, and since the posture of the NEPA issues may change before those issues are ripe for adjudication, we decline to pass on them at this time.

Our opinion *infra* is divided into five parts. The first discusses the legality of the Special Land Use Permit for construction purposes proposed to be issued by Interior to Alyeska. Part II discusses the other rights-of-way to be issued to Alyeska—for pumping stations and communications facilities. The third part concerns the rights-of-way to be issued to the State of Alaska for a public highway, for several airports, and for the free use of gravel. Part IV discusses the issues raised by the Special Land Use Permit for the tank farm. Finally, Part V explains our reasons for not deciding the NEPA issues in this case. Before turning to this analysis, we present a short factual introduction, relevant primarily to the first three parts of our opinion.

### Factual Introduction

Prudhoe Bay, on the North Slope of Alaska, was the site of a major oil field discovery in 1968. Following that dis-

---

1. Absent any actual applications, the legality of these permits and rights-of-way is not "ripe" or "suitable for judicial determination." *See* L. Jaffe, *Judicial Control of Administrative Action* 395 (1965). Without specific applications before us, we lack certain factual information which might be relevant to the legal issues. *Compare* our analysis *infra* of the Special Land Use Permit (SLUP) for construction purposes, an analysis which relies, to some extent, on information obtained from the application itself. *See* Abbott

Laboratories v. Gardner, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), in which the Supreme Court rested its finding of ripeness on its observation that the issue presented was "a purely legal one." *See also* Davis v. Ichord, 143 U.S.App.D.C. 183, 196, 442 F.2d 1207, 1220 (1970) (Leventhal, J., concurring), suggesting that the test of ripeness is whether "the controversy is so sharpened by a specific factual context as to permit a sure-footed judicial appraisal of the pertinent factors."

covery several oil companies, acting through their agent Trans Alaska Pipeline System (TAPS), predecessor of appellee Alyeska, developed plans to transport the oil from Prudhoe Bay to markets in the lower 48 states. As finalized, the plans involved constructing a 48-inch diameter pipeline to extend 789 miles from Prudhoe Bay to the Port of Valdez on the Pacific Ocean, a route crossing lands owned by the United States for about 641 miles. The pipeline would have an ultimate capacity of carrying 2,000,000 barrels of crude oil per day. Oil arriving at Valdez would be loaded on to tankers for shipment to ports such as Seattle, San Francisco and Los Angeles.

Because the proposed pipeline would cross lands owned by the United States, the oil companies had to seek rights-of-way from the agency entrusted with management of the lands to be crossed, the Bureau of Land Management of the Department of the Interior. In June 1969 TAPS submitted its first application,[2] requesting a 54-foot primary right-of-way, an additional 46-foot-wide right-of-way parallel and adjacent to the 54-foot right-of-way for construction purposes, and a second additional right-of-way 100 feet in width for a construction road to run from Prudhoe Bay to the town of Livengood, a point somewhat less than half way to Valdez (the pipeline route south from Livengood to Valdez was already serviced by a state highway). In addition, the application requested temporary use, for construction purposes, of 200 to 500 feet on each side of all river and stream crossings, and for land on which to locate temporary construction camps.

Having had the foresight to anticipate that development of a project of this magnitude would pose environmental, technological, social and legal problems,

then Secretary of the Interior Walter Hickel had, on April 18, 1969, established within the Interior Department a North Slope Task Force. At the President's request, in May 1969 that Task Force was enlarged into a Government-wide group, spanning many Government agencies. On September 15, 1969 the Task Force submitted its Preliminary Report to the President,[3] outlining the problems posed by development of the pipeline. Among these problems were "Legal and Procedural Matters" and within this category was a discussion of the legal problems posed by the then pending right-of-way application:

"*Width of the right-of-way:* The application requests a 54-foot wide pipeline right-of-way together with an additional parallel and adjacent 46-foot right-of-way. Further, for all sections between Livengood and the North Slope, the applicants request another 100-foot right-of-way for a construction road, making a total requirement of 200 feet in width for that distance.

"The authorizing statute (30 U.S.C. 185) limits pipeline rights-of-way to 25 feet on either side of center line, or to a total of 54 feet. Discussions are continuing between the Department and TAPS to determine the exact method by which TAPS will acquire the additional 46 feet for the pipeline right-of-way and the further addition of a 100-foot right-of-way for a construction road." [4]

Apparently aware of the legal problems posed by its earlier application, TAPS submitted an amended application in December 1969.[5] This application purported to request only a single right-of-way 54 feet in width, the legality of which has never been questioned under the Mineral Leasing Act. Concurrently with this amended application,

2. Supplemental Documents to Brief of Plaintiffs-Appellants, Tab A.

3. *Id.*, Tab C.

4. *Id.*, Tab C at 11. It is interesting to note that, although the Task Force classified

the Mineral Leasing Act's width limitation as a problem, it did not include it in its list of 5 "major concerns" in its Preliminary Report. *See id.* at 14.

5. *Id.*, Tab. D.

however, TAPS submitted two separate applications for "Special Land Use Permits." The first Special Land Use Permit (we will hereafter use the unfortunate acronym SLUP) application requested "additional access and construction space extending 11 feet on one side and 35 feet on the opposite side" of the oil pipeline right-of-way. The second SLUP application requested an area "200 feet in width to contain the pipeline construction surface and haul road" to run from Prudhoe Bay to Livengood.

On March 26, 1970 plaintiffs-appellants—The Wilderness Society, Friends of the Earth, and Environmental Defense Fund, Inc.—filed their complaint for declaratory and injunctive relief against appellee Secretary of the Interior. They alleged that the Secretary intended "within the immediate future to issue right-of-way and/or special use permits to TAPS for the purposes of the pipeline" and that this action would violate the width restrictions of Section 28 of the Mineral Leasing Act of 1920. On April 3, 1970 Judge McGuire denied plaintiffs'-appellants' request for a temporary restraining order. On April 23, 1970, after oral argument on plaintiffs'-appellants' motion for a preliminary injunction, Judge Hart issued his findings of fact and conclusions of law. See Wilderness Society v. Hickel, supra. Judge Hart found that the 54-foot right-of-way permit, the 46-foot SLUP for access and construction space, and the 200-foot SLUP for a construction surface and haul road constituted, "in effect, a single application for a pipe line right-of-way" and that when considered together the applications requested "a pipe line right-of-way in excess of the width permissible under Section 28 of the Mineral Leasing Act of 1920, 30 U.S.C. § 185." 325 F.Supp. at 424. Accordingly, Judge Hart issued a preliminary injunction against issuance of the permits and rights-of-way.

During the 16-month interval between issuance of the preliminary injunction and the hearing on the permanent injunction, there were several significant developments affecting the Mineral Leasing Act issues. In March 1971 Alyeska filed an application for rights-of-way for 26 communications sites.[6] In June 1971 the State of Alaska, intervenor-appellee in these cases, entered into a contract with Alyeska[7] whereunder Alyeska agreed to build a public highway to run from Livengood to Prudhoe Bay, along a route almost identical with the route of the 200-foot-wide haul road proposed in TAPS' SLUP application of December 1971. In this contract Alaska agreed to be responsible for securing all rights-of-way across federal land necessary for the highway, and on July 28, 1971 the State of Alaska applied to the Bureau of Land Management for a highway right-of-way across public lands for this road.[8] Following this application, on August 18, 1971 Alyeska withdrew its SLUP application for the 200-foot haul road.[9]

Alaska has also submitted applications to the Secretary of the Interior for leases of public lands for construction of three airports along the pipeline route.[10] Alyeska has entered into a contract with Alaska whereby Alyeska will construct these airports and operate them as public airports during construction of the pipeline.[11] Also, Alaska has applied for a series of free-use permits for gravel, the gravel to be used in construction of the above described highway and airports.[12]

On February 4, 1972 Alyeska filed an amendment to its December 1971 application for a SLUP for construction purposes.[13] The amendment, in contrast

6. *Id.*, Tab II–6.

7. Supporting Documents, Alyeska Mineral Leasing Act Brief, Vol. II, Tab 6.

8. Supplemental Documents, *supra* note 2, Tab E–2.

9. *Id.*, Tab G.

10. *Id.*, Tab I.

11. *Ibid.*

12. Supporting Documents, *supra* note 7, Vol. II, Tab 8.

13. *Id.*, Tab 3.

to the December SLUP application, did not specify the amount of land to be covered by the SLUP but rather requested "the temporary use of such minimum amounts of land under the jurisdiction of the Secretary of the Interior as may be reasonably necessary for construction of a proposed 48″ diameter oil pipeline * * *." [14] Also on February 4, 1972 Alyeska filed an amended application requesting rights-of-way for 10 pumping stations.[15]

On May 11, 1972, through a News Release,[16] the Secretary of the Interior announced his decision to grant the necessary permits for the proposed pipeline. It is the lawfulness of this decision which is at issue in these cases. On August 15, 1972 Judge Hart dissolved the preliminary injunction, denied the application for a permanent injunction, and dismissed appellants' complaints.

## I. THE SPECIAL LAND USE PERMIT

### A. Introduction.

The pending application by appellee Alyeska to the Bureau of Land Management requests, as indicated above, "the temporary use of such minimum amounts of land under the jurisdiction of the Secretary of the Interior as may be reasonably necessary for construction of a proposed 48″ diameter oil pipeline * * *." [17] The application states that "[a]fter construction has been completed, no continuing interest in this additional space is or will be claimed by Alyeska. * * * Alyeska recognizes that any authorization to use the space * * * will remain at all times revocable at will by the government, without cause or justification, and without giving rise to any claim against the government arising out of such revocation." [18]

While the application states that "[t]he precise amount of land required for construction purposes may only be approximated at this time," [19] it also provides what all parties agree are fair estimates of the amount of space to be used *outside and in addition to* the basic 54-foot right-of-way, the legality of which is not challenged under the Mineral Leasing Act. The application states:

" * * * [A]pproximately 85 per cent of the right-of-way (approximately 662 miles) will require the temporary use of widths ranging from 46 to 146 feet. Approximately two-thirds of this distance (about 456 miles) will require temporary widths of 96 feet or less. Along the remainder of the route, instances will occur where greater widths will be necessary, such as at river crossings, road crossings, and in mountainous terrain. Temporary widths exceeding 246 feet are expected to comprise only about 28 miles of the 789-mile pipeline route, occurring primarily at river crossings and in particularly difficult terrain." [20] (Footnote omitted.)

In order to understand what the SLUP will be used for, why it is needed, and whether it is legal, it is necessary to consider some of the mechanics of pipeline construction. Most of the proposed pipeline will be buried underground, the remainder being placed on a gravel berm or on raised pilings. We will only describe construction under the burial mode since construction under the other modes differs only slightly with respect to the amount of land used. Construction proceeds step-by-step through a number of distinct operations. First, prior to construction a centerline is surveyed and marked. A construction zone is cleared and graded, and the ditch for

14. *Id.*, Tab 3, Response to Question 2a at 2.

15. Supplemental Documents, *supra* note 2, Tab H–5.

16. Appendices to Briefs of Plaintiffs-Appellants, Tab A.

17. Supporting Documents, *supra* note 7, Vol. II, Tab 3, Response to Question 2a at 2.

18. *Id.* at 4.

19. *Id.* at 2.

20. *Id.* at 3.

the pipe is dug. The pipe, valves, fittings and coating materials are then transported to the job site and the pipe is strung along the open ditch. Frequently it is necessary to bend the pipe by machine at the site to fit the alignment and contour of the ditch. Strings of pipe are then aligned, clamped, and welded together. Joined sections of pipe are lowered into the ditch by heavy sideboom tractors. These sections are then joined to the pipe already in place and the pipe receives its final coatings. The ditch is then backfilled and compacted.

A minimum work area of about 55 feet on one side of the pipe is necessary along the entire length of the pipe. The modern method of pipeline construction requires use of bulky and heavy equipment designed to operate from one side of the pipe only. It is essential to provide adequate vehicle passing space along the entire length of the proposed route since pipe sections must constantly be trucked to the head of the construction area, and sideboom tractors which have finished lifting and lowering sections of pipe must pass ahead of others still engaged in such operations to take up new positions as construction of the line advances. Space is needed for the transport of men and equipment, and safety margins must be provided to avoid collisions.

The land in most areas along the proposed route is permafrost—that is, land which absent human interference remains frozen throughout the year. To prevent thawing and other disturbance of the permafrost during construction in these areas, and to prevent the sinking of heavy equipment, a gravel work pad must be constructed over the working area. The pad is basically a gravel road with gravel compacted to a depth of from 18 inches to five feet.[21] Of the total 9600 acres of land estimated to be covered by the SLUP, about 3600 acres represent land to be used for this construction area and work pad.

The remaining 6000 acres will be used in other, construction-related ways. First, whenever the pipeline passes through hilly or mountainous areas, or where it crosses a river or road, it is often necessary to modify the grade in areas adjacent to the actual construction area to assure slope stability and to provide for a level construction area. Grading these adjacent areas produces large amounts of rock, dirt and gravel, known as cut spoil, which must be piled up on the side of the pipeline opposite the construction side. In addition, the material removed from the ground when the ditch is dug and displaced by the pipeline when it is placed in the ditch—known as ditch spoil—must also be piled up opposite the construction side of the pipeline. In laymen's terms, then, the other 6000 acres will be used to grade away mountains and hills in some areas, and to pile their remains, along with ditch spoil, in others.

B. *Section 28 of the Mineral Leasing Act.*

Section 28 of the Mineral Leasing Act of 1920, 30 U.S.C. § 185, provides in pertinent part:

"Rights-of-way through the public lands, including the forest reserves of the United States, may be granted by the Secretary of the Interior for pipeline purposes for the transportation of oil or natural gas to any applicant possessing the qualifications provided in section 181 of this title, to the extent of the ground occupied by the said pipe line and twenty-five feet on each side of the same under such regulations and conditions as to survey, location, application, and use as may be prescribed by the Secretary of the Interior and upon the express condition that such pipe lines shall be

---

21. *See* U.S. Dept. of Interior, Final Environmental Impact Statement: Proposed Trans-Alaska Pipeline, Vol. IV, at 67 (1972) (hereinafter cited as Impact Statement). *Cf.* Aleyeska Pipeline Service Co., Summary: Project Description of the Trans Alaska Pipeline System 50 (Aug. 1971) (hereinafter cited as Project Description), estimating the thickness to be from 6 inches to 3 feet.

constructed, operated, and maintained as common carriers and shall accept, convey, transport, or purchase without discrimination, oil or natural gas produced from Government lands in the vicinity of the pipe line in such proportionate amounts as the Secretary of the Interior may, after a full hearing with due notice thereof to the interested parties and a proper finding of facts, determine to be reasonable: * * * *Provided further*, That no right-of-way shall hereafter be granted over said lands for the transportation of oil or natural gas except under and subject to the provisions, limitations, and conditions of this section. Failure to comply with the provisions of this section or the regulations and conditions prescribed by the Secretary of the Interior shall be ground for forfeiture of the grant by the United States district court for the district in which the property, or some part thereof, is located in an appropriate proceeding."

Appellants contend that the SLUP for the construction zone violates that portion of Section 28 which provides "That no right-of-way shall hereafter be granted over said lands for the transportation of oil or natural gas except under and subject to the provisions, limitations, and conditions of this section." That is, appellants claim that the SLUP is a "right-of-way" "for the transportation of oil" which violates one of the "provisions, limitations, and conditions" of Section 28 in that it exceeds the statutory width limitation "to the extent of the ground occupied by the said pipe line and twenty-five feet on each side of the same * * *."

Appellees' response also focuses on a literal reading of the statutory language. Interior argues that a tempo-

rary, revocable permit is not a right-of-way. In its view, a right-of-way is an easement, a permanent interest in land. A revocable permit, on the other hand, is like a license which is not an interest in land. A permit, by this reasoning, cannot be a right-of-way. Alyeska adopts a similar approach. In its view "[f]ailure to make a distinction between acts which convey an interest in land and those which merely allow its use is the fundamental flaw in *Wilderness Society's* arguments." "The term [right-of-way] implies conveyance of an interest in the land, rather than a mere license to use the land." In support of their position, appellees cite several cases in which a statutory grant of a right-of-way was construed to grant a permanent easement. *See, e. g.,* Great Northern Ry Co. v. United States, 315 U.S. 262, 271, 62 S.Ct. 529, 86 L.Ed. 836 (1942); Panhandle Eastern Pipe Line Co. v. State Highway Comm'n, 294 U.S. 613, 618, 55 S.Ct. 563, 79 L.Ed. 1090 (1935); United States v. Welch, 217 U. S. 333, 339, 30 S.Ct. 527, 54 L.Ed. 787 (1910).

█ █ Although we base our statutory interpretation not merely on a literal reading of the statute but on other indicia of legislative intent, we conclude that a literal reading indicates a result favorable to appellants. To begin with, it seems clear that a revocable permit to use land is a right-of-way. Most statutory grants of rights-of-way, it is true, are construed as grants of permanent easements, but rights-of-way are occasionally construed as revocable licenses,[22] and, more importantly, there is nothing in the accepted definition of the phrase "right-of-way" which restricts its application to permanent interests in land. A right-of-way is most typically defined as the right of passage over another person's land.[23] It has been said that "[a]

---

22. *See* Guerra v. Packard, 236 Cal.App. 2d 272, 285, 46 Cal.Rptr. 25, 33 (1965) (construing the grant of a "right of way for the purpose of constructing and maintaining a Motorway and Firebreak" as a revocable license); *cf.* Seltenreich v. Town of Fairbanks, D. Alaska, 103 F.

Supp. 319, 325–336, 13 Alaska 582 (1952), affirmed, 9 Cir., 211 F.2d 83, 14 Alaska 568, cert. denied, 348 U.S. 887, 75 S.Ct. 206, 99 L.Ed. 697 (1954).

23. *See generally* 77 C.J.S. Right 393 (1952) and cases there cited.

right of way is nothing more than a special and limited right of use," [24] a definition that sounds remarkably similar to the special land use permit issued in this case. There is no temporal element in these definitions. Both a revocable license and a permanent easement fall within their language. The regulations of the Bureau of Land Management recognize this when they define the term "right-of-way" as follows: " 'Right-of-way' includes license, permit, or easement, as the case may be * * *." 43 C.F.R. § 2800.0–5(i) (1972).[25]

■ Appellees also argue that a revocable permit cannot be a right-of-way because the latter term refers to an interest in land, and licenses are not interests in land. An examination of relevant authority, however, indicates that licenses are indeed interests in land. They may not be the kind of interests in land that must be created in writing or recorded to be enforced,[26] or the kind of interests in land for which compensation must be paid following condemnation for public use,[27] but they are nevertheless interests in land. See 3 R. Powell, Real Property ¶ 428 at 526.63 (1970); 2 A. Casner (ed.), American Law of Property § 8.110 at 317 (1952). The Restatement provides: "All 'licenses,' as the term is used in this Chapter, are 'interests in land' as that phrase is used in the Restatement of Property." Restatement of Property § 512, Comment c, at 3116 (1944). In fact, the affidavit of an individual knowledgeable about customary practices in the oil pipeline industry, introduced into the record by appellees, supports the view that a grant of permission to use land for construction purposes is a grant of an interest in land. Thus where construction of a pipeline takes place over privately owned property, according to this affidavit, space necessary for construction is "purchased or condemned * * * for the time necessary for construction of the pipeline." [28]

Appellees also make the argument that the land covered by the SLUP will not be used for "pipe-line purposes" or for "the transportation of oil" within the meaning of Section 28. Interior argues that "[t]he temporary revocable permits do not pertain to land to be used for the transportation of oil or natural gas." Alyeska argues that "[i]f one applies normal rules of construction, Congress must have intended something by the use of the phrase 'pipe line purposes' that was not synonymous with construction and maintenance." But we would have to stretch the statutory language totally beyond its natural meaning to conclude that the SLUP in this case is not being issued for "pipe-line purposes." As the United States Supreme Court had occasion to note, "This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments."

---

24. West v. Maryland Gas Transmission Corp., 162 Md. 298, 312, 159 A. 758, 763 (1932).

25. Until 1968, another of the Bureau's SLUP regulations specifically provided that SLUPs will not be issued "for the securing of rights-of-way obtainable under existing laws," thus implicitly recognizing that the permission granted by a SLUP could constitute a "right-of-way." See, e. g., 43 C.F.R. § 258.2(a) (1949). See also 43 U.S.C. § 959 (1970), which authorizes the Secretary of the Interior to "permit the use of rights of way through the public lands" but then further provides that "any permission given by the Secretary * * * may be revoked by him * * * in his discretion, and shall not be held to confer any right, or easement, or interest in * * * public land," thus expressly creating a revocable right-of-way.

26. See 3 R. Powell, Real Property ¶ 428 at 526.64 (1970); 2 A. Casner (ed.), American Law of Property § 8.118 (1952).

27. See 2 Nichols, Eminent Domain § 5.23[7] (Rohan recompilation 1970); 3 R. Powell, supra note 26, at 526.64; Sinclair Pipe Line Co. v. United States, 287 F.2d 175, 152 Ct.Cl. 723 (1961).

28. Affidavit of Dean F. Smalley, Supporting Documents, supra note 7, Vol. I, Tab 1 at 2.

Flora v. United States, 362 U.S. 145, 150, 80 S.Ct. 630, 633, 4 L.Ed.2d 623 (1960). It simply makes no sense to insist on the one hand, as all parties do, that use of this land is absolutely necessary if the pipeline is to be built and oil to be transported, and to claim on the other hand that the land will not be used for pipeline purposes or for the transportation of oil. One of the functions of statutory rights-of-way is to allow room for construction activities.[29] Indeed, the Bureau's own contemporaneous interpretation of Section 28 stated that the purpose of the right-of-way was for "construction, maintenance, and operation of the pipe line." 47 Int.Dept.Dec. re Pub. Lands 437, 461 (March 11, 1920).[30]

It is also argued that the statutory requirement of compliance with "the provisions, limitations, and conditions" of Section 28 is concerned solely with the condition that pipelines be common carriers. While it is clear that the common carrier provision was one of Congress' chief concerns, nevertheless the statutory language plainly bars any pipeline right-of-way which does not comply with all "provisions, limitations, and conditions," including limitation of the right-of-way to 25 feet.

■■ In conclusion, under a literal reading of Section 28 the proposed SLUP is a "right-of-way" "for the transportation of oil" which is not "subject to" one of "the provisions, limitations, and conditions" of Section 28. Of course, we cannot end our inquiry with this simplistic and literal approach.[31] On occasion we have paid lip service to the rule that where the language of a statute is clear and unambiguous on its face it cannot be controverted by seeking to show inconsistent legislative intent, see Sea-Land Service, Inc. v. F.M. C., 131 U.S.App.D.C. 246, 250, 404 F.2d 824, 828 (1968), but we have also faced up to the reality that "the 'plain meaning' doctrine has always been subservient to a truly discernible legislative purpose however discerned," District of Columbia v. Orleans, 132 U.S.App.D.C. 139, 141, 406 F.2d 957, 959 (1968). Regardless of how plainly we might feel the SLUP is barred by the literal terms of Section 28, we must respond to what seems to us to be the crucial contention in the Mineral Leasing Act aspects of this case. All parties agree that it is impossible to build large-diameter oil pipelines if construction is to be limited to 25 feet on either side of the pipeline. Appellees then argue that Congress must have intended Section 28 to include all those uses of land necessary to secure the central objective of allowing pipeline construction. Absent any other indication of what Congress in fact intended, settled maxims of statutory construction would probably lead us to accept this inference about congressional intent. *Cf.* United States v. State of Maryland for Use of Meyer, 121 U.S.App.D.C. 258, 260, 349 F.2d 693, 695 (1965). There is a presumption against construing a statute so as to render it ineffective. Bird v. United States, 187 U.S. 118, 124, 23

29. *See, e. g.,* United States v. Great Northern Ry Co., D.Mont., 32 F.Supp. 651, 654 (1940), affirmed, 9 Cir., 119 F. 2d 821 (1941), modified on other grounds, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942): "Many definitions have been given * * * of the term 'right of way' but the consensus of opinion seems to be that it means exactly what the words imply, that is to say, the right to use the grant of right of way for the purpose of *constructing,* maintaining, and operating a railroad thereon." (Emphasis added.)

30. The legislative history indicates that the phrase "for the transportation of oil or natural gas" was added to the statute solely to ensure that the statute did not govern pipelines for water and artificial gas. *See* 51 Cong.Rec. (Part 15) 15419 (1914).

31. *See* Malat v. Riddell, 383 U.S. 569, 571–572, 86 S.Ct. 1030, 16 L.Ed. 2d 102 (1966); C.I.R. v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); Salt River Project Agr. Impr. & Power District v. F.P.C., 129 U.S.App.D.C. 117, 121, 391 F.2d 470, 474, cert. denied, 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968).

S.Ct. 42, 47 L.Ed. 100 (1902); United States v. Blasius, 2 Cir., 397 F.2d 203, 207 n.9 (1968), cert. dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969); United States v. Milk Distributors Ass'n, Inc., D.Md., 200 F.Supp. 792, 799 (1961); In re White, N.D.N.Y., 266 F.Supp. 863, 866 (1967). But conjecture and inference about the central purposes of Section 28 and what Congress "must have intended" are not necessary in this case, for we have firmer evidence of what Congress did in fact intend when it enacted the width limitation of Section 28, and it is to this legislative history that we now turn.

C. *Legislative History of Section 28.*

The Mineral Leasing Act of 1920, of which Section 28 is but a small and relatively minor part, was not the product of a single Congress. Other versions of the Act, substantially similar to the one finally adopted and containing provisions virtually identical with what is now Section 28, were introduced, reported out of Committee, and debated on the floor of Congress as early as 1914. *See* H.R. 16136, 63rd Cong. (various prints) (1914); H.R. 406, 64th Cong. (various prints) (1915–16); H.R. 3232, 65th Cong. (various prints) (1917); S. 2812, 65th Cong. (various prints) (1918). The legislative history of the bill that was finally enacted into law as the Mineral Leasing Act of 1920, S. 2775, 66th Cong., 2d Sess. (1920), contains no discussion of the width limitation in either the reports, the hearings, or the floor debates. The legislative history of similar bills in prior Congresses, however, is very revealing. *Cf.* United States v. Plesha, 352 U.S. 202, 205, 77 S.Ct. 275, 1 L.Ed.2d 254 (1957); United States v. Blasius, *supra*, 397 F.2d at 205–206.

As originally drafted Section 28 provided, not for 25 feet on either side of the pipeline, but for only 10 feet. *See* H.R. 16136, 63rd Cong., 2d Sess., § 17 (April 29, 1914). The bill was referred to the House Committee on Public Lands and was reported therefrom with an amendment that would substitute "twen-

ty" for "ten." *See* H.R. 16136, 63rd Cong., 3d Sess., § 11 (February 2, 1915). When next introduced into Congress, the section again provided for only 10 feet. *See* H.R. 406, 64th Cong., 1st Sess., § 18 (December 6, 1915). When this bill was reported from the House Committee on Public Lands, however, the width limitation provision was amended to change "ten" to "twenty-five." *See* H.R. 406, 64th Cong., 1st Sess., § 13 (January 4, 1916). The bill was sent back to Committee again, and when reported the width limitation had been changed once more, this time from "twenty-five" to "twenty." *See* H.R. 406, 64th Cong., 1st Sess., § 11 (March 30, 1916). When introduced in subsequent Congresses, however, and when reported from Committee and debated thereafter, the width limitation remained at 25 feet. *See* H.R. 3232, 65th Cong., § 13 (various prints) (1917); S. 2812, 65th Cong., 2d Sess., § 13 (May 14, 1918); S. 2775, 66th Cong., 1st Sess., § 27 (August 15, 1919); S. 2775, 66th Cong., 1st Sess., § 28 (October 21, 1919). This legislative history indicates that Congress placed some significance on the exact figure chosen. The number "twenty-five" was not pulled out of thin air, but was resolved upon after apparently careful deliberation. In view of the significance Congress seemed to place on the exact figure chosen, it seems unreasonable to conclude that Congress intended the interpretation put forth by appellees in these cases, for under that interpretation it is irrelevant whether the statute permits 10, 20 or 25 feet. If the statute allows one to use any land reasonably necessary to build a pipeline, what purpose is there in choosing 25 feet rather than 10? *Cf.* United States v. Blasius, *supra*, 397 F.2d at 207.

▮ It is a well known maxim of statutory construction that all words and provisions of statutes are intended to have meaning and are to be given effect, and words of a statute are not to be construed as surplusage. *See* McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164 (1938); D. Ginsberg

& Sons, Inc. v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932); Klein v. Republic Steel Corp., 3 Cir., 435 F.2d 762, 765–766 (1970); Consolidated Flower Shipments, Inc.—Bay Area v. C. A.B., 9 Cir., 205 F.2d 449, 450 (1953). We should be particularly mindful of this maxim in cases such as these where there is specific evidence that Congress placed significance on the statutory language in dispute.

More than the bills themselves, the debates in the House of Representatives [32] indicate that Congress intended all construction work to take place within the width limitation of the statute. As noted earlier, the first predecessor of Section 28 provided for only 10 feet. When this provision was first put before the House, Mr. Mondell, a Representative from Wyoming who continued to play an active role in the debates throughout the history of Section 28, proposed an amendment to be added to the provision:

"Provided, That nothing herein contained shall be held to repeal the provisions of the act approved May 21, 1896, entitled 'An Act to grant right of way over the public domain for pipe line in the States of Colorado or Wyoming,' but all pipe lines built under the provisions of that act shall be common carriers." [33]

The act referred to in the proposed amendment is still codified at 43 U.S.C. § 962 (1970), although the legislative history of Section 28 makes it questionable whether it is still in force.[34] It provides:

"The right of way through the public lands of the United States situate in the State of Colorado and in the State of Wyoming * * * is granted to any pipe-line company or corporation formed for the purpose of transporting oils * * * to the extent of the ground occupied by said pipe line and twenty-five feet on each side of the center line of the same; also the right to take from the public lands adjacent to the line of said pipe line, material, earth, and stone necessary for the construction of said pipe line."

Mr. Mondell supported his amendment as follows:

"The pipe lines that are really important, so far as the question of right of way is concerned, are the great carrying lines. There have already been two, over 60 miles long each, constructed in my State under the act that I have referred to. I think one of them cost $600,000. I do not know how much the other cost. Such lines are large. They are very expensive. * * * The provisions of this section are not sufficiently liberal to allow the construction of one of these great lines." [35]

Congressman Mondell was asked whether a total space of 20 feet was not sufficient room in which to construct a pipeline. He responded:

"No; it is not wide enough to construct one of these great lines over a rough country. The width is not great enough, and there is no opportu-

32. The debate on the floor of the Senate never discussed the width limitation.

33. 51 Cong.Rec. (Part 15) 15418 (1914).

34. Mr. Ferris, the man who introduced H.R. 16136 (and many of the later versions of the Mineral Leasing Act) into Congress, had asked the Department of the Interior to comment on whether the bill would repeal the Act of May 21, 1896. The Department said that it would, if enacted, "preclude the department from in future allowing any pipe-line right-of-way applications under the provisions of

the said act of May 21, 1896, supra, because it provides an exclusive method for the granting of rights of way for pipe lines over the public lands of the United States, and further stipulates that no right of way shall be hereafter granted over the public lands for the transportation of oil or gas except under the provisions, limitations, and conditions of the section." *Id.* at 15418–15419. *See also* 56 Cong.Rec. (Part 7) 7097 (1918).

35. 51 Cong.Rec. (Part 15) at 15418.

858

nity to get the necessary material from the adjacent lands. * * * " 36

Representative Taylor of Colorado said he believed the amendment offered by Mondell was a good one for, in his words,

"* * * I regret to see this law, which is applicable to the States of Colorado and Wyoming alone, thus wiped off the statute books, because it has been a good law and nobody has ever complained of it. It is a better law than this one. * * * " 37

But he said he would not support the amendment because he did not believe in special legislation for one or two states. He concluded: "I feel that if this proposed law works all right we can operate under it in our State, and if it does not, then we hope to come back here some time and amend it." 38 During later debate on the provision, Taylor specifically referred to the views of the House Committee on Public Lands on this matter:

"* * * I think that law [Section 962] ought to be inserted in this bill in lieu of section 17, but at the same time the committee has taken a different view, and I am not disposed to quarrel with the committee about the matter. * * * I think the provisions of this section in the bill, the same as some other sections, should be more liberal. But I have expressed myself on this bill at great length in my minority report and in my speech on the bill, and I will therefore not offer any special opposition to this section at this time." 39

A vote was then taken on the proposed amendment and it was defeated.

Realizing that to some extent the opposition to his proposal was based on a desire not to have special legislation for any states, Representative Mondell immediately introduced another amendment, the effect of which would be to change the width limitation to read "to the extent of the ground occupied by said pipe line and 25 feet on each side of the center of line of the same; also the right to take from the public lands adjacent to the line of said pipe line material, earth, and stone necessary for the construction of said pipe line." 40 Again Mondell justified his proposed amendment:

"* * * First, the provisions of this section [as originally drafted] are not liberal enough to enable people desiring to do so to construct the great carrying pipe lines which we are attempting to provide for. * * * Those lines are most of them of considerable length. The two that have been constructed in my State so far are each some sixty-odd miles in length. A line is now under contemplation which will be much longer than either of those lines. Eventually, we will have to cross the State, and probably cross a large portion of the State of Colorado with a main pipe line. At least 50 feet right of way is needed, and opportunity to use material on either side is needed to make the construction of these pipe lines practicable. * * *

* * * * * *

"* * * The section as it stands will not do at all. That is clear in the first place, and it does not give the intending builder of pipe lines the space that he needs and the material that he needs. * * * " 41

A vote was then taken on Mondell's second proposal and it was defeated.

As noted earlier, when next introduced into Congress as part of H.R. 406, the width limitation again provided for only 10 feet. Mr. Mondell expressed his apprehensions and summarized the views of Congress once more:

"* * * The provisions of this section are very illiberal. They are not sufficient to give fair opportunity

36. *Id.* at 15420.
37. *Ibid.*
38. *Ibid.*
39. *Id.* at 15421.
40. *Ibid.*
41. *Id.* at 15421–15422.

for the building of large pipe lines such as are essential to a large oil business. I wish it were possible to amend it \* \* \*. That is evidently impossible from the present attitude of the committee, and I realize that no amendment would be favorably received liberalizing this section, therefore I offer none." [42]

As later versions of H.R. 406 indicate, however, Representative Mondell was eventually successful in getting one of the amendments he wanted. When the section came out of Committee, "ten" was changed to "twenty-five" where it remained, with one exception already noted, throughout the period until enactment of the Mineral Leasing Act in 1920. Although the Committee did finally agree to enlarge the width allowance, Mondell was apparently unsuccessful in obtaining any amendment that would, in the manner of 43 U.S.C. § 962, allow one to go outside the right-of-way to obtain materials necessary for pipeline construction.

This legislative history indicates first that Congress agreed with Representative Mondell's position that the width limitation restricted all construction activities. By recognizing that a change from 10 feet to 25 feet was necessary, Congress was implicitly accepting the view that Mondell put forth. Secondly, Congress was offered an amendment that would modify the width limitation so as to expressly provide that one could go outside the statutory right-of-way where necessary for construction purposes and, as noted earlier,[43] it had been told by the bill's sponsor that enactment of the bill would repeal a pre-existing statute that contained such an express provision. Congress voted down the amendment, however, clearly indicating its desire to restrict construction to the statutory right-of-way.[44] Finally, the history indicates that Congress had been warned that the future was going to bring larger and larger pipelines, and that the statutory right-of-way was going to prove insufficient to allow construction of these lines. But rather than exercise what we might now call reasonable foresight, foresight which the Congress did exercise on other similar occasions,[45] the Congress did not at-

---

42. 53 Cong.Rec. (Part 2) 1095 (1916).

43. *See* note 34 *supra*.

44. We have, in the past, recognized that it is hazardous to draw conclusions from congressional inaction. *See* National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 291, 443 F.2d 689, 706 (1971). In that case, however, we noted a distinction between the mere silence that accompanies "proposals languishing without any Congressional action" and "positive action by Congress rejecting the \* \* \* amendments." *Ibid.* In the present case we can confidently place some significance on congressional rejection of the proposed amendment that would allow going outside the statutory right-of-way where necessary for construction purposes. The Supreme Court has said that the reason for not drawing inferences from congressional failure to adopt an amendment is that "[l]ogically, several equally tenable inferences could be drawn from the failure of the Congress to adopt an amendment \* \* \* including the inference that the existing legislation already incorporated the offered change." United States v.

Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1359, 8 L.Ed.2d 590 (1962). But in the present case we cannot draw the inference that the existing legislation already incorporated the proposed change; Congress' attention had been drawn to a prior act containing the proposed change, and Congress was told that the bill, as drafted, would repeal the provisions of that prior act.

45. *Compare* Alaska Right of Way Act of May 14, 1898, 30 Stat. 409, 43 U.S.C. § 942–1 (1970) (granting 100-foot rights-of-way for railroads in Alaska, but also providing for the "right to take from the lands of the United States adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad" and providing for the "right to use such additional ground as may in the opinion of the Secretary of the Interior be necessary where there are heavy cuts or fills \* \* \*") ; Act of March 2, 1899, 30 Stat. 990, as amended, 25 U.S.C. § 313 (1970) (providing a 50-foot right-of-way for railway, telegraph and telephone lines through Indian reservations, but allowing use of 100 feet

tempt to provide for the future by giving the Secretary of the Interior express authority to allow use of any amount of land reasonably necessary for construction. The apparent attitude of Congress was best exemplified by Representative Taylor of Colorado who, because of the state he represented, was very concerned with the effect of the proposed statute on pipeline construction. As quoted earlier, Taylor's position was that if the new law was not adequate, "then we hope to come back here some time and amend it." Thus though Congress seemed to be aware that the width limitation might be, or might in the future prove to be, insufficient, the remedy suggested was not to plan for the future but rather to tell the industry to come back to Congress if these fears were borne out by actual practice under the Act.

The final chapter in the legislative history of Section 28 was the debates on H.R. 3232, 65th Cong. Despite the apparent acquiescence of Congress in Mondell's amendment to 25 feet, Representative Chandler of Oklahoma attempted to amend the limitation back to 10 feet.

"Mr. CHANDLER of Oklahoma. Mr. Chairman, I see no reason for granting a right of way for a pipe-line company of this magnitude. There is no reason in the world why a pipe line should have any more right of way than a railroad company, and most of the railroads in this country only have 50 feet right of way. This bill provides that the pipe lines shall have a grant of the land occupied by the pipe line and then an additional 25 feet on each side of the pipe line.

"Now, this is entirely too much ground to give to any pipe-line company.

As everybody knows, most of the railroads of the United States have only 50 feet of right of way—they have to make grades, and so forth—but a pipe line only takes up 12 or 16 inches, making no grade, simply digs ditches, goes over the hills and down again, and the Government ought not to give a pipe-line company this amount of land.

\* \* \* \* \* \*

"Mr. TAYLOR of Colorado. Mr. Chairman, I infer that my good friend from Oklahoma has never lived in a mountainous country. In a mountainous or rough and broken or hilly country pipe lines are sometimes buried on side hills or gulches, sometimes on high trestles, and on all kinds of ground, and people have to go up and down the lines to mend breaks in and repair the pipe line, and for various reasons, and you can not drive teams or haul material on a 10-foot strip of ground through that kind of country. The use of it is merely an easement, subject to such rules and regulations as may be prescribed by the Secretary of the Interior. These regulations will not prevent the ground from being used, if the ground is such that it ever can be used for anything; that is, if a pipe line runs over any land that anybody ever wants. It is only public land that has been heretofore deemed worthless. If the lands over which a pipe line will run were any good they would be in private ownership long ago. It is only the rough, arid land that nobody wants which is now open for settlement. If merely an easement over a right of way is given, and only temporarily, for the occupation by a pipe line, subject to such rules and regulations as the Secretary of the Interior will prescribe, the Government is not going to be hurt any by allowing the owner to

"where there are heavy cuts and fills \* \* \*"); Act of March 11, 1904, 33 Stat. 65, as amended, 25 U.S.C. § 321 (1970) (providing for rights-of-way through Indian reservations for oil and gas pipelines, and expressly granting the Secretary of the Interior authority to "grant temporary permits revocable in his discretion for the construction of such

lines \* \* \*"); Act of Aug. 1, 1946, 68 Stat. 921, as amended, 42 U.S.C. § 2201 (1970) (authorizing the Atomic Energy Commission to grant rights-of-ways across lands under its control for railroad, pipeline and other purposes, limited to that amount of "land [that] is reasonably necessary for the purpose for which granted").

use for that purpose only a strip of ground 25 feet wide on each side of the center of the pipe line, and I hope the gentleman's amendment will be defeated.

\* \* \* \* \* \*

" \* \* \* Mr. Chairman, owing to the very great shortage of oil, the very great consumption in excess of production, I assume that every Member of this House is very much in favor of oil development. With a shortage of 60,000,000 barrels this year, every patriotic citizen should be in favor of any fair law that will encourage oil development, and if this House is in favor of oil development there is certainly no reason for handicapping it by any more restrictions than are already in this bill. I may say that there is not a western Member of this House, certainly none from the States to which this legislation will apply, who is satisfied with this bill. It is much more drastic than we feel it ought to be. It will not bring about the development that the country needs and would get under a more liberal bill. At the same time we have agreed to accept this bill as the best we can get, and for that reason have not filed a minority report.

\* \* \* \* \* \*

"MR. RAKER. \* \* \* Here is an act granting the right to establish pipe lines in Colorado, giving a right of way of 25 feet on each side. That is the law now.

"Mr. TAYLOR of Colorado. Yes; that is the Colorado and Wyoming act, and expressly grants 25 feet on each side. People can neither build or [sic] maintain a pipe line on less than that width in that country. There is no use of requiring impossibilities or restricting development by utterly impracticable restrictions and limitations that neither do the Government or [sic] anyone else any good.

\* \* \* \* \* \*

" \* \* \* My dear sir, to build and maintain a pipe line you have got to have more than just the actual land that the pipe rests on. You have got to have a wagon road to transport the material, you have very often got to take earth and rocks from the side of the right of way, and so on. A trestle supporting a pipe line may be 50 feet wide at the foundation. There is no earthly use of preventing construction or compelling people to come back to Congress again to get a sensible law.

"When the Secretary of the Interior is given the complete control of this right of way, that is sufficient; and I hope the amendment will not be adopted, because it is entirely inadvisable, absolutely impracticable, and utterly unnecessary. It can not be made to work out. Pipe-line owners would be compelled to go out and buy land adjoining every right of way or obtain from the Government an additional grant. This provision ought to be more liberal than it is.

\* \* \*

\* \* \* \* \* \*

"Mr. NORTON. \* \* \* [D]oes not the gentleman know, as a matter of fact, that the width of the right of way granted to the railroads has been found by practical experience to be altogether too great in the Western States?

"Mr. TAYLOR of Colorado. The 400-foot right of way granted to the Union Pacific was more than was necessary, especially on level ground for nearly a thousand miles; but in no place where there is rough ground has the 100-foot right of way been too wide or been curtailed.

"Mr. NORTON. I am sure it is the consensus of opinion of the people in the Central West that the right of way of 100 feet on each side granted to the Northern Pacific and the Great Northern Railway through Minnesota, North Dakota, and Montana is altogether too wide.

"Mr. TAYLOR of Colorado. On level farm land I think that is true. I think those railroads got a large amount of good land that they did not need and had no right to; but we are not asking for any good land or any land that we do not need.

\* \* \* \* \* \*

"Mr. MONDELL. Mr. Chairman, there is now on the statute books an oil pipe-line law, applying to Wyoming and Colorado, which grants an easement of 25 feet on each side of the pipe line.

"Mr. RAKER. Will the gentleman yield to me for a question right there?

"Mr. MONDELL. This section will repeal that law, which is in many respects much more liberal than this provision is, so we are putting in this law a provision much less liberal than the present law.

"Mr. RAKER. Will the gentleman yield for a question? The provision of law which the gentleman refers to is more extensive than this one, and reads as follows—

\* \* \* \* \* \*

"Mr. MONDELL. I introduced that bill. I know something about it. If we secure the development of oil on the public lands, which we hope for under this bill, long pipe lines will have to be built, and they will have to be built over a rough country. In many cases they will have to be carried on trestles and at elevations that will require a great spread of the trestle at the base. In many cases they will have to be built along sloping hillsides and mountain sides, and the width of 50 feet is none too great. The land that these pipe lines will run over in the main are [sic] of but little value, and all that is granted is an easement for the use of the pipe lines. No one in the operation of one of these pipe lines cares to have any more land than is absolutely essential for the maintenance of the pipe lines, but unless you grant enough so that the building of the pipe line can proceed and material can be obtained for the building of the pipe line, you hamper this very great development.

\* \* \* \* \* \*

"Mr. RAKER. Since looking through this Colorado and Wyoming act I find this provision in it that is not in this bill—

"Mr. MONDELL. It authorizes the taking of material.

"Mr. RAKER. Yes.

"Mr. MONDELL. Which this bill does not, and which on two different occasions I have endeavored to have the committee adopt, but having promised the chairman not to offer amendments I did not offer it on this occasion, though that provision ought to be in the bill.

"Mr. RAKER. Let me read it to the gentleman:

Also the right to take from the public lands adjacent to the line of said pipe line material, earth, and stone necessary for the construction of said pipe line.

"Mr. MONDELL. I hope the gentleman will offer that amendment to this section.

"Mr. CHAIRMAN. All time has expired. The question is on the amendment offered by the gentleman from Oklahoma.

"The amendment was rejected." [46]

The debate indicates that the participants assumed that all construction had to take place within the width limitation of the statute. As noted earlier, any dispute between 10 feet and 25 feet becomes meaningful only if construction is limited to the statutory right-of-way. Opponents of the 10-foot limitation clearly state that were that amendment adopted it would be impossible to construct or maintain large pipelines, a result which would not obtain were we to adopt appellees' position in this case. Proponents of oil pipeline development again admitted that even as amended— that is, even with a 25-foot width allowance—the bill was not as liberal as it should be because it lacked the provision allowing one to go outside the statutory right-of-way where necessary for construction. But, as Representative Taylor stated, "[W]e have agreed to accept this bill as the best we can get \* \* \*." More importantly, the debate provides answers to some of appellees'

46. 56 Cong.Rec. (Part 7) 7096–7098 (1918).

key arguments. They contend that to interpret the statute to restrict construction to the statutory right-of-way is to frustrate the purpose of the Mineral Leasing Act, to presume that the legislature intended to have done a futile thing, and to reach a result that is unreasonable, absurd and ridiculous. But the legislative history indicates that at the time the Mineral Leasing Act was passed Congress thought it was possible to build the then largest pipelines— which, according to Representative Chandler, were 12 to 16 inches wide— within the statutory right-of-way.[47] Finally, the debates indicate the reason why Congress was so strict with the right-of-way. Congress felt that in the past, when granting rights-of-way to railroads, it had been much too generous in giving away valuable public lands, and it did not want this to be repeated.

Of course, attempting to place too much emphasis on bits and shreds of legislative history is often a hazardous process. *See* United States v. O'Brien, 391 U.S. 367, 383–384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). We note that in this instance we deal with a debate that engaged but a few members of one house of Congress, a Congress that was not even the one that eventually passed the Mineral Leasing Act of 1920.[48] But there appears to be no reason for not accepting this history for its obvious import. This is not a case where legislative history is being used to contradict the natural or literal reading of an act. *Compare* St. Marys Sewer Pipe Co. v. Director of U. S. Bureau of Mines, 3 Cir., 262 F.2d 378 (1959). Instead, it is being used to support the literal reading. This is not a case where opponents and proponents characterized the provisions of the act differently. They disagreed as to what was a proper width limitation, but they all agreed that the width limitation applied to the construction area. *See* First Nat. Bank of Logan v. Walker Bank & Trust Co., 385 U. S. 252, 261, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); United States v. City & County of San Francisco, 310 U.S. 16, 22, 60 S. Ct. 749, 84 L.Ed. 1050 (1940). Nor is this a case where we must confront mere attempts to amend the statute, without discussion about the significance of such amendments. *Cf.* National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 291,

47. Appellees also suggest that Congress' belief that the statutory right-of-way was sufficient for construction of pipelines was mistaken even in 1920—*i. e.*, that in 1920 it was impossible to construct the then largest oil pipelines within the statutory right-of-way. Even were this the case, however, it would be a matter for Congress, not this court, to correct. Congress was told that it might be hindering oil pipeline development, and it chose to do nothing about it except say that if that were the case the oil companies should come back and try to get a more liberal law. Moreover, there is insufficient proof in this case that Congress was wrong in assuming that 25 feet on either side of the pipeline was sufficient. As indicated in Representative Chandler's remark, Congress assumed it was providing for pipelines of up to about 12 to 16 inches. All the available extrinsic evidence indicates that this was in fact the largest size technologically feasible back in 1920. Even as late as 1940, pipelines were normally from 2 to 12 inches in diameter. *See* Finney, Oil Pipe-Line Transportation, in E. DeGolyer (ed.), Elements of the Petroleum Industry 310 (1940). The revolutionary "Big Inch" and "Little Big Inch" pipelines constructed for wartime industrial purposes during World War II were 24 inches and 20 inches respectively in diameter. *See* G. Wolbert, American Pipe Lines 10 n. 40 (1951). Congress was thus apparently correct in its assumptions about the then largest size of pipelines. And there is simply no evidence in this case proving that Congress was incorrect in its other assumption that 25 feet on either side was sufficient for these small pipelines, given pipeline construction methods then in use.

48. *Cf.* Foti v. Immigration & Naturalization Service, 375 U.S. 217, 225 n. 11, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); D. C. Federation of Civic Assns, Inc. v. Volpe, 140 U.S.App.D.C. 162, 171, 434 F.2d 436, 445 (1970); United States v. Matthews, 136 U.S.App.D.C. 196, 201 n. 9, 419 F.2d 1177, 1182 n. 9 (1969).

443 F.2d 689, 706 (1971). The function of the width limitation is readily apparent from the debates.

■■ The main lesson of this legislative history is that the presumptions upon which our maxims of statutory interpretation are built are not always borne out. These presumptions, like most others in the law, are rebuttable. And while our maxims of statutory construction might have led us to conclude that Congress "must have intended" that those building pipelines could make use of land outside the statutory right-of-way for construction purposes, the legislative history simply indicates otherwise. One might have expected the Congress of the United States to exercise foresight in a situation in which it was expressly warned that the statute it was enacting was then, or might in the future become, ineffective. But such foresight was notably lacking. Foresight no doubt would have been the wisest choice in this instance, since after the passage of the Mineral Leasing Act pipeline technology developed to permit construction of larger pipelines needing greater amounts of construction space. It might fairly be said that Congress overreacted to the prior excesses of railroad rights-of-way. But it is not our function, when we pass on either the constitutionality of statutes or their interpretation, to substitute our opinion as to what is wise for that of Congress. *Cf.* Tidewater Oil Co. v. United States, 409 U.S. 151, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972); Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Congress chose not to be foresightful; it chose to retain control of the width of pipeline rights-of-way over public land itself, and that decision and its consequences must stand until Congress chooses otherwise.[49]

## D. *Administrative Construction of Section 28.*

Appellees have placed their primary reliance on the administrative practice with respect to SLUPs. While we find it unnecessary to review the administrative history in great detail, looking at that history in the light most favorable to appellees it indicates (1) that ever since the Mineral Leasing Act was passed the informal policy of the Bureau of Land Management has been to permit those constructing pipelines to use land for construction purposes outside the statutory right-of-way; (2) that since 1960 this informal practice has begun to become formalized through the procedure of granting SLUPs for construction space to supplement the statutory right-of-way; and (3) that the Department of the Interior and other agencies have granted SLUPs for a multitude of purposes other than pipeline purposes for the last 100 years, oftentimes in situations where the SLUP "supplemented" a limited statutory right-of-way. Appellees argue that this administrative practice should be accorded great weight and deference in the interpretation of the effect of Section 28 on SLUPs for construction purposes, and should lead us to conclude that Section 28 does not affect the Secretary's authority to issue SLUPs.

■ Before discussing the administrative history of SLUPs any further, it would be best to state at the outset our general approach to the area of executive interpretation of statutes. We do not question the settled principle that administrative interpretations of statutes are entitled to great weight. *See* Zuber v. Allen, 396 U.S. 168, 192–193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Volkswagenwerk Aktiengesellschaft v. F. M. C., 390 U.S. 261, 272, 88 S.Ct. 929,

49. A bill recently introduced into the United States Senate, with the support of the Department of the Interior, would, *inter alia*, amend § 28 so as to do away with the width limitation and allow use of any land reasonably necessary as determined by the Secretary of the Interior. *See* Mineral Leasing Bill of 1971, S. 2726, 92nd Cong., 1st Sess. (Oct. 20, 1971). *See also* 117 Cong.Rec. S16611 (daily ed. Oct. 20, 1971).

19 L.Ed.2d 1090 (1968); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).[50] But it is our firm belief that a line must be drawn between according administrative interpretations deference and the proposition that administrative agencies are entitled to violate the law if they do it often enough. Not to draw this line is to make a mockery of the judicial function. "[T]he courts are the final authorities on issues of statutory construction * * * and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' * * * 'The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . . .' " Volkswagenwerk Aktiengesellschaft v. F. M. C., *supra*, 390 U.S. at 272, 88 S.Ct. at 935. Administrative construction of a statute "is only one input in the interpretational equation." Zuber v. Allen, *supra*, 396 U.S. at 192, 90 S.Ct. at 327. A court should not "abdicate its ultimate responsibility to construe the language employed by Congress," *id.* at 193, 90 S.Ct. at 328, but rather should defer to an administrative construction only if there are no "compelling indications that it is wrong." Red Lion Broadcasting Co. v. F. C. C., *supra*, 395 U.S. at 381, 89 S.Ct. at 1802. It has a duty to ignore that construction should it determine that it is "in conflict with the plain intent of the legislature." Brhd of Railroad Trainmen v. Akron & Barberton Belt R. Co., 128 U.S.App.D.C. 59, 90, 385 F.2d 581, 612 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).[51] "Administrative interpretations are not absolute rules of law which must necessarily be followed in every instance, but are only helpful guides to aid courts in their task of statutory construction." Sims v. United States, 4 Cir., 252 F.2d 434, 438 (1958), affirmed, 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed.2d 667 (1959). Judge Hand summarized the principle very succinctly when he said, "[I]n the end, after whatever reserve, upon the courts rests the ultimate responsibility of declaring what a statute means * * *." Fishgold v. Sullivan Drydock & Repair Corp., 2 Cir., 154 F.2d 785, 790, affirmed, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946). An administrative practice which is plainly contrary to the legislative will may be overturned no matter how well settled and how long standing. *See, e. g.*, Baltimore & Ohio R. Co. v. Jackson, 353 U.S. 325, 77 S.Ct. 842, 1 L.Ed.2d 862 (1957) (overruling administrative practice of 60 years' duration); United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) (overruling administrative practice of 40 years' duration).

Balancing the maxim of deference to administrative interpretations

**50.** *See also* Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Power Reactor Development Co. v. Int. U. of Elec., Radio & Mach. Wkrs, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Trans World Airlines, Inc. v. C.A.B., 128 U.S.App.D.C. 126, 138, 385 F.2d 648, 660 (1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968); Johnson v. Britton, 110 U.S.App.D.C. 164, 168, 290 F.2d 355, 359, cert. denied, 368 U.S. 859, 82 S.Ct. 99, 7 L.Ed.2d 56 (1961); Savoid v. District of Columbia, 110 U.S.App.D.C. 39, 40 n. 5, 288 F.2d 851, 852 n. 5 (1961); Born v. Allen, 110 U.S.App.D.C. 217, 223 n. 11, 291 F.2d 345, 351 n. 11 (1960); Anderson v. McKay, 94 U.S.App.D.C. 11, 19, 211 F.2d 798, 806, cert. denied, 348 U.S. 836–837, 75 S.Ct. 51, 99 L.Ed. 660 (1954).

**51.** *See also* United States v. City & County of San Francisco, 310 U.S. 16, 31–32, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); United States v. Finnell, 185 U.S. 236, 244, 22 S.Ct. 633, 46 L.Ed. 890 (1902); R. V. McGinnis Theatres & Pay T.V., Inc. v. Video Independent Theatres, Inc., 10 Cir., 386 F.2d 592 (1967), cert. denied, 390 U.S. 1014, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1968); Trans World Airlines, Inc. v. C.A.B., *supra* note 50, 128 U.S.App.D.C. at 138, 385 F.2d at 660.

with the principle that the courts remain the final arbiter of the meaning of the law is unquestionably a difficult process. It would seem, however, that a sensible way of meeting this task would be to analyze the rationales behind the doctrine of deference and to ask if they apply in this case. For if they do not, the maxim of deference must inevitably bow before the principle of judicial supremacy in matters of statutory construction. Application of that methodology to the instant case leads us to conclude that "[t]hose props that serve to support a disputable administrative construction are absent here." Zuber v. Allen, *supra*, 396 U.S. at 193, 90 S.Ct. at 328.

 Perhaps the primary rationale behind the doctrine of deference is the idea of administrative expertise. Thus it has been said that special deference is due when the administrators were involved in the drafting and passage of the statutory language. *See ibid.* "Administrative construction is less potent than it otherwise would be where it does not rest upon matters peculiarly within the administrator's field of expertise." Thompson v. Clifford, 132 U.S.App.D.C. 351, 364, 408 F.2d 154, 167 (1968). *See also* Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946); Skidmore v. Swift & Co., 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944); I. C. C. v. Service Trucking Co., 3 Cir., 186 F.2d 400, 402 (1951).

There can be no doubt that there is no need for administrative expertise in resolving the question of the meaning of Section 28. Expertise might be needed to decide what is a reasonable pipeline construction area, but it is not needed to decide whether Section 28 precludes construction outside the statutory right-of-way.

" \* \* \* [S]ince the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction. \* \* \* 'The role of the courts should, in particular, be viewed hospitably where . . . the question sought to be reviewed does not significantly engage the agency's expertise. "[W]here the only or principal dispute relates to the meaning of the statutory term" . . . [the controversy] presents issues on which courts, and not [administrators], are relatively more expert.' \* \* \* "

Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970), *quoting* Hardin v. Kentucky Utilities Co., 390 U.S. 1, 14, 88 S.Ct. 651, 19 L. Ed.2d 787 (1968) (Mr. Justice Harlan, dissenting).

The second basic rationale for the doctrine of deference is the concept of congressional acquiescence in the administrative interpretation. "Under some *circumstances*, Congress' failure to repeal or revise [a statute] in the face of such administrative interpretation has been held to constitute persuasive evidence that that interpretation is the one intended by Congress." Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965).[52] Thus in actual cases courts have to analyze whether there is any reason to believe that the particular administrative interpretation in question came to the attention of Congress so that it might reasonably be said that Congress, by failing to take any action with respect thereto, approved the interpretation.[53] As we have

---

52. *See also* Red Lion Broadcasting Co. v. F.C.C., *supra* note 50, 395 U.S. at 381–382, 89 S.Ct. 1794; Canada Packers, Ltd. v. Atchison, Topeka & Santa Fe R. Co., 385 U.S. 182, 184, 87 S.Ct. 359, 17 L.Ed. 2d 281 (1966).

53. *See* Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Red Lion Broadcasting Co. v. F.C.C., *supra* note 50, 395 U.S. at 381, 89 S.Ct. 1794; Power Reactor Development Co. v. Int. U. of Elec., Radio & Mach. Wkrs,

had occasion to note, "Legislative silence cannot mean ratification unless, as a minimum, the existence of the administrative practice is brought home to the legislature." Thompson v. Clifford, *supra*, 132 U.S.App.D.C. at 361, 408 F.2d at 164.

Applying the rationale to the present case, there is absolutely no indication that the practice of granting SLUPs for pipeline construction purposes has ever been brought to the attention of Congress, either through testimony at a congressional hearing or by any other means.[54] Nor is the practice of granting SLUPs for pipeline construction purposes of such public knowledge that it is reasonable to assume that congressmen, as members of the general public, knew of the practice. Indeed, it is ironic that the very oil companies which now claim that it was settled and well known administrative practice to grant pipeline construction SLUPs apparently did not know about the practice when they first made application for rights-of-way for the trans-Alaska pipeline. The first application, as noted in the factual introduction, requested an additional permanent right-of-way for construction purposes.[55] Likewise, we note that in its Preliminary Report to the President in 1969 the North Slope Task Force organized by the Department of the Interior had not yet figured out how the additional space was to be acquired.[56] In fact, the Interior Depart-

*supra* note 50, 367 U.S. at 408–409, 81 S.Ct. 1529; Sims v. United States, 4 Cir., 252 F.2d 434, 439 (1958), affirmed, 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed.2d 667 (1959).

54. *Compare* Power Reactor Development Co. v. Int. U. of Elec., Radio & Mach. Wkrs, *supra* note 50, 367 U.S. at 408, 81 S.Ct. at 1535, where the Court found that the administrative interpretation had "time and again been brought to the attention" of the responsible congressional committee.

Not only do appellees argue that Congress has acquiesced in the practice of granting SLUP's for pipeline purposes. They also claim that Congress has specifically authorized the Secretary of the Interior to issue SLUPs for any and all purposes in his discretion. But an examination of the relevant statutes shows no such authorization. The 3 statutes cited by appellees are 43 U.S.C. §§ 2, 1201 & 1457 (1970). Section 2 provides that the Secretary of the Interior "shall perform all executive duties * * * in anywise respecting [the public lands of the United States] * * *." Section 1201 authorizes him "to enforce and carry into execution, by appropriate regulations, every part of the provisions of [Title 43] * * *." Section 1457 charges the Secretary "with the supervision of public business relating to the following subjects and agencies: * * * 12. Petroleum conservation. 13. Public lands, including mines." We cannot find an authorization to issue SLUPs in these statutes. There is no question, of course, that the Secretary of the Interior, as the executive in charge of federal lands, has some power to authorize entry upon federal lands; otherwise every entry on such lands would be a trespass absent specific statutory authority. And we recognize that technically a special land use permit is nothing but a formal document permitting what would otherwise be a trespass. But to reason from the fact that the Secretary has some authority under these broad statutes to permit entry upon federal land to the conclusion that any and all special land use permits are congressionally authorized, no matter how permanent the intended use, no matter how inconsistent with other more specific legislation, requires a leap of faith we cannot make. This is an instance where a difference in degree constitutes a difference in kind, and although we might imagine cases in which it would be difficult to draw the line between uses which may be authorized under the Secretary's broad executive authority and those that must rest on specific statutory authority, given the express proviso in the Mineral Leasing Act and the Act's legislative history we are confident that the SLUP in this case is not authorized under these broad and vague delegations of administrative responsibility.

55. *See* text accompanying note 2 *supra*.

56. *See* text accompanying note 4 *supra*. *Cf.* Leary v. United States, 395 U.S. 6, 25–26, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969), in which the Court placed significance on the fact that at the very time the case was being litigated "the alleged administrative construction was unknown even to those charged with

ment's own version of the development of the practice of granting pipeline construction SLUPs makes it highly unlikely that any but a small handful of prior recipients would know of the practice. The agency admits that until 1960 the practice was completely informal. That is, those building pipelines did not request use of additional space; they merely used what space they needed while project supervisors from the Bureau of Land Management silently looked on. It was not until 1960 that SLUPs were granted, and even then the main purpose of the SLUPs was not to authorize formally what otherwise would be a trespass on federal lands. Rather, the Bureau's desire to issue SLUPs stemmed from the Bureau's view that some builders of pipelines were using more construction space than was in fact reasonably necessary, or were refusing to attempt to return the construction space to its original condition. It was therefore felt that in those cases where

there was a risk of such behavior a SLUP would be desirable either as a means of limiting, but not eliminating, encroachments on property outside the statutory right-of-way or as a means of providing a vehicle in which stipulations about returning the land to satisfactory condition could be placed. For all that appears from the administrative record before us, SLUPs are still not granted in every case of pipeline construction, but only in those cases where the Bureau's rationales are applicable. Even today the Bureau's policy is not publicized through a formal rule or through any other "expressly articulated position at the administrative level."[57] See Investment Co. Institute v. Camp, 401 U.S. 617, 627, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). We are constrained to conclude, therefore, that the practice of granting pipeline construction SLUPs has never come to the attention of Congress, and that there can be no finding of congressional acquiescence.[58]

representing the United States in this Court. In these circumstances, the alleged administrative construction can furnish no additional support for the Government's argument."

57. Indeed, the Bureau's own regulations would seem to the average reader to preclude granting a SLUP for pipeline construction. See 43 C.F.R. § 2920.0–2(a) (1972). See also pp. 870–871 infra & note 59 infra.

58. One aspect of the administrative history merits further attention. In 1931 the Secretary of the Interior asked then Attorney General William D. Mitchell whether the Secretary had authority, under § 28, to grant a right-of-way for construction of a pumping station outside the 50-foot strip in which the pipeline is located. After determining that "pumping stations are absolutely necessary to operate pipe lines" because "oil cannot be transported through pipe lines by gravity for any considerable distance," the Attorney General held that wherever the establishment of a pumping station "is reasonably necessary for the operation of the pipe line," the Secretary "has authority to authorize the grantee to construct such a pumping station and provide the site reasonably necessary for that purpose." He based his conclusion on the following reasoning: "Any other con-

struction of the Act would render the grant of a right of way for pipe line purposes entirely useless. Congress must have intended that the rights of way granted should be of practical use and that pipe lines when laid would be useful instrumentalities for the transportation of oil and gas. It is not reasonable to suppose Congress intended to enact legislation which could not effect the purpose for which it was intended and which would require supplemental legislation in order to make it effective." Establishment of Pumping Stations, 36 Op.A.G. 480, 481–482 (1931). He also noted: "It appears that for more than eight years past the Secretary of the Interior has administered the Act on the assumption it authorizes him to grant rights for pumping stations on tracts in addition to the fifty-foot strip, and from time to time grants have been made in accordance with that construction of the statute. It is well settled that the practical construction given to a statute by the officer charged with the duty of enforcing and administering it is entitled to great weight. It is fair to assume that if the Congress had been dissatisfied with this construction of the Act by the Secretary of the Interior it would have taken legislative steps to overturn it." Id. at 483.

Appellees make two arguments on the basis of this opinion. First, they urge

Interior points to the fact that Congress has been made aware of the issuance of SLUPs in other situations, particularly in situations where the Secretary of Agriculture has issued SLUPs to supplement statutory rights-of-way. *See, e. g.,* Sierra Club v. Hickel, 9 Cir., 433 F.2d 24 (1970), affirmed only on the ground of lack of standing to sue,

405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). We need not voice our views with respect to the Ninth Circuit's opinion in *Sierra Club,,* noting only that the opinion seemed to find congressional acquiescence in Agriculture Department SLUP practices. For, even assuming *arguendo* we agree with the Ninth Circuit with respect to Agriculture Depart-

that we apply similar reasoning to the SLUP for construction purposes. While, as indicated *infra,* we agree with the *result* of this Attorney General's opinion, our earlier discussion of the legislative history compels us to reject the opinion's *reasoning* toward that result, at least as applied to SLUPs for construction purposes. Whereas the Attorney General reasoned that Congress "must have intended" that the Secretary could authorize use of additional land and that it is unreasonable to suppose that Congress intended to "require supplemental legislation" if the Mineral Leasing Act proved ineffective, our reading of the legislative history, at least so far as it pertains to a construction area, indicates precisely the opposite. Congress intended to restrict construction to the statutory right-of-way and it expected that if the right-of-way proved too narrow remedial legislation would be necessary.

The second argument made on the basis of the Attorney General's opinion is that, regardless of whether its reasoning was right or wrong back in 1931, the fact that this reasoning has been made public ever since 1931 through an Attorney General's opinion requires us to conclude that Congress has acquiesced in the reasoning —i. e., that Congress now shares the view that the Mineral Leasing Act permits use of all land "reasonably necessary" for construction, maintenance and operation of oil pipelines. Through this argument appellees seek to turn congressional acquiescence in the practice of granting rights-of-way for pumping stations into congressional acquiescence for construction SLUPs. We cannot accept this approach. First, the right to build isolated pumping stations on land outside the 50-foot strip and the right to use land outside the strip for construction along the entire length of the pipeline differ dramatically with respect to the extent of incursion into land outside the 50-foot strip. For example, the trans-Alaska pipeline would eventually require 12 pumping stations, each of which will occupy an area of approximately 50 acres. *See* Project Description at 30. Thus a

total of 600 acres will be used for pumping stations. In contrast, the amount of land covered by the SLUP is estimated to be 9600 acres, an area 16 times as large, and, we might add, larger than the area covered by the statutory right-of-way which in this case is estimated to be 5160 acres. *See* Impact Statement, Vol. IV, at 257 (Table 3). We hesitate, therefore, to treat congressional acquiescence in one type of minor incursion as congressional acquiescence in incursions of a different order of magnitude.

More importantly, we reject any approach whereby congressional silence with respect to particular administrative action is used, not merely to show congressional acquiescence in that action, but to prove congressional acquiescence in the administrative *reasoning* behind that action. It is common knowledge that in Congress, just as in the judicial system and elsewhere in life, individuals often agree on a particular result while disagreeing as to the reasoning that leads toward that result. In this very case, while we disagree with the reasoning of the Attorney General's pumping station decision, we reach the same result through analyses of the express terms of the statute and the legislative history. *See* pp. 875–878 *infra.* Therefore, we cannot conclude from this Attorney General's opinion that Congress has acquiesced in the practice of issuing construction SLUPs in direct violation of the intent of those who enacted the Mineral Leasing Act. As the Supreme Court held in Toucey v. New York Life Insurance Co., 314 U.S. 118, 139–141, 62 S.Ct. 139, 147, 86 L.Ed. 100 (1941) :

"* * * Loose language and a sporadic, ill-considered decision cannot be held to have imbedded in our law a doctrine which so patently violates the expressed prohibition of Congress. * * *

* * * * *

"* * * There is no occasion here to regard the silence of Congress as more commanding than its own plainly and unmistakably spoken words. * * * "

ment SLUPs, we do not see how this affects the legality of SLUPs issued by the Department of the Interior for pipeline purposes. The question raised in *Sierra Club* involved interpretation of a different statute controlling a different agency. In addition, the statute involved in that case, 16 U.S.C. § 497 (1970), has no provision comparable to that in Section 28 of the Mineral Leasing Act expressly stating that no rights-of-way for the uses in question shall be granted except under the provisions, conditions and limitations of the statute. Appellees' reliance on such administrative practice simply ignores the fact that the issue before this court is not the legality of any and all SLUPs, issued by any and all agencies, for any and all purposes. The question is far more precise, and pertains solely to the issuance of SLUPs as "rights-of-way" "for the transportation of oil" in violation of express statutory language that no rights-of-way for this purpose shall be granted except under the limitations of Section 28 of the Mineral Leasing Act. This is the only question we decide. Administrative practice with respect to other statutes and other agencies is not sufficiently relevant to that question to force us, in this litigation, to review the legality of those other practices.

We therefore place no reliance on the administrative practices involving SLUPs for purposes other than oil or gas pipeline construction. And looking at the history of the administrative practice of granting pipeline construction SLUPs, we do not feel, for the reasons discussed above, that this history either merits our deference or leads us to ignore an ascertainable legislative will to restrict construction activities to the statutory right-of-way.

E. *Regulations of the Bureau of Land Management.*

■ We need not rest our decision holding the SLUP here to be illegal on Section 28 alone, for appellants have also demonstrated that this SLUP violates the agency's own regulations governing the granting of special land use permits.

Appellees have based their request for a SLUP on 43 C.F.R. § 2920.0–2(a) (1972):

"* * * It is the policy of the Secretary of the Interior, in the administration of the lands under the jurisdiction of the Bureau of Land Management, to permit the beneficial use thereof, where practical, for special purposes not specifically provided for by existing law. Permits for such special use will not be issued, however, in any case where the provisions of any law may be invoked. Permits will not be issued where such issuance would be inconsistent with the objectives of the regulations in this chapter or would be in conflict with any Federal or State laws."

In addition, 43 C.F.R. § 2920.3(a)(1) (1972) provides: "A special land-use permit will be revocable in the discretion of the authorized officer at any time, upon notice, if in his judgment the lands should be devoted to another use, or the conditions of the permit have been breached." Appellants contend, first, that the SLUP in this case violates Section 2929.0–2(a), which only permits special land use permits for "purposes not specifically provided for by existing law," and the similar proviso in the same section that "[p]ermits for such special use will not be issued, however, in any case where the provisions of any law may be invoked." Also, it is argued that the SLUP violates Section 2920.3 (a)(1) because it is not "revocable in the discretion of the authorized officer at any time" as that phrase has been construed in prior cases.

Turning to the first argument, there are no judicial cases interpreting the requirement that a SLUP be for "purposes not specifically provided for by existing law." The only administrative interpretation of the provision indicates that the question whether there is a violation of the regulation is identical with the question whether there is a violation of Sec-

tion 28. In a Solicitor's opinion of October 22, 1946, Leases & Licenses, Ore. & Calif. Lands, 59 I.D. 313 (1946), the following issue was posed. A statute gave the Bureau of Land Management the power to lease certain land for recreational purposes to "States, counties, or municipalities." The question presented was whether, in light of that statute, the Bureau had the authority to issue leases and/or special land use permits for the same land for recreational purposes to private individuals. The Solicitor concluded that leases to individuals were impermissible, but that special land use permits were valid. He reasoned that the regulation barring permits in situations where the provisions of existing public land laws may be invoked did not mean that the Bureau could only issue permits in "situations where there is no statute at all governing the particular type of use." *Id.* at 316. While this language would tend to support appellees, the next sentence makes it clear that, under the regulation, SLUPs could be issued only "[i]n the absence of a congressional intent to preclude the issuance of any special land-use permits with respect to a particular kind of use." *Ibid.* The analysis of whether the regulation is violated is thus identical with our previous analysis of whether Section 28 was violated. Congressional intent to confine construction activities to the pipeline right-of-way authorized in the statute represents a congressional intent to preclude construction SLUPs for land outside the statutory right-of-way.[59] Thus the SLUP constitutes a violation of the regulation in this regard.

Turning then to the regulation's requirement that the SLUP be revocable, past administrative interpretation of the revocability requirement has produced two very different tests. The first is best epitomized by the Attorney General's opinion in Erection of Catholic Chapel at West Point, 21 Op.A.G. 537 (1897). In that case a cleric had petitioned the Superintendent of the United States Military Academy at West Point for permission to erect a Roman Catholic chapel there. The Secretary of War then issued a "revocable license" to erect the chapel, an act that the Attorney General concluded was illegal. The Attorney General was unpersuaded by the fact that the license expressly provided that it was revocable and that the licensee would remove, at his own expense, and within 60 days of notice of revocation, any structures erected on the land, and would leave the land "in as good condition for use by the United States as it is at this date." He reasoned:

"* * * The licenses provide for no term, and really commit the Government to a practical perpetuity. It would be idle to deny this—idle to deny that you do not expect to exercise, nor is it expected that you will exercise, the power of revocation except in an emergency. * * * At any rate the Government would find itself embarrassed either to endure a perpetuity of right in the license or exercise an invidious power."

*Id.* at 541. This test, then, focuses on the likelihood of revocation as opposed to the mere legal right to revoke.[60] Un-

---

59. Indeed, in the above discussed opinion the Solicitor recognized that development of minerals was one area where Congress had precluded issuance of SLUPs. *See* 59 I.D. at 316 n. 3. *See also* 43 C.F.R. § 258.2 (1949): "Permits for * * * special use will not be issued * * * in any case where the provisions of the existing public land laws may be invoked. For example, they will not be issued * * * for the development of minerals, or for the securing of rights-of-way obtainable under existing laws * * *."

60. *See also* Revocable Licenses, 22 Op. A.G. 240, 246 (1898): "[A revocable permit] can not be used as a basis for granting, under the guise of a temporary license, a substantially permanent right to maintain a railroad." *Cf.* Government-Owned Site at Aqueduct Bridge, 30 Op. A.G. 470, 483 (1915) (revocable licenses cannot be used "where the use granted from its very nature would not be revocable, practically speaking, whatever it might be in form").

der this approach, the licensee's plans to invest sizable amounts of capital in improvements on the licensed property indicated that there is no real intent ever to exercise the right to revoke, for to do so would require destruction of the investment.

The second test, a far more liberal one, is best represented by the Attorney General's opinion in Benicia Arsenal Military Reservation, 35 Op.A.G. 485 (1928). In that case the question was whether the Secretary of War had authority to grant a revocable permit to Southern Pacific Railroad to construct a railroad of two or more tracks across the Benicia Arsenal Military Reservation in California. The Attorney General expressly rejected the position taken in the *West Point Chapel* case.[61] The test he proposed instead is as follows:[62]

"The essential thing is to preserve unimpaired the title of the United States and its right at any time to occupy and use its property and to prevent any use by the licensee which would permanently damage or destroy the property for governmental use. If

the permit is revocable at will by its terms, and if the structures which the licensee proposes to erect are capable of being removed in case of revocation, and if upon revocation the land may be left in suitable condition for Government use, the fact that the licensee expects that the United States may not soon find it to its interest to revoke the license has no real bearing on the legal situation."

*Id.* at 489.

Though the parties to this case have debated which of these tests is proper, we find it unnecessary to approve one or the other, for we find that the SLUP to be issued in the present case fails both tests. For the same reason, we expressly fail to consider and do not rely upon the argument, advanced by appellants, that Article IV, Section 3, Clause 2 of the United States Constitution, which provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States * * *," requires a strict definition of revocability.

61. He contended that "[i]n cases where it appears that the permittee intends to make substantial improvements the removal of which would cause him a great loss in case of revocation of the permit, it is [merely] a matter of departmental policy whether a situation should be created by the issue of a permit which may afterwards embarrass the head of the department in the exercise of the power of revocation." 35 Op.A.G. at 489–490. In addition, he attempted to distinguish the *West Point Chapel* case on the ground that the application for permission to erect the chapel contained a condition that after its completion the property would be taken over by the United States and permanently maintained. He argued that therefore *West Point Chapel* "did not involve a revocable license." *See id.* at 488. It seems clear from the *West Point Chapel* decision, however, that this distinction is without merit. The opinion specifically speaks in terms of a revocable license, and the proposal to turn the chapel over to the United States Government through the Secretary of War is declared illegal on a separate ground, namely that "the Secre-

tary of War has no power to accept a donation of property for the Government * * *." 21 Op.A.G. at 540.

62. Elsewhere in *Benicia Arsenal Military Reservation*, the Attorney General seems to establish a different set of tests: "If an effort were made to evolve from the prior opinions of the Attorneys General a rule which may be reconciled with all of them, it would be that the Secretary of War has power to grant revocable permits for occupancy of parts of military reservations for railway purposes provided (1) the permits are made expressly revocable at will, (2) the structures which the licensee proposes to erect are capable of being removed in case of revocation, and the use to which the licensee proposes to put the land will not permanently damage or destroy it for Government use, (3) *the granting of the permit and the use of the property under it will be of direct benefit to the United States.*" 35 Op.A.G. at 489. (Emphasis added.) It is unnecessary for us to comment upon the "direct benefit" test in this case since we find that the SLUP for construction purposes is not revocable under either the liberal or the strict test of revocability.

It is obvious that the SLUP in this case fails the first test. Were the SLUP to be revoked at any time during the several-year construction period, construction of the remainder of the pipeline could not continue and the entire investment in already completed segments of the pipeline would be lost.[63] Looking at the period after completion of the pipeline, appellees themselves have made it clear that the pipeline will need maintenance and servicing, and that this servicing will at times involve building temporary bypasses and removing sections of pipe and replacing them.[64] If a certain construction space will be needed to install the pipe in the first place, it seems likely that the same amount of space will be necessary to remove the old pipe and put another section in its place. At least there is no evidence in the record in this case which would indicate the contrary.[65] It is clear, then, that the entire pipeline investment rests on continuing availability of the SLUP area to appellee Alyeska, and therefore, despite the fact that the application states that the SLUP is revocable and temporary, it is for all real purposes irrevocable and as permanent as the basic pipeline right-of-way. To suggest that during or after pipeline construction an administrator, or for that matter Congress, could revoke the permits and treat all entry into the SLUP land as a trespass is simply to suggest the incredible. By issuing the SLUP the United States is put in a position of suffering continued trespass on its lands or of destroying a multibillion-dollar investment.

Even were continued access not vital to the maintenance and operation of the pipeline, it is obvious that the thick gravel pad to be erected on SLUP property will become a permanent feature of the arctic landscape. We note first some ambiguity as to Alyeska's intentions with respect to the gravel pad. Interior's Impact Statement indicates that "Alyeska proposed at one place [in its Project Description] not to remove the gravel work pad * * *, whereas elsewhere restoration of the construction zone as nearly as feasible to its original condition is proposed * * *."[66] Despite the ambiguity, Alyeska obviously has no intention of removing the pad and the Interior Department will never require removal. The construction pad, a gravel roadway up to five feet deep, will be built with about 34 million cubic yards of gravel, taken from 234 gravel pits located along the pipeline route.[67] The Department clearly is not going to require Alyeska to bear the great cost of breaking up this improvement and returning the gravel to its source. As ex-

**63.** Indeed, the SLUP application in this case is notably ambiguous as to whether any enforceable interest is created during the construction period. At one point the application states that "Alyeska recognizes that any authorization to use the space requested by this application will remain *at all times* revocable at will by the government," but on the same page states that "[a]*fter construction has been completed*, no continuing interest in this additional space is or will be claimed by Alyeska," thereby implying that *before construction is completed* some enforceable interest is claimed. *See* Supporting Documents, *supra* note 7, Vol. II, Tab 3, Response to Question 2a at 4. (Emphasis added.)

**64.** *See* Project Description at 56.

**65.** During oral argument before the District Court on the motion for a permanent injunction, appellants challenged appellees to produce such evidence: "I would hope [the court] would ask [counsel for appellees] when he gets up for the oil company if this is needed to bury the pipeline how can you get down and unbury the pipeline in case of a rupture without the same equipment. What do they propose to do as they say they are willing to lift this road at any time, that is an impossibility, if this material is necessary for the construction of the pipeline why isn't it also necessary for the maintenance of the pipeline?" Tr. at 254. Appellees never responded to this argument.

**66.** Impact Statement, Vol. IV, at 100.

**67.** *Id.* at 66–67.

plained more fully below, once the pad is constructed, it is environmentally more detrimental to remove it than to keep it in place. We cannot believe, in light of all the effort the Department has expended in developing stipulations to minimize detrimental environmental effects, that the Department will ever force Alyeska affirmatively to degrade the environment.

Applying the second test is more difficult, for it requires us to consider whether any structures to be erected can in fact be removed and whether the land may be left, after revocation, in suitable condition for Government use. Looking first at those areas where hills and mountains are to be graded away, and the other areas where the spoil from such grading will be piled, it would seem that construction of the pipeline involves permanent changes affecting the land that cannot be reversed upon revocation. There is, of course, no way to rebuild a mountain. Whether the graded land and the land on which the spoil is located can ever be in "suitable condition for Government use" after revocation is difficult to determine on the record we have, since there is no indication as to what, if anything, the Government use would be, and it might be argued that the land can be used for vacant open space as much after grading as before grading.

When we turn to the construction area, and particularly those sections of the construction area over which a gravel work pad will be constructed to insulate the permafrost, however, the second test will be violated because the pad cannot be removed without producing permanent and deleterious changes in the underlying land. Even were we to accept Alyeska's most recent stipulation to remove the pad if requested, our analysis of Interior's Final Environmental Impact Statement indicates that it would be impossible to remove the pad and return the underlying land to a condition suitable for other uses. The Impact Statement first discusses the effects of retaining the gravel pads: the land would remain bare for many years because of compaction by the heavy equipment; the survival of planted trees on graded spoil piles is questionable. Were the pads to be removed, the Impact Statement suggests, there would occur "some of the same effects that would exist if the pad is retained and some additional ones." [68] These additional effects would include the further hindrance of revegetation due to the increased compaction of the land caused by the removal process and by heavy removal equipment. More importantly, in permafrost areas, where the purpose of the gravel pad is to minimize thaw,

> "[r]emoval of these pads and attempts to restore the surface and vegetation would create some adverse conditions. Destruction of insulating vegetation and peat layers causing thaw of underlying permafrost is well known and readily observable * * *. Removal of the pad would remove the insulation and severe thaw with subsidence and erosion would occur." [69]

This factor, of course, supports the proposition that the Bureau of Land Management is never in fact going to request removal of the gravel pads. But more pertinent to the second test, it indicates that given present technology it is impossible to remove the pads without causing serious erosion. Appellees contend that the problems of removing the gravel pad would be no greater than those associated with destruction of such facilities as buildings or railroad lines, uses which frequently have been authorized in the past under revocable land use permits.[70] But their own discussion

68. *Id.* at 100–101.

69. *Id.* at 101–102.

70. According to Bureau of Land Management statistics, the Bureau has presently outstanding SLUPs covering some 1,370,- 000 acres, permitting uses as varied as cemeteries, gospel missions, garbage dumps, office buildings, grain elevators, movie towns, and soapbox derby runways. *See* Brief for Appellee Alyeska Pipeline Service Company Covering Mineral

of the peculiar qualities of permafrost simply indicates otherwise,[71] and appellees have not shown that any projects involving such irreversible changes in permafrost have ever before been permitted under SLUP authority.

We therefore conclude that the SLUP to be issued for pipeline construction violates the Bureau's own requirement of revocability, regardless of which interpretation of revocability we apply.

 Having examined the regulations of the Bureau of Land Management as they pertain to the SLUP to be issued in this case, we need not resolve any purported conflict between the terms of the statute and the Bureau's historic authority to permit temporary special land use through permits. For the historic authority to issue permits applies only if the uses to be made thereunder are really temporary and revocable. If the use is really not temporary or occasional, but is permanent (or at least long-lasting), the matter cannot be papered over merely by designating it as "revocable" when it is not intended to be revocable and, in the nature of things, is not in fact revocable.

 In addition to this inherent limitation on SLUPs, recognized in the Bureau's own regulations and many Attorney General opinions, it is obvious that SLUPs cannot be used as a means of avoiding the provisions of Section 28. Indeed, Alyeska concedes in its brief that it could not have avoided the legal dispute by not applying for any permanent right-of-way at all under Section 28, and obtaining all necessary land under a SLUP. The same result follows when a person is seeking a SLUP which is revocable in theory only to obtain authority for a use which Congress plainly contemplated would be obtained solely by application under, and subject to the limitations of, Section 28.

These two principles are both operative here. This case involves not only an attempt to avoid the width limitation of Section 28, but an attempt to do so in a manner inconsistent with the Bureau's own regulations. These two factors are interrelated and reinforcing and together they serve to invalidate the SLUP proposed to be issued by the Secretary of the Interior for construction of the Alaska pipeline.[72]

## II. PUMPING STATION AND COMMUNICATION FACILITY RIGHTS–OF–WAY

### A. *Pumping Stations.*

Because oil will not flow through a pipeline under the force of gravity alone, an operable pipeline requires pumping stations. The proposed Alyeska pipeline will have 12 such stations when its maximum capacity of 2,000,000 barrels per day is reached. Within each of the stations the following necessary facilities will be located: pumps, fuel tanks, valves, oil storage tanks, housing to accommodate up to 16 men, electrical

---

Leasing Act and Terminal Facility Issues at 37–38. The Department of Agriculture had, in 1965, permits outstanding covering 5,000,000 acres, permitting uses involving improvements totalling over $1 billion. *Id.* at 39.

71. The Environmental Impact Statement discusses the following "[c]hanges in stable terrain caused by construction and maintenance procedures.—In this category, the lessons learned from previous experience in Alaskan engineering are most important because of the rapid, and often unexpected, consequences of conventional construction practices. Most difficulties here arise from natural thawing of stable frozen soils that lose their strength when a natural insulating cover is removed by construction equipment. Solar radiation plus run-off and flowing or ponded thaw-water can cause substantial damage in a very short time. These effects are seen in slope instability, modification of surface drainage, erosion and deposition, lasting scars in tundra mat, and other terrain disturbances." Impact Statement, Vol. IV, at 15.

72. We, of course, intimate no views at the present time with respect to the equitable considerations which may govern the propriety of issuing injunctive relief in cases where it is alleged that a previously issued pipeline SLUP exceeded the authority of the Department of the Interior.

generating facility, heating and water treatment plant, shop and warehouse buildings, and a helicopter landing site.[73] As is evident from this description, it is impossible to locate necessary pumping station facilities within 25 feet of either side of the pipe; each station will occupy a site of approximately 50 acres.[74] Alyeska has therefore applied for rights-of-way for land on which to locate these pumping stations, authority for such rights-of-way being premised upon 43 C.F.R. § 2881.3 (1972):

> "A site for a pumping station or other structures reasonably necessary to the operation of a pipeline on a right-of-way approved under section 28 of the [Mineral Leasing Act of 1920] may be granted under the same sections [*sic*] * * *."

Appellants charge that the Secretary of the Interior has no power under the Mineral Leasing Act to issue this regulation and that the rights-of-way for pumping stations are illegal under Section 28 of the Act, their argument being identical with that raised with respect to the SLUP for construction purposes, namely, that these rights-of-way violate the proviso "[t]hat no right-of-way shall hereafter be granted over said lands for the transportation of oil or natural gas except under and subject to the provisions, limitations, and conditions of this section."

While the question of a pumping station right-of-way may appear similar to that of construction SLUPs, close examination reveals the similarity to be merely superficial. That pumping stations are part of the pipeline under the Act, and that they are distinguishable from construction SLUPs in this manner, may be determined from the language of the statute itself, the legislative history, and the administrative practice.

■ Our basic response to appellants' argument against the pumping station rights-of-way is that pumping stations are part of the "pipe line" as that term is used in Section 28. The statute, of course, does more than provide a right-of-way for sections of pipe; it provides for a "pipe line," a facility for the transportation of oil.[75] It is evident that back in 1920, as well as today, oil could not flow through a pipeline for any significant distance by the force of gravity alone.[76] A length of pipe without any pumping stations never could be an operating "pipe line" as that term is used in the statute. When the statute provides for a right-of-way on land "to the extent of the ground occupied by said pipe line," it therefore must provide not only for land on which to locate pipe, but also for land on which to locate those other facilities which make pipe a "pipe line." Similarly, when the statute provides for "twenty-five feet on each side" of the pipeline, it must provide not only for 25 feet on each side of the pipe, but also for 25 feet on each side of those facilities which constitute part of the "pipe line."

The legislative history, meager though it is, fully accords with this reading of the statute. During the debates on the

---

73. Project Description at 30–35. During the initial stage of operations, the pipeline will have only a 600,000-barrel per day capacity, and only 5 pumping stations will be needed. *Id.* at 30.

74. *Id.* at 30.

75. *Cf.* United States v. Denver & Rio Grande R. Co., 150 U.S. 1, 12–13, 14 S.Ct. 11, 15, 37 L.Ed. 975 (1893):

"* * * In its ordinary acceptation and enlarged sense the term 'railroad' fairly includes all structures which are necessary and essential to its operation. * * * [I]t was not the intention of Congress to aid in the mere construction of the roadbed, or roadway, but to aid in the construction of the railroad as such, which term has a far more extended signification than the mere track, or roadway. * * *

"It could hardly be questioned that a grant of power to construct a railroad would include the right to erect necessary structures, such as station houses, water tanks, etc., as essential and constituent parts thereof. * * *"

76. *See* text accompanying note 884 *infra.*

bills that eventually became the Mineral Leasing Act of 1920, the problem of pumping stations was averted to.[77] The only response made to questioning about pumping stations was the following, by Representative Chandler, the man we met earlier (pages 860–864) as a proponent of a 10-foot width limitation:

" * * * I think your bill is broad enough to cover not only the pipe line but the pumping station, and that they can go and take what land they need for the pumping station as long as they occupy it. Pumping stations are a part of the pipe line." [78]

Our conclusion that the statutory right-of-way limits construction space is fully consistent with this approach. Construction space is necessary, not only for the laying of pipe, but also for the erection of facilities such as pumping stations. Similarly, maintenance space is needed, not only for the pipe itself, but also for facilities which allow oil to flow through the pipe. There is therefore nothing inconsistent with a reading of the statute that, on the one hand, limits construction and maintenance to the statutory 25 feet on either side of the pipeline but, on the other hand, includes necessary facilities as part of the pipeline.

Not only is there no inconsistency, but this approach is the only one that gives meaning to all parts of Section 28 while at the same time reading the statute in a manner consistent with its purpose to permit oil pipeline development. As discussed in Part I, the provision of 25 feet in addition to the land actually occupied by the pipeline makes absolutely no sense unless that distance is to be used for construction and maintenance purposes. In addition, our earlier analysis of the legislative history indicated that Congress intended the statutory right-

of-way to limit construction space. This reading of the statute was fully consistent with congressional intent to promote pipeline development, because Congress made express its belief that 25 feet on either side was all the construction space needed to build a pipeline.

To read the statute to require that pumping stations be constructed within the narrow strip of land made up by the pipe itself and 25 feet on either side would, in contrast, have made Section 28 meaningless and ineffective from its very inception. There is no indication that Congress either thought that pumping stations were not necessary to the transportation of oil or believed that such stations could be constructed within this narrow width. Tracing actual oil pipeline pumping station practice back before 1920, it is evident that even the earliest oil pipelines, dating to the mid-19th century, required pumping facilities,[79] and from the description of these facilities it is clear that they could not fit within a 50-foot wide strip.[80] It therefore seems reasonable to conclude that when Congress enacted Section 28 it agreed with Representative Chandler's position that pumping stations were part of the pipeline and were authorized under the statute. We naturally avoid any interpretation of a statute that would have rendered it totally ineffective as of the date of enactment.

Finally, in contrast to the ambiguous administrative practice with respect to pipeline construction SLUPs, the administrative practice with respect to pumping station rights-of-way is clear, longstanding and consistent, and provides a reasonable basis for a finding of congressional acquiescence. As early as 1923, only three years after enactment of the Mineral Leasing Act, an application for a pumping station right-of-way

---

77. See 51 Cong.Rec. (Part 15) at 15418; 56 Cong.Rec. (Part 7) at 7097.

78. 56 Cong.Rec. (Part 7) at 7097.

79. See generally P. Giddens, The Birth of the Oil Industry 142, 144, 146 (1938).

80. The earliest pumping plants apparently involved pumps run by steam engines. See id. at 146. Such engines, of course, required bulky fuels such as wood or coal and men to stoke the boilers.

was granted.[81] In 1926 the Department of the Interior approved a right-of-way application for an 80-acre pumping station.[82] In 1931 the Secretary of the Interior informed the Attorney General of this past practice and requested a ruling as to whether the Secretary had authority under the Mineral Leasing Act to issue such rights-of-way. The Attorney General, after noting "that oil cannot be transported through pipe lines by gravity for any considerable distance and that without pumping stations at certain intervals a pipe line for the transportation of oil and gas would be practically useless, and that a pumping station cannot be constructed within the limits of the fifty foot strip," concluded that the Secretary had authority under the statute to authorize construction of pumping stations and to grant rights-of-way for that purpose. Establishment of Pumping Stations, 36 Op.A.G. 480, 481–482 (1931). Soon thereafter the Interior Department's regulations took cognizance of this authority. See 56 I. D. 532, 553 (1938). The pumping station regulation assumed its present shape in 1943, see 8 Fed.Reg. 7723 (1943), and has been a part of the Code of Federal Regulations ever since, see, e. g., 43 C.F.R. § 244.52 (1949).

As discussed in Part I, courts normally defer to an administrative interpretation of a statute unless there are compelling indications that it is wrong.[83] Unlike the issue of construction SLUPs, here there are no compelling indications that the Interior Department's interpretation of its statutory authority is

wrong; what legislative history there is fully supports Interior's position. Settled maxims of statutory interpretation —for example, the presumption against interpreting statutes so as to render them ineffective—would have led us to the same result.[84] Again in contrast to the practice of issuing pipeline construction SLUPs, a practice apparently unknown to the administrators themselves, the practice of issuing rights-of-way for pumping stations has been a matter of public record for over 40 years. It is thus reasonable to presume that the administrative construction of the statute came to Congress' attention and to consider Congress' failure to respond in any way to the administrative interpretation as acquiescence in the administrative practice.

### B. Communication Facilities.

On March 3, 1971, Alyeska applied for rights-of-way for 26 communications sites for a microwave communications system necessary for permanent operation of the proposed pipeline.[85] The proposed system has several functions, including relay of information about pipeline and oil flow conditions to a central operating center at Valdez and transmission of control commands from the operating center at Valdez to pumping stations and block valves along the pipeline.[86]

Appellees assert authority to issue rights-of-way for these facilities under 43 U.S.C. § 961 (1970):

"The head of the department having jurisdiction over the lands be, and he

---

81. Letter from the Office of the Solicitor, Department of the Interior, to the Secretary of the Interior, July 24, 1931, in Supporting Documents, supra note 7, Vol. IV, Tab 2.

82. Ibid.

83. See Red Lion Broadcasting Co. v. F.C.C., supra note 50, 395 U.S. at 381, 89 S.Ct. 1794; Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 372, 435 F.2d 440, 444 (1970); National Ass'n of Theatre Owners v. F.C.C., 136 U.S.App.D.C. 352, 358, 420 F.2d 194, 200 (1969), cert.

denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970).

84. See Bird v. United States, 187 U.S. 118, 124, 23 S.Ct. 42, 47 L.Ed. 100 (1902); United States v. Blasius, 2 Cir., 397 F.2d 203, 207 n. 9 (1968), cert. dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969); United States v. Milk Distributors Ass'n, Inc., D.Md., 200 F.Supp. 792, 799 (1961); In re White, N.D.N.Y., 266 F.Supp. 863, 865 (1967).

85. See note 6 supra.

86. Project Description at 45–49.

is, authorized and empowered, under general regulations to be fixed by him, to grant an easement for rights-of-way, for a period not exceeding fifty years from the date of the issuance of such grant, over, across, and upon the public lands and reservations of the United States * * * for radio, television, and other forms of communication transmitting, relay, and receiving structures and facilities, * * * not to exceed four hundred feet by four hundred feet for radio, television, and other forms of communication transmitting, relay, and receiving structures and facilities, to any citizen, association, or corporation of the United States, where it is intended by such to exercise the right-of-way herein granted for any one or more of the purposes herein named * * *."

Pursuant to the authority granted to him in Section 961, the Secretary of the Interior has issued regulations governing procedures for obtaining rights-of-way under the statute. *See* 43 C.F.R. Subpart 2861 (1972)., That the communication facility rights-of-way to be issued by the Department of the Interior satisfy all of the requirements of Section 961 is not contested by appellants. Rather they argue that Section 28 of the Mineral Leasing Act bars resort to other statutory grants of rights-of-way when those rights-of-way will be used for pipeline purposes.

 As is discussed in Part III of this opinion, the only theory upon which we might conclude that Section 28 forbids resort to other statutory rights-of-way is that Congress, in enacting Section 28, intended it to repeal or supersede these other statutes in situations where they conflict. In this instance it is particularly difficult to reach such a conclusion about congressional intent since the pertinent provisions of Section 961 were enacted after, not before, the Mineral Leasing Act. *See* Pub.L.No.367, 82nd Cong., 2d Sess., 66 Stat. 95 (May 27, 1952), amending c. 238, 36 Stat. 1253 (March 4, 1911). In any event, for the reasons set forth at length in Part III, we hold that nothing in Section 28 bars resort to other specific statutory grants of rights-of-way, including rights-of-way for communications facilities. There being no contention that these rights-of-way for microwave communication sites do not meet the requirements of Section 961, we must affirm the Secretary's decision granting those rights-of-way.

## III. RIGHTS-OF-WAY ISSUED TO THE STATE OF ALASKA

The State of Alaska has applied for and the Secretary of the Interior has stated his intention to grant a permanent right-of-way for a public highway from the Yukon River to Prudhoe Bay along the pipeline route, a 20-year lease of lands on which to locate three public airports, and permits for the free use of gravel with which to construct these facilities. Appellants draw our attention to the facts that construction of these facilities is indispensable to the proposed pipeline, that the State probably would not have constructed these facilities (at least not at the present time) were it not for the pipeline, and that the facilities are not actually going to be constructed by the State, but rather by Alyeska who by contract with the State has agreed to construct the facilities at its own expense. Based on these allegations, appellants charge that the rights-of-way are nothing but "another device to tack together separate rights-of-way in order to achieve that which is explicitly proscribed by the Mineral Leasing Act." Putting it another way, appellants maintain that these too are "rights-of-way" "for the transportation of oil" which exceed the width limitations of Section 28 and are therefore barred by the provision in Section 28 "[t]hat no right-of-way shall hereafter be granted over said lands for the transportation of oil or natural gas except under and subject to the provisions, limitations, and conditions of this section."

Appellees respond by pointing to specific statutory authority for each right-

of-way, and argue that we should not read Section 28 so as to forbid resort to other statutory grants of rights-of-way. The highway right-of-way, they argue, is authorized by 43 U.S.C. § 932 (1970) which provides very simply: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." The airport leases are alleged to be authorized under 49 U.S.C. § 211 (1970) which authorizes the Secretary of the Interior, "in his discretion and under such regulations as he may prescribe, to lease for use as a public airport any contiguous public lands, unreserved and unappropriated, not to exceed two thousand five hundred and sixty acres in area * * *." Finally, the application for a free use permit for gravel rests upon 30 U.S.C. § 601 (1970) which authorizes the Secretary of the Interior to dispose of mineral materials including gravel. That section provides that the Secretary must charge a price for such materials except that he "is authorized in his discretion to permit any * * * State * * * to take and remove, without charge, materials and resources subject to this subchapter for use other than for commercial or industrial purposes or resale."

In rebuttal appellants contend that the statutes are inapplicable to the rights-of-way at issue in this lawsuit. In their view, the road to be constructed by Alaska will not qualify as a "highway" within the meaning of Section 932 because it will not be open to the public; similarly, they charge that the airports to be constructed under the lease will not be "public" within the meaning of Section 211. Finally, since the ultimate purposes of these facilities are allegedly to facilitate construction of the pipeline, they argue, gravel with which the facilities will be constructed will be used for

"commercial or industrial purposes" within the meaning of Section 601, thus making the free use exception inapplicable.

These competing contentions of the parties raise two separate questions for this court. First, does Section 28 of the Mineral Leasing Act preclude resort to other statutory grants of rights-of-way in cases where Section 28 and the other statutes appear in conflict? Second, if the answer to the first question is "no," do the rights-of-way at issue in this case meet the requirements of the specific statutes cited by appellees?

A.

▪ The only theory upon which we might conclude that Section 28 forbids resort to other statutory rights-of-way is that Congress, in enacting Section 28, intended it to repeal or supersede these other statutes in situations where they conflict. Although Section 28 was passed after one of the other statutes cited by appellees, Section 932,[87] we hesitate to conclude that its enactment was intended to operate as a repeal of that statute to the extent that Section 932 permits rights-of-way which incidentally, or even primarily, are used to facilitate construction of an oil pipeline. It is an axiom of statutory construction that repeals by implication are not favored.[88] Thus when interpreting statutes inconsistencies are to be avoided and repeal by implication found only where there is a "positive repugnancy" between the two or where the intention to repeal is "clear and manifest." Rosenberg v. United States, 346 U.S. 273, 295, 73 S.Ct. 1152, 97 L.Ed. 1607 (1953) (Mr. Justice Clark, concurring); United States v. Borden Co., 308 U.S. 188, 199, 60 S.Ct. 182, 84 L.Ed. 181 (1939). In the case of Section 28, we cannot find

---

87. See Act of July 26, 1866, c. 262, § 8, 14 Stat. 253, 43 U.S.C. § 932 (1970).

88. See Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm'n, 393 U.S. 186, 193, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968); Amell v. United

States, 384 U.S. 158, 165–166, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966); Millard v. Harris, 132 U.S.App.D.C. 146, 151, 406 F.2d 964, 969 (1968); District of Columbia National Bank v. District of Columbia, 121 U.S.App.D.C. 196, 200, 348 F.2d 808, 812 (1965).

any such positive repugnancy or any such manifest intent to repeal. Section 932 is nowhere mentioned in the legislative history of Section 28. It should also be noted that Congress' intent in enacting the Mineral Leasing Act was to grant rights-of-way where none existed previously, not to take away rights-of-way already authorized by statute.

▪ A differently phrased yet similar principle of statutory construction is that where there are two acts on the same subject—here rights-of-way in federal lands—effect should be given to both if possible. United States v. Borden Co., *supra*, 308 U.S. at 198, 60 S.Ct. 182; Rawls v. United States, 8 Cir., 331 F.2d 21, 28 (1964); A.P.W. Paper Co. v. F.T.C., 2 Cir., 149 F.2d 424, 427 (1945), affirmed, 328 U.S. 193, 66 S.Ct. 932, 90 L.Ed. 1165 (1946). Courts should make every effort to reconcile allegedly conflicting statutes and to give effect to the language and intent of both, so long as doing so does not deprive one or the other of its essential meaning. Myers v. Hollister, 96 U.S.App.D.C. 388, 390, 226 F.2d 346, 348 (1955), cert. denied, 350 U.S. 987, 76 S.Ct. 474, 100 L.Ed. 854 (1956).

▪ This doctrine should be of special significance when we deal with allegedly conflicting public land laws. As a cursory glance at those sections of the United States Code which deal with public lands will indicate, these laws are hardly a model of neat organization and uniform planning. Congress recently noted in creating the Public Land Law Review Commission:

"Because the public land laws of the United States have developed over a long period of years through a series of Acts of Congress which are not fully correlated with each other and because those laws, or some of them, may be inadequate to meet the current and future needs of the American people * * * it is necessary to have a comprehensive review of those laws and the rules and regulations promulgated thereunder and to determine

479 F.d—56

whether and to what extent revisions thereof are necessary."

43 U.S.C. § 1392 (1970). This is an area of the law where it truly can be said that most statutes are *sui generis*. It is an area where it is extremely doubtful that Congress, when passing certain legislation, was aware of, let alone intended, inconsistencies with prior legislation. Indeed, the history of Section 28 of the Mineral Leasing Act is a good example of the lack of organization and coordination in this area of our nation's statutory framework. As noted in Part I *supra*, when Congress passed the Mineral Leasing Act it thought the only prior law dealing with oil pipelines was an 1896 statute, now codified at 43 U.S.C. § 962 (1970), which granted rights-of-way for pipelines in Colorado and Wyoming. Congress was evidently unaware of a 1910 statute dealing with rights-of-way for pipelines through public lands in the State of Arkansas, *see* 43 U.S.C. § 966 (1970), an unawareness caused, no doubt, by the fact that in 1920 the first edition of the United States Code had not yet been prepared. However understandable this ignorance may be, it indicates that in this area of the law we should be especially hesitant to arrive at inferences with respect to congressional intent to have one statute supplant, modify or supersede another. Absent specific indication to the contrary, the only reasonable inference is that Congress intended all of its statutes to have effect, and it is this inference we follow in holding that nothing in Section 28 precludes resort to other specific statutory grants of rights-of-way, even in cases where the purposes for which said rights-of-way are to be used seem to fall within the purposes intended to be covered by Section 28.

B.

Having concluded that if the rights-of-way at issue qualify under the specific statutory provisions cited by appellees they will be valid notwithstanding Section 28 of the Mineral Leasing Act, we

can now analyze whether in fact they so qualify.

### 1. *Highway from Yukon River to Prudhoe Bay.*

Appellants contend that the road to be built does not qualify as a "highway" under 43 U.S.C. § 932 (1970). They argue first that, even though Alaska has formally indicated its intention to construct a public highway along the right-of-way, its real "motive" is not benefit to the public but assistance to those constructing the pipeline, and that this motive takes the road outside Section 932. Second, they charge that the State in fact has no intention of making the road public, at least not until construction of the pipeline has been completed, pointing to the fact that the construction contract between Alaska and Alyeska gives Alyeska a preference over the public to use the road.

 There is no question that the State, at least formally, has indicated its intention to construct a public highway along the right-of-way requested. The application from the State Department of Highways to the Bureau of Land Management specifically states that "[t]he primary purpose for which the right of way is to be used is a public highway." [89] In addition, in 1970 the legislature of the State passed a statute enabling the Department of Highways to contract with Alyeska for construction of the highway. In that statute "[t]he

legislature finds and declares that there is an immediate need for a public highway from the Yukon River to the Arctic Ocean and that this public highway should be constructed by the State of Alaska at this time * * *." Alaska Stat. § 19.40.010(a). Ordinarily this expression of intent would constitute valid acceptance of the right-of-way granted in Section 932. That section acts as a present grant which takes effect as soon as it is accepted by the State.[90] Tholl v. Koles, 65 Kan. 802, 803, 70 P. 881, 882 (1902); *cf.* Railroad Co. v. Baldwin, 103 U.S. 426, 429, 26 L.Ed.2d 578 (1880). All that is needed for acceptance is some "positive act on the part of the appropriate public authorities of the state, clearly manifesting an intention to accept * * *." Hamerly v. Denton, Alaska, 359 P.2d 121, 123 (1961).[91]

 Appellants charge that this is not the ordinary case because the State's real intentions and real motives are not to construct a public highway but to permit Alyeska to build a haul road for construction of the trans-Alaska pipeline. It is a well known precept of our jurisprudence that we shun attempts to look behind a stated legislative purpose to find a hidden intention or motive, and that we may not "restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." McCray v. United States, 195 U.S. 27, 56, 24 S.Ct. 769, 776, 49 L.Ed. 78

---

89. Supplemental Documents, *supra* note 2, Tab E–2.

90. Since the section acts as a present grant, it is normally not even necessary for the builder of the highway to apply for a right-of-way. *See* 43 C.F.R. § 2822.1–1 (1972): "No application should be filed under [43 U.S.C. § 932], as no action on the part of the Government is necessary." However, since § 932 applies only to land "not reserved for public use," and the lands sought to be used for highway purposes were considered reserved for public use under Public Land Order No. 4582, Jan. 17, 1969, 34 Fed.Reg. 1025, application was necessary under 43 C.F.R. § 2822.1–2 (1972) to request that the reservation be revoked or modified so as to

permit construction of the highway. By Public Land Order No. 4760, Jan. 7, 1970, 35 Fed.Reg. 424, Public Land Order No. 4582 was modified to permit granting of rights-of-way necessary for construction of the trans-Alaska pipeline. In addition, by Public Land Order No. 5150, Dec. 28, 1971, 36 Fed.Reg. 25410, a contiguous series of tracts of public lands from the North Slope to Valdez was set aside for a "utility and transportation corridor."

91. *See also* Kirk v. Schultz, 63 Idaho 278, 282, 119 P.2d 266, 268 (1941); Koloen v. Pilot Mound Township, 33 N.D. 529, 539, 157 N.W. 672, 675 (1916); Streeter v. Stalnaker, 61 Neb. 205, 206, 85 N.W. 47, 48 (1901).

(1904). *See* United States v. O'Brien, *supra,* 391 U.S. at 383, 88 S.Ct. 1673; Arizona v. California, 283 U.S. 423, 455, 51 S.Ct. 522, 75 L.Ed. 1154 (1931). While this doctrine typically has force in a context different from that present here, namely review of the constitutionality of legislative enactments, we think it thoroughly applicable to the instant case. The doctrine is based on the theory that ascertaining motive is a difficult and hazardous task, *see* United States v. O'Brien, *supra,* a factor present when reviewing administrative as well as legislative action, in a constitutional context or otherwise. In addition, any rule requiring us to look behind the face of Alaska's action in this case and analyze its "real motive" is inconsistent with the sound federal-state relationship that the judiciary has carefully protected in other contexts.

■■■ Even were we to pierce the alleged facade of Alaska's intentions, we would be constrained to approve the highway right-of-way. The State has been interested in providing some form of ground transportation to the North Slope area for many years. Studies of a proposed road were made in both 1951 and 1965, and in 1966 the State Legislature authorized the expenditure of up to $20,000 for another study, involving aerial photography and visual investigation of principal alternative routes and the drafting of maps and preliminary cost estimates for the various alternatives.[92] The State's intentions to have a public highway, rather than a mere pipeline construction road, are further evidenced by the fact that the State required Alyeska to make certain changes in the design features of the road to better accommodate public use.[93] These changes included realigning segments of the road to tie it in with an existing network of roads, reducing grades in certain segments, changing standards for bridges and culverts to ensure their continued maintenance after construction of the pipeline is completed, and enlarging bridge spans to better accommodate public traffic.

Appellants charge that even though Alaska might intend eventually to open the road to the public, the contract between the State and Alyeska envisions granting Alyeska preferential use during the pipeline construction period—that is, it may be read to allow public use to be barred when hazards posed by pipeline construction use endanger the public. Even were we to conclude that Alaska intends to grant Alyeska this preference,[94] we would affirm the validity of the right-of-way.

The contract between Alyeska and Alaska provides that Alyeska will bear the entire cost of constructing the road for the State, a cost which the Alaska Department of Highways estimates to

92. *See* North Slope Road Study in Supporting Documents, *supra* note 7, Vol. I, Tab 1, at 1.

93. *See* letter of June 19, 1972 from Alyeska to its counsel in Supporting Documents, *supra* note 7, Vol. I, Tab 11.

94. The original construction agreement between Alyeska and Alaska provided: "When the Commissioner [of the State Department of Highways] determines in writing that there is no danger to the public from hazards associated with construction, the Highway may be opened by the State for use by the public during construction of the trans Alaska pipeline." *Id.,* Vol. II, Tab 6, at 3. By later amendment, this provision was changed to read:

"After completion of construction of each segment of the Highway and acceptance thereof by the State pursuant to Paragraph 10 of this Agreement, that segment will be open to use by the public under such regulations as the Commissioner may impose unless the Commissioner finds that such use will be hazardous to the public." *Id.,* Vol. II, Tab 7. While the amended version does not expressly refer to hazards caused by pipeline construction use, appellants claim that the same pipeline construction preference made express in the original agreement is implied in the amended version. Since we hold the right-of-way valid under § 932 even assuming this preference during pipeline construction, we need not reach this question of contract interpretation.

be in excess of $100,000,000.[95] Preferential use in favor of Alyeska may be looked at as a reasonable price to be paid by the State and by the public for what amounts to, in the words of the Department of Highways, "a gift to the State of Alaska."[96] There can be no doubt that but for Alyeska this road would not be built at the present time. But rather than tainting the arrangement between the State and Alyeska, this fact merely supports its reasonableness. As Mr. Justice Jackson said in United States v. Oklahoma Gas & Electric Co., 318 U.S. 206, 211, 63 S.Ct. 534, 536, 87 L.Ed. 716 (1943): "[I]t has long been both customary and lawful to stimulate private self-interest and utilize the profit motive to get needful services performed for the public. The State appears to be doing no more than that."

2. *Airports.*

■ Appellants' contention that the airports will not be public and that they therefore cannot be authorized under 49 U.S.C. § 211 (1970) warrants little discussion in view of the fact that the contract between Alaska and Alyeska, whereunder the latter agrees to construct the airports for the former, specifically provides that each airport, as soon as it is open for air traffic, "shall be open to the public on a nondiscriminatory basis."[97] For the reasons discussed earlier, we hesitate to search for any hidden intention to the contrary, and if one exists there certainly is no indication of it in the present record. In addition, 49 U.S.C. § 212(b) (1970) requires the lessee to "maintain the lands in such condition, and provide for the furnishing of such facilities, service, fuel, and other supplies, as are necessary to make the lands available for public use as an airport * * *," and applicable regulations of the Department of the Interior provide for cancellation of the lease for failure to comply with such

conditions. *See* 43 C.F.R. § 2911.1–2(c) (1972).

3. *Free Use Gravel Permits.*

■ Appellants charge that, since the ultimate purpose of the road and airports is to facilitate construction of the pipeline, the use is for "commercial or industrial" purposes within the meaning of 30 U.S.C. § 601 (1970), and therefore excepted from the free use exemption. As indicated earlier, however, both the declared and the real State intention with respect to the road and airports is to construct *public* facilities, and the fact that such facilities will incidentally, or even primarily, initially benefit private industrial or commercial activities does not detract from the public, noncommercial, nature of the facilities themselves. It seems reasonable to assume that in enacting the exception to the free use exemption Congress intended to exact a price from the state only when the state itself was using the gravel in some profit-making enterprise. There being no indication that this is the case here, we hold the free use permits valid.

IV. VALDEZ TANK FARM ISSUES

A.

In June 1969 TAPS filed an application with the Department of Agriculture requesting a revocable special land use permit for construction and operation of an oil tank farm and terminal facility on an 802-acre site within the Chugach National Forest. On October 1, 1969 the Forest Service of the Department issued the requested permit. At the present time, while the first stage of construction of the tank farm, involving site clearing and survey, has been completed, actual construction has been deferred by Alyeska because of the present litigation.

Plaintiff-appellant Cordova District Fisheries Union, an unincorporated asso-

---

95. Department of Highways, State of Alaska, 1966 Annual Report, in Supporting Documents, *supra* note 7, Vol. IV, Tab 5, at 8.

96. *Ibid.*

97. *Id.,* Vol. II, Tab 8, at 4.

ciation of commercial fishermen in Cordova, Alaska, brought suit asking that the revocable permit be declared invalid. Since we do not reach the merits of the controversy, we merely summarize the competing contentions. Appellants contend that the permit exceeds the 80-acre limitation of 16 U.S.C. §§ 497 and 497a (1970). Appellees concede that the permit is not *authorized* by these statutes, but claim that neither is it *barred* by them. They argue that the permit is lawful pursuant to the broad regulatory powers of the Secretary of Agriculture under 16 U.S.C. § 551 (1970). In addition, they contend that the practice of issuing such permits has been acquiesced in by Congress, as recognized in Sierra Club v. Hickel, *supra*, 433 F.2d at 34–35. Appellants respond that Section 551 is inapplicable and that the project in this case is distinguishable from that approved in *Sierra Club* because it is not for recreation purposes.

In an affidavit filed with the District Court, the Attorney General of the State of Alaska informed the court that the State had filed an application with the Interior and Agriculture Departments for approval of the selection by the State of the 802-acre site pursuant to Section 6 of the Alaska Statehood Act,

Pub.L. 85–508, 72 Stat. 339 (July 7, 1958). That section authorizes selection by the State of Alaska of approximately 400,000 acres of vacant and unappropriated public lands within national forests.[98]

While the Secretary of Agriculture has not yet approved the selection, appellees expect that he will do so shortly. Applicable regulations provide that the Bureau of Land Management within the Department of the Interior shall then issue the State a patent for the land. 43 C.F.R. § 2627.3 (1972). After title to the land is obtained by the State, Alyeska plans to obtain the site from the State. Appellees argue that in view of the imminent transfer of the land to the State of Alaska, we should not decide whether the permit is valid for upon that transfer the case will become moot. Appellants disagree, arguing that a decision on the validity of the permit may have significance even after the transfer because under Alaska law a lawful permittee will have priority in obtaining the land from the State. In any event, they argue that approval of the selection may not be obtained from the Department of Agriculture, there being some question about whether the selection is lawful under the Alaska Statehood Act,[99]

98. " * * * For the purposes of furthering the development of and expansion of communities, the State of Alaska is hereby granted and shall be entitled to select, within twenty-five years after the date of the admission of the State of Alaska into the Union, from lands within national forests in Alaska which are vacant and unappropriated at the time of their seelction not to exceed four hundred thousand acres of land, and from the other public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection not to exceed another four hundred thousand acres of land, all of which shall be adjacent to established communities or suitable for prospective community centers and recreational areas. Such lands shall be selected by the State of Alaska with the approval of the Secretary of Agriculture as to national forest lands and with the approval of the Secretary of the Interior as to other public lands; *Provided,* That

nothing herein contained shall affect any valid existing claim, location, or entry under the laws of the United States, whether for homestead, mineral, right-of-way, or other purpose whatsoever, or shall affect the rights of any such owner, claimant, locator, or entryman to the full use and enjoyment of the land so occupied."

Pub.L. 85–508, 85th Cong., 2d Sess., 72 Stat. 339, § 6(a) (July 7, 1958).

99. In a letter to the Forest Service, the Cordova District Fisheries Union notified the Service that if the application for selection is approved the Union will contest the approval on the following grounds:

"(1) That the selection is not for the purposes of furthering the development of and expansion of communities as required by Sec. 6(a) of the Alaska Statehood Act;

"(2) That the land selected is neither adjacent to an established community

and that we should reach the merits and hold the permit invalid. In response to this point, appellees ask that we decide in this litigation whether the anticipated transfer is in fact valid under the Alaska Statehood Act. The District Court reached the merits and held the permit valid, offering no opinion on the lawfulness of the pending selection.

### B.

At the outset we find it inappropriate in this litigation to offer our views with respect to the anticipated approval of Alaska's land selection by the Agriculture and Interior Departments. Not only is this an issue not properly raised in the pleadings of this lawsuit, but decision of this question by this court at the present time would be totally inconsistent with the settled doctrines of primary jurisdiction and exhaustion of administrative remedies.[100] *See generally* L. Jaffe, Judicial Control of Administrative Action chs. 4 & 11 (1965).

Turning to the central issue, we note that it is not contended by any party that the controversy over the permit is presently moot. To the extent the doctrine of mootness merely incorporates the doctrine that a federal court has jurisdiction only to adjudicate "cases or controversies," *see* Powell v. McCormack, 395 U.S. 486, 496 n.7, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), there can be no question but that this dispute is not technically moot. This lawsuit involves no mere abstract question of law. It challenges the lawfulness of a permit already issued which would permit activities clearly detrimental to the legal interests of plaintiffs-appellants.

The real question here is, for want of a better term, "justiciability," or whether we should exercise our "judicial discretion to dismiss the action without a determination on the merits," despite the existence of jurisdiction. *See generally* Davis v. Ichord, 143 U.S. App.D.C. 183, 193, 442 F.2d 1207, 1217 (1970) (Leventhal, J., concurring). Several factors lead us to exercise that discretion in this case. As noted above, Alyeska has to date held up construction under the tank farm permit, awaiting our decision as to the legality of the permits and rights-of-way necessary for construction of the pipeline itself. It appears likely that, in view of our decision on the pipeline construction SLUP, no further construction will take place until Congress resolves the Mineral Leasing Act problem so as to permit construction of the pipeline. By that time, the selection process under the Alaska Statehood Act will hopefully be resolved one way or the other. If selection of the disputed lands is lawfully completed, the legality of the permit will very likely become a moot point. That Alyeska might, because of the permit, have a "preference" under Alaska law for obtaining the land from the State does not affect this conclusion. It is questionable whether Alyeska will face competition in its attempt to obtain this land from the State after selection, and even if such competition appears, Alyeska might well choose not to exercise any preferential rights and instead might accept a position as a co-equal with other private parties seeking the land. Of course, if Alyeska does seek to exercise its preference, the legality of the permit

---

or [*sic*] suitable for prospective community centers and recreational areas as required by Sec. 6(a) of the Alaska Statehood Act;

"(3) And, in the alternative to items 1 and 2 herein, the selection fails to comply with Sec. 6(g) of the Alaska Statehood Act which prohibits selections containing less than 5,760 acres with exceptions not here relevant * * *." Supporting Documents, *supra* note 7, Vol. IV, Tab 11. Of course, as stated in text,

we intimate no views concerning these issues.

100. While the record is not altogether clear on this point, it appears that the selection must first be approved by the Regional Forester of Region 10 within the Agriculture Department's Forest Service. Supporting Documents, *supra* note 7, Vol. IV, Tab 11. Applicable administrative regulations provide for administrative review of the Regional Forester's decision. *See* 36 C.F.R. § 211.22(b) (1972).

can be litigated at that time. The likelihood of mootness and the availability of a forum when, if ever, the question becomes ripe for adjudication lead us to avoid a decision on the merits. The Supreme Court has "cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations." Public Affairs Press v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed. 2d 604 (1962). *See also* Eccles v. Peoples Bank, 333 U.S. 426, 432, 68 S.Ct. 641, 92 L.Ed. 784 (1948). In the present case, where the speculation goes not merely to factual matters but to the very question of whether a decision on the merits will have any legal significance, caution would seem especially appropriate.·

Justiciability not only involves an analysis of the appropriateness of the issues for decision by the court, but also concerns whether denial of judicial relief at a given time will cause hardship to the parties. *See* Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 156, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Mr. Justice Frankfurter, concurring). Since it appears unlikely that any further construction of the tank farm terminal will take place until the Mineral Leasing Act problems are solved, we find that deferral of adjudication on the merits will not impose any significant hardships on plaintiffs-appellants in this case.

Finally, we take note of the fact that the issues on the merits are "clearly substantial" and "raise important ramifications for the quality of the country's public land management." Sierra Club v. Morton, 405 U.S. 727, 757, 92 S.Ct. 1361, 1377, 31 L.Ed.2d 636 (1972) (Mr. Justice Blackmun, dissenting). In addition, as in many cases where it is claimed that an administrative agency has violated a legislative command, this case involves difficult questions concerning the relationship between the legislative and executive branches of our government. While the importance of the issues presented might seem to call out for judicial resolution, settled principles of adjudication suggest that a court avoid such difficult issues whenever a decision on the merits is not necessary to the outcome of the dispute then before the court. "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." Eccles v. Peoples Bank, *supra*, 333 U.S. at 431, 68 S.Ct. at 644.

In declining decision on the merits, we are not unmindful of our duty liberally to construe the Declaratory Judgment Act, 28 U.S.C. § 2201 (1970). No doubt, avoidance of a decision on the merits thwarts to some extent that Act's laudable policy of providing speedy adjudication of legal disputes to remove uncertainty and insecurity from legal relationships. *See* Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 92 F.2d 321 (1937). We do "not lightly turn aside a suitor who seeks a hearing and decision" of his federal rights. Davis v. Ichord, *supra*, 143 U.S.App.D.C. at 196, 442 F.2d at 1220 (Leventhal, J., concurring). Despite these concerns, however, we conclude that the instant case is an appropriate one for staying the judicial function until it becomes clear that resolution of the issues presented will be of real significance.

## V. NATIONAL ENVIRONMENTAL POLICY ACT ISSUES

While appellants claim that the Secretary of the Interior has violated NEPA in several different ways, the heart of their complaint relates to the question of an alternative oil pipeline route through Canada. NEPA provides, in Section 102(2)(C)(iii), 42 U.S.C. § 4332(2)(C) (iii) (1970), that

"to the fullest extent possible * * * all agencies of the Federal Government shall—

* * * * * *

"(C) include in every recommendation or report on proposals for legisla-

tion and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

\* \* \* \* \* \*

"(iii) alternatives to the proposed action[.]"

In addition, Section 102(2)(D), 42 U.S.C. § 4332(2)(D), requires that

"to the fullest extent possible \* \* \* all agencies of the Federal Government shall—

\* \* \* \* \* \*

"(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[.]"

Appellants first suggest that from the beginning of its consideration of the oil companies' proposal to construct a trans-Alaska oil pipeline the Department of the Interior has been aware that if North Slope oil resources are developed at all natural gas (which is an inevitable byproduct of oil extraction) [101] will be transported to market by means of an all-land pipeline route through Canada. That route would probably run from Prudhoe Bay inland to Fort McPherson, a distance of 465 miles, thence from Fort McPherson to Edmonton through the Mackenzie Valley, a distance of 1,240 miles. From Edmonton two already existing oil pipelines run southeast to Chicago and southwest to Puget Sound. The expected gas pipeline would probably follow the Edmonton-Chicago route.

Nowhere in the Department of the Interior's Final Impact Statement, according to appellants, is there a recognition of this critical fact. As a result, even though the Impact Statement ostensibly describes and discusses the alternative of an oil pipeline along this route, it allegedly never adequately analyzes the real choices faced, namely (1) an oil and gas pipeline in a common corridor across Canada, or (2) an oil pipeline through Alaska in addition to a gas pipeline through Canada. Had the choice been posed in this manner, according to appellants, there is a substantial chance that the common corridor approach would have been found preferable.

The other major charge is that the Department's consideration of the Canadian route violated its duty to develop appropriate alternatives to proposed action. Appellants contend that throughout the decision making process the Department has taken a passive approach to the Canadian alternative. In their view, the Department concentrated on the proposal before it—that is, the trans-Alaska oil pipeline proposal—affirming by inaction the oil companies' decision to seek a trans-Alaska rather than a trans-Canada route. This passivity is also allegedly evidenced by the history of the Impact Statement. It was not until February 1972, almost two years after the Department began preparation of an impact statement, that the Department allegedly decided to include in the statement any analysis of North Slope natural gas transportation. And by that time a March 15 deadline had been set by the Undersecretary in charge of preparation of the statement, making it virtually impossible to give the matter the attention it allegedly deserved. Other examples of this passive approach are cited. Rather than assume responsibility for investigating the political and economic feasibility of the trans-Canada oil pipeline alternative, the Department allegedly simply requested the oil companies to discuss these mat-

101. The practice of flaring natural gas, that is, burning it without use, will not be permitted by the State of Alaska. Therefore, the gas must be either reinjected into the well or brought to market. *See* U. S. Dept. of Interior, Analysis of the Economic and Security Aspects of the Trans-Alaska Pipeline, Vol. I at C-22 (1971). We were informed during oral argument that reinjection could continue only for approximately 2 years; after then it would be impossible to continue pumping oil without also removing natural gas.

ters with Canadian officials and relied on biased oil company representations as to the outcome of these discussions. In short, appellants charge that the Department's treatment of the Canadian alternative was "too little, too late."

In response appellees claim that their six-volume Environmental Impact Statement does in fact discuss both an oil pipeline through Canada and a common corridor approach with a gas pipeline. Interior admits that the discussion might not be presented in a form or in detail sufficient to suit appellants, but it argues that there is sufficient information to allow an informed decision to be made, and that this is all that NEPA requires. With respect to the Department's role in developing the Canadian alternative, appellees claim that from early 1969 the Department has actively sought and considered information about the alternative by establishment of a task force to examine the environment along several possible Canadian routes, by direct contacts between professionals of the Department and personnel of counterpart bureaus of the Canadian Government, and through analysis of non-environmental aspects of the Canadian alternative by the National Security Council and others. Information thus obtained, according to appellees, was in fact considered by the Department in the decision making process leading to approval of the trans-Alaska pipeline. That approval, they conclude, was unquestionably reasonable in light of several problems posed by the Canadian alternative, including a general lack of information about the alternative and the facts that it would delay delivery of oil to markets, that it would pose virtually insurmountable financing problems, and that it would adversely affect United States economic and security interests. Finally, Alyeska suggests that the Secretary's action in this case is entitled to greater deference on review than in other NEPA cases because consideration and development of the Canadian alter-

native involve delicate questions of international relations and foreign policy.

This and other NEPA issues presented by the parties to this action pose complex and important questions regarding the duties of administrative agencies under NEPA. We have chosen, however, not to decide these questions at the present time. We rest our choice first on a desire to expedite our decision in this case as much as possible. More importantly, we recognize that a ruling on the NEPA issues will not affect the real outcome of the present litigation. Our holding that the SLUP for construction purposes is illegal under the Mineral Leasing Act makes it impossible to construct this pipeline until Congress decides to amend the Act. All parties have conceded this fact. Assuming Congress will amend the Act to permit construction of this pipeline, we have no way of knowing when this will occur. Should amendment of the Act take several years, the analysis of environmental, economic and other costs in the present Impact Statement may become outdated, and in its updating the Department conceivably might introduce changes mooting anything we might say about its present adequacy or inadequacy. In addition, future developments with respect to the Canadian alternative, including information obtained from reports now being prepared by the Canadian Government,[102] may well moot anything we might now say about the sufficiency or insufficiency of the Department's efforts in developing and describing this alternative.

The NEPA issues, therefore, are not ripe for adjudication at the present time. As Mr. Justice Frankfurter noted, "[T]he adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." Poe v. Ullman, 367 U.S. 497, 503, 81 S. Ct. 1752, 1755, 6 L.Ed.2d 989 (1961). It

102. *See note 103 infra.*

is obvious the present litigation involves "a lively conflict between antagonistic demands," but we question whether resolution of the NEPA issues presented to us at this time will have any practical significance. To pass upon the issues in this context would be to decide a mere abstract question of law. A finding of lack of ripeness properly rests "in the fact that the need for some further procedure, some further contingency of application or interpretation, whether judicial, administrative or executive, * * * served to make remote the issue which was sought to be presented to the Court." Poe v. Ullman, *supra*, 367 U.S. at 528, 81 S.Ct. at 1769 (Mr. Justice Harlan, dissenting). Here remoteness is a result, not of some contingent judicial, administrative or executive action, but rather of the contingency of legislative action modifying the Mineral Leasing Act so as to permit construction of this pipeline.

The final reason why we pass over the NEPA issues at the present time is that many of the issues involve still disputed questions of fact. For example, appellants have charged that the Secretary gave insufficient consideration to the alternative of deferring a decision until more information was obtained on the Canadian alternative. Appellants point to a May 4, 1972 letter from the Canadian Minister of Energy, Mines and Resources, Donald S. Macdonald, to Secretary Morton, informing the Secretary that the Canadians had "recently made public and have provided to your State Department a list of the thirty environmental and social studies under way at this time and scheduled for completion later this year."[103] Appellants charge that in view of the fact that these critical studies were to be completed in 1972 it was unreasonable for the Secretary to refuse to defer a decision on the Canadian alternative until the results of these studies were obtained. In response the Secretary, both in his brief and most emphatically at oral argument, maintains that few if any of these studies

will in fact be completed in 1972. Many of the studies, it is alleged, have just begun, and the great majority have not even been started. For these reasons. the Secretary argues, his refusal to delay a decision any further was eminently reasonable.

Normally, appellate review of matters involving such questions of fact is facilitated by initial resolution of factual questions by the trial court. In the present case, however, the trial court apparently felt there were no important disputed factual issues. It dismissed appellants' complaint in response to a motion for summary judgment. No witnesses ever testified, except through depositions. We do not even have the benefit of the trial court's views as to the supposedly undisputed questions of fact. In order to facilitate prompt appellate review, the trial court declined to issue what it termed "detailed findings of fact that are undisputed * * * which would require weeks and months to complete." Instead it issued only some broad legal conclusions—*e. g.*, that the Final Environmental Impact Statement "reasonably sets forth alternatives to the proposed project" and "complies with * * * requirements of the National Environmental Policy Act." Given the present state of the record and the contentions made in the briefs and at oral argument, however, we cannot agree that there is nothing in this case but undisputed facts, at least with respect to the NEPA issues. Resolution of such contested factual issues as do exist would require more than the array of affidavits, letters, memoranda, etc. that we confront in this record. It would require testimony and cross-examination of witnesses and other incidents of judicial fact finding. Adjudication of such important legal questions as are presented in this case "should rest on an adequate and full-bodied record. The record before us is woefully lacking in these requirements." Public Affairs Press v. Rickover, *supra,* 369 U.S. at

103. *See* Brief for Appellants David Anderson and Canadian Wildlife Federation, Appendix A.

113, 82 S.Ct. at 582. For these reasons, we decline to pass judgment on the NEPA issues presently tendered to us.

## CONCLUSION

"[G]reat cases are called great," Mr. Justice Holmes said 70 years ago, "not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest * * *." Northern Securities Co. v. United States, 193 U.S. 197, 400, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (dissenting opinion). The same may be said about the present litigation over the Alaska pipeline. These cases are indeed "great" because of the obvious magnitude and current importance of the interest at stake: billions of gallons of oil at a time when the nation faces an energy crisis of serious proportions; hundreds of millions of dollars in revenue for the State of Alaska at a time when financial support for important social programs is badly needed; industrial development and pollution of one of the last major unblemished wilderness areas in the world, at a time when we are all becoming increasingly aware of the delicate balance between man and his natural environment.

But despite these elements of greatness, the principles of law controlling these cases are neither complex nor revolutionary. Although the first part of this opinion went to great lengths to demonstrate that special land use permits for construction purposes were ille-

gal under the Mineral Leasing Act, at the heart of that discussion is the following very simple point. Congress, by enacting Section 28, allowed pipeline companies to use a certain amount of land to construct their pipelines. These companies have now come into court, accompanied by the executive agency authorized to administer the statute, and have said, "This is not enough land; give us more." We have no more power to grant their request, of course, than we have the power to increase congressional appropriations to needy recipients. "Article 4, § 3, Cl. 2 of the Constitution provides that 'The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States.' The power over the public land thus entrusted to Congress is without limitations. 'And it is not for the courts to say how that trust shall be administered. That is for Congress to determine.'" United States v. City and County of San Francisco, supra, 310 U.S. at 29–30, 60 S.Ct. at 756, quoting Light v. United States, 220 U.S. 523, 527, 31 S.Ct. 485, 55 L.Ed. 570 (1911).

This principle is as settled as it is simple. The present litigation is not the first time the recipient of a right-of-way grant has tried to change the conditions and limitations Congress placed upon that grant. See, e. g., United States v. City and County of San Francisco, supra; [104] United States v. Trinidad Coal & Coking Co., 137 U.S. 160, 11

---

104. The Raker Act of 1913, c. 4, 38 Stat. 242, granted a right-of-way to the City of San Francisco for construction of a dam and reservoir as a means for supplying water and generating electricity. Section 6 of the Act prohibited the City from selling to any corporation or individual other than a municipality the right to sell the electrical energy. Instead of directly violating the Act by selling to a private power company the right to sell the electricity, the City entered into an agreement with a private utility whereby it consigned the right to sell electricity to the private utility, naming the private

company the City's agent or consignee for ultimate sales to consumers. The City claimed that this contract did not violate § 6. The United States Supreme Court, per Mr. Justice Black, first examined carefully the legislative debates on § 6, concluding that the clear intent of the legislature was to ensure that the City would become a competitor of private utility companies. It was evident that the contract between the City and the private utility, though not labeled a sale, thwarted this obvious congressional intent, and it was therefore held illegal under the Act.

S.Ct. 57, 34 L.Ed. 640 (1890).[105] The pipeline construction SLUPs of today had their counterparts in the schemes of yesteryear, but courts have consistently refused to accept such attempts to avoid obvious congressional intent. As Mr. Justice Black said, "Mere words and ingenuity * * * cannot by description make permissible a course of conduct forbidden by law." United States v. City and County of San Francisco, *supra*, 310 U.S. at 28, 60 S.Ct. at 756. Then, as now, courts have been wary of interpreting right-of-way statutes so as to make the conditions and limitations enacted by Congress "of no value whatever." United States v. Trinidad Coal & Coking Co., *supra*, 137 U.S. at 167, 11 S.Ct. 57.

Those who would attempt to avoid congressional restrictions have, in the past, argued that the conditions and limitations believed important by Congress in fact served no legitimate purpose. But the response of courts then was the same as our own. "It is not the office of the courts to pass upon the justification for that belief or the efficacy of the measures chosen for putting it into effect. Selection of the emphatically expressed purpose embodied in this Act was the appropriate business of the legislative body." United States v. City and County of San Francisco, *supra*, 310 U.S. at 26, 60 S.Ct. at 755. In the past,

also, parties sought to rationalize, or evoke sympathy for, their positions by demonstrating a settled administrative practice to ignore the law. The answer then was the same as our answer today. "We cannot accept the contention that administrative rulings—such as those here relied on—can thwart the plain purpose of a valid law." *Id.* at 31–32, 60 S.Ct. at 757.

Congress, by placing a width limitation in Section 28 and by declaring that no pipeline rights-of-way shall be issued unless they comply with this limitation, clearly intended to restrict the amount of land that builders of pipelines could use. Congress intended to maintain control over pipeline rights-of-way and to force the industry to come back to Congress if the amount of land granted was insufficient for its purposes. Whether this restriction made sense then, or now, is not the business of the courts. And whether the width limitation should be discarded, enlarged, or placed in the discretion of an administrative agency, is a matter for Congress, not for this court.

In the last analysis, it is an abiding function of the courts, in the course of decision of cases and controversies, to require the Executive to abide by the limitations prescribed by the Legislature. The scrupulous vindication of that basic principle of law, implicit in our form of government, its three branches

105. An Act of Congress, c. 279, 17 Stat. 607–608 (1873), authorized land offices to grant rights to enter vacant coal lands of the United States, the amount of lands set at 160 acres for individuals and 320 acres for associations. The Act expressly provided that "no association of persons, any member of which shall have taken the benefit of this act, either as an individual or as a member of any other association, shall enter or hold any other lands under the provisions [thereof] * * *." The defendant coal company, a corporation, sought to avoid the acreage limitation of the statute by a scheme whereby individual officers, stockholders and employees obtained rights to enter and then conveyed these rights to the corporation. The corporation claimed it was not violating the law because these assorted individuals were not "members of the corporation" within the meaning of the statute. The United States Supreme Court, per Mr. Justice Harlan, emphatically rejected this argument: "This contention cannot be sustained unless the court lends its aid to make successful a mere device to evade the statute. The policy adopted for disposing of the vacant coal lands of the United States should not be frustrated in this way. It was for Congress to prescribe the conditions under which individuals and associations of individuals might acquire these lands, and its intention should not be defeated by a narrow construction of the statute. If the scheme described in the bill be upheld as consistent with the statute, it is easy to see that the [acreage limitation] would be of no value whatever." 137 U.S. at 166–167, 11 S.Ct. at 60.

and its checks and balances, looms more important in the abiding public interest than the embarkation on any immediate or specific project, however desirable in and of itself, in contravention of that principle. We think it plain that the Executive Branch, when confronted with the legal problems attendant upon the Alaska pipeline, should have taken note of the limitations that had been prescribed by Congress, and should have presented to Congress the case for revision of the basic statute.

Accordingly, the judgment of the District Court in these cases is hereby vacated and the cases are remanded to the District Court with instructions to enter a decree enjoining the Secretary of the Interior from issuing a special land use permit right-of-way for pipeline construction purposes. The District Court is also directed to enter orders declaring valid under the Mineral Leasing Act of 1920 the leases for airports, right-of-way for a public highway, and free use gravel permits proposed to be issued to the State of Alaska, and declaring valid under the same Act the pumping station and permanent communication facility rights-of-way proposed to be issued to appellee Alyeska Pipeline Service Company.

It is so ordered.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

The opinion of the majority consists of five separate parts which will be discussed in order. I dissent in part from Part I and concur in part, concur substantially with Parts II, III and IV, and I dissent from Part V.

I.—*The Special Land Use Permits (Part I of the Majority Opinion)*

In this part of its opinion the majority holds that it would be illegal for the Secretary of the Interior to issue the requested special land use permits (also referred to as revocable permits). The majority maintains that this alleged illegality rests upon two grounds: (1) The first is the contention that the legislative history of section 28 of the Mineral Leasing Act requires that statute to be interpreted as prohibiting the issuance of the requested revocable permits because Congress in section 28 "intended all *construction work* to take place within the [54 foot] width limitation of the statute."[1] (2) The second ground is the argument that it would be illegal to issue the requested revocable permits because they would not be revocable in fact.[2]

A. Legislative History

Regardless of the validity of the second ground it is important to point out the fatal flaws in the majority's first contention with regard to the legislative history, because the claimed illegality of revocable permits for pipeline purposes, which the majority asserts, rests upon an incorrect interpretation of the statute by the majority that would affect all prior and future applications of the Act. This infirmity in the opinion of the majority should be pointed out for the benefit of other courts who may be called upon to interpret section 28. It is thus essential to examine those instances of congressional action upon which the majority opinion relies for support of its interpretation of the legislative history because the validity of any decision based on legislative history is no better than its ability to stand analysis that it correctly translates specific legislative action into demonstrable legislative intent. It is in this area that the opinion of the majority fails.

Basically the opinion of the majority contends that the *legislative debates* with respect to section 28 indicate that

---

1. Pp. 856, 858, 859, 862, 863, 864, 869, *supra*.

2. P. 875, *supra*:
 If the use is really not temporary or occasional, but is permanent (or at least long-lasting), the matter cannot be papered over merely by designating it as "revocable" when it is not intended to be revocable and, in the nature of things, is not in fact revocable.

Congress intended thereby to prohibit the issuance of any special land use permits for *temporary construction purposes*.[3] However, when Congress enacted section 28 and thereby fixed the amount of land to be granted as *permanent* right of way for the *operation* of a pipeline as a *transportation* facility they were not considering and they did not decide how much space and material they would permit to be used temporarily in its construction. To assume, as the majority opinion does, that the one decision included the other is completely illogical. The one decision, fixing the amount of land that would be *permanently* granted for construction, maintenance and operation, which Congress did make, simply did not include any expression of intent as to the extent of allowable *temporary* permits for the use of additional public lands in such projects. Temporary revocable permits were not involved in *any* of the provisions of the congressional bills which preceded the enactment of section 28, nor in *any* of the amendments proposed to these bills while they were being acted upon by Congress.

1. *The Rejection by Congress of the Amendment Authorizing the Taking of Necessary Materials, Earth and Stone*

The majority opinion rests its contrary interpretation of the legislative history partially upon the fact that Congress at one time defeated a proposed amendment to an earlier Mineral Leasing Bill which contained a provision that would have authorized all pipelines being constructed over United States lands "to take from the public lands adjacent to the line of said pipe line material, earth and stone necessary for the construction of said pipe line."[4] From the defeat of the proposed amendment containing this provision the opinion of the majority concludes: "Congress voted down the amendment, however, clearly indicating its desire to restrict construction to the

statutory right-of-way."[5] However, the action by the House on the amendment does not support such conclusion because the amendment that was offered included substantial additional propositions. Thus, the action by the House cannot be construed as expressing the claimed intention with respect to the single proposition that related to the use of materials outside the right of way.

To make the first point clear it is only necessary to compare the provision in the bill that was sought to be amended with the proposed amendment because these two provisions composed the entirety of the propositions on this issue considered by the House. The provision of the bill that was sought to be amended provided:

> Sec. 17. That rights of way through the public lands of the United States are hereby granted for pipe line purposes to any applicant possessing the qualifications provided in section 1 of this act to the extent of the ground occupied by the said pipe line and *10 feet* on each side of the same, under such regulations as to survey, location, application, and use as may be prescribed by the Secretary of the Interior, and upon the express condition that such pipe lines shall be constructed, operated, and maintained as common carriers: *Provided*, That no right of way shall hereafter be granted over the public lands for the transportation of oil or natural gas except under and subject to the provisions, limitations, and conditions of this section.

51 Cong.Rec. 15418 (emphasis added).

The proposed amendment would have inserted in lieu of the foregoing the following:

> That the right of way through the public lands of the United States is hereby granted to any applicant qualified under this act, any pipe-line company or corporation formed for the

---

3. *See* note 1, *supra*.

4. Page 858, *supra*; 51 Cong.Rec. 15421.

5. Page 859, *supra*.

purpose of transporting oils, crude or refined, which shall have filed or may hereafter file with the Secretary of the Interior a copy of its articles of incorporation and due proofs of its organization under the same, to the extent of the ground occupied by said pipe line and *25 feet* on each side of the center of line of the same: *also the right to take from the public lands adjacent to the line of said pipe line, material, earth, and stone necessary for the construction of said pipe line.*

That any company or corporation desiring to secure the benefits of this act shall within 12 months after the location of 10 miles of the pipe line if the same be upon surveyed lands, and if the same be upon unsurveyed lands, within 12 months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a map of its line, and upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office, and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way.

That if any section of said pipe line shall not be completed within five years after the location of said section the right hereto granted shall be forfeited, as to any incomplete section of said pipe line, to the extent that the same is not completed at the date of the forfeiture.

That nothing in this act shall authorize the use of such right of way except for the pipe line, and then only so far as may be necessary for its construction, maintenance, and care.

That all pipe lines built under the provisions of said act shall be common carriers.

51 Cong.Rec. 15421 (emphasis added).

A mere reading of this amendment makes it obvious that the House was not expressing any view on the italicized portion of the amendment separate and apart from the rest of the amendment. To summarize, the amendment proposed the following changes over the provisions of the pending bill:

1. The right of way to be permanently granted would be increased from 10 feet to 25 feet on each side of the pipeline.

2. The express requirement of the bill that applicants for pipeline right of way must possess the citizenship and nationality "qualifications provided in section 1 of this Act" in the proposed amendment would be replaced by a provision authorizing a grant "to *any* applicant qualified under the Act." (Emphasis added.) This would have effectively removed the requirement that applicants for pipeline rights of way possess United States citizenship or be state corporations.

3. The proposed amendment would have excluded the provision "That no right of way shall hereafter be granted . . . except under and subject to the provisions, limitations and conditions of this section." This was a material provision of the bill and its intent was obviously far from duplicated by the provision in the proposed amendment:

That nothing in this Act shall authorize the use of such right of way except for the pipeline, and then only so far as may be necessary for its construction, maintenance and care.

4. The proposed amendment would also have authorized the pipeline companies to take "from [adjacent] public lands . . . material, earth, and stone necessary for the construction of [the] pipelines." [6]

Since there was no division of the four questions when the amendment was

---

6. The Secretary's right under the bill to prescribe regulations relating to the "survey, location, application and use" of the right of way would be replaced with the few specific limitations dealing with these matters that were specified in the proposed amendment.

rejected by the House,[7] the expressed intent of the House obviously did not indicate any separate position on any of the single provisions contained in the amendment. Thus no separate intent was expressed by Congress on the proposal to authorize the taking of materials outside the right of way. To hold to the contrary, *as the majority opinion does,* is unreasonable, illogical and unwarranted. The same logic which the opinion of the majority applies in asserting its position would conclude that if a Congressman refused to order soup, fish, steak and pie ala mode from a menu on September 1, 1914,[8] and he went into another restaurant[9] six years later on February 25, 1920[10] and ordered only steak,[11] that it could be concluded positively from such actions that he would never order ice cream.[12] Ordinary people do not believe that such acts on their part will be so interpreted; nor should they.

From the foregoing comparison of the bill and the proposed amendment it is self-evident that Congress did not by its rejection of the particular amendment, with the numerous changes it suggested, indicate that it intended absolutely to restrict the space and materials that might be available for construction to that solely within the confines of the permanent statutory right of way by prohibiting the issuance of *temporary* revocable permits for construction purposes.

Questions of this sort come up most frequently in congressional debates when an amendment containing two propositions is rejected and then later one of the propositions is offered singly. That the offering of the single proposition presents a substantially different question to the House, than when it was offered in combination, is recognized by parliamentary law based on congressional precedents.[13] And since Congress (and all parliamentary law) recognizes that the rejection of the amendment containing several propositions does not indicate any position on the individual propositions in isolation, the action by Congress here cannot be interpreted as taking any position on that portion of the amendment dealing solely with the use of adjacent lands.

Moreover, even if the amendment to allow pipeline companies to take "material, earth and stone necessary for construction" from public lands adjacent to the permanent right of way had been offered singly and rejected by a *separate* vote it would *not* indicate that Congress thereby indicated an intention to prevent the Secretary from issuing *temporary* revocable permits for construction purposes. This conclusion is deducible because each of the two provisions embody substantially different considerations. The former would amount to a *permanent statutory grant,* over which the Secretary would only have limited authority to see that the statute was not violated by the pipeline company, while the latter would be merely a *temporary permit,* which the Secretary could issue or not within his discretion, which he could condition as he deemed best, and which was required to be *revocable.* It

---

7. 51 Cong.Rec. 15422.

8. The date the omnibus amendment was rejected by the House in the 63rd Congress.

9. The 66th Congress.

10. The effective date of the law authorizing a 25-foot right of way.

11. The 25-foot right of way.

12. *Temporary* Special Land Use Permits, which are a lesser right than the permanent statutory grant (pie ala mode).

13. 8 Cannon's Precedents of the House of Representatives § 2841, p. 439 (1935), where it was held that a negative vote on an amendment embodying two propositions does not prevent the offering of another amendment embodying the substance of one of the rejected propositions.

The Supreme Court also enunciated the same principle in Gemsco, Inc. v. Walling, 324 U.S. 244, 265, 65 S.Ct. 605, 617, 89 L.Ed. 921 (1945) where it remarked that, "Rejection of an entire bill cannot be taken to be a specific rejection of each and every feature . . . . ."

is thus obvious that the denial of the first in no way indicates an intention to deny the latter. The requirement of *revocability* alone, which is present in one and not in the other, is a sufficient basis for concluding that the House did not intend to prohibit the issuance of *revocable* permits when it rejected the amendment to give pipelines a *permanent* statutory right to obtain construction materials from adjacent public lands.[14]

2. *The Reliance of the Majority Opinion on the Act Specifically Authorizing the Secretary to Issue Revocable Permits for Pipeline Purposes Over Indian Lands*

The majority opinion, in respect to this same issue (its interpretation of the legislative history of section 28, *supra* n. 45), also relies upon another false prop when it cites the action of Congress in passing the statute authorizing grants over Indian lands for pipeline purposes as another indication of legislative history which supports its claimed interpretation.

By the Act of March 2, 1917, c. 146, 39 Stat. 969, Congress amended the Act "authorizing the Secretary of the Interior to grant right of way for pipe lines through Indian lands," March 11, 1904, c. 505, 33 Stat. 65, so as to provide that the Secretary of the Interior may, under such rules and regulations as he may prescribe, grant *temporary permits revocable in his discretion for the construction of such [pipe]lines.* (39 Stat. 974, emphasis added.)

The opinion of the majority interprets passage of this 1917 legislation authorizing the Secretary to grant temporary revocable permits for pipeline purposes over Indian lands as indicating that Congress intentionally withheld such authorization from the Secretary with respect to pipelines running over United States lands. Such interpretation is unwarranted and will not withstand analysis.

Rather, the fact that one Congress (1917) that was considering the Mineral Leasing Act (but did not enact it) found it necessary to enact a specific law authorizing the Secretary to issue revocable permits for pipelines being constructed over Indian lands, in addition to the authority previously conferred by statute, with respect to Indian lands, to issue permanent rights of way for such purposes, clearly demonstrates that Congress was aware that revocable permits were necessary for the "construction, operation and maintenance," 33 Stat. 65, of pipelines in addition to even the liberal right of way authorized by the Indian

---

14. At page 854 the opinion of the majority argues that "licenses are [an] . . . interest in land" and hence the term revocable permit is included within the term right of way. That really is beside the point because our only concern here is whether a revocable *license* is a right of way *as that term is used in section 28.* When the question is considered in that light it is perfectly apparent that a revocable license, which is what SLUPs are, is not the type of *permanent* right of way that Congress was referring to in section 28. All the legislative debates indicate that Congress in this section was referring to permanent rights of way and not to revocable licenses. If there were any doubt about this, that doubt is completely dispelled by the last sentence of section 28 where Congress provided that any "right of way" they were referring to in the forepart of the section could only be forfeited for a violation of the Act through a court proceeding. Revocable licenses by their very nature and terms are revocable by the Secretary without the necessity of court proceedings. So it is clear that Congress indicated the rights of way it was referring to in section 28 were permanent rights of way revocable by court action and did *not* include revocable licenses (SLUPs) revocable by the Secretary. This means that the so-called "exclusivity provision" of section 28 cannot be interpreted as prohibiting the Secretary from issuing revocable permits to aid temporarily in the construction of oil pipelines because section 28 only forbids the issuance of any additional permanent "right of way" for pipeline purposes and a temporary revocable permit, as pointed out above, is not a "right of way" as Congress used that term in section 28.

Lands Pipeline Act, 33 Stat. 65. And the fact that Congress did not expressly authorize the Secretary to issue revocable permits for similar purposes with respect to pipelines being constructed over lands owned by the United States, indicates that *Congress considered the Secretary already possessed such authority,* as he did (*see* authorities cited, note 15, *infra*). This interpretation is obvious because the construction, maintenance and operation of a pipeline over United States lands requires exactly the same space and materials as over Indian lands, and it is certain that Congress never intended to discriminate against the pipelines which run over both United States lands and Indian lands by depriving those running over United States lands of the same temporary construction assistance it considered to be necessary for pipelines constructed over Indian lands.

On the basis of the foregoing it is concluded that the analysis of the legislative history in the opinion of the majority is unsupported, and therefore any statutory interpretation based upon that analysis must fall.

### B. The Revocability of a Portion of the Special Land Use Permits

The majority opinion contends that it would violate departmental regulations, applicable decisional law, Attorney General opinions and administrative rulings to issue the requested special land use permits. Among the alleged deficiencies, the opinion of the majority finds that *the so-called revocable permits would not in fact be temporary or revocable.* I disagree with all the grounds asserted in the majority opinion as a basis for this conclusion except that based on the finding that a portion of the uses would *not* be temporary and revocable in

fact. In sum, it is my opinion that the requested permits could be validly issued for *construction* purposes, but not for *operational* and *maintenance* purposes. Under no circumstances could I concur in any opinion holding that a permit for *construction* purposes was not temporary or revocable in fact. Given the long history of the issuance of revocable permits and the temporary nature of construction, it strains credulity to even suggest the contrary. It is, however, important to determine the exact basis of illegality because of the precedential nature of our decision and the weight it may have with Congress and other courts in other matters.

### 1. Alyeska's Request for a Special Land Use Permit

When we analyze the request made by Alyeska Pipeline Service Company on February 4, 1972 to the Department of the Interior for a "Special Land Use Permit Necessary for Trans Alaska Pipeline Construction," we note that it is a request to use land in the requested amounts adjacent to and *in addition to* the 54-foot pipeline right of way authorized by 30 U.S.C. § 185. The application was made under 43 C.F.R. Part 2920,[15] and stated that the requested permits were for

> *Temporary use, during construction,* of land *adjacent* to the proposed pipeline right-of-way . . . [which would be] temporary, revocable at the will of the government and that any special land use permit or permits issued will not give rise to any easement or other form of interest affecting title to land involved. . . . The applicants agree that they will accept the special land use permit(s) subject to all terms and conditions of applicable regulations and to such

---

15. This regulation sets forth the principles and procedures with respect to "Special Land Use Permits":

Authority: The provisions of this Part 2920 issued under secs. 446, 453, 2478, Revised Statutes (1875), as amended; 43 U.S.C. secs. 1, 2, 1201 (1964); Act of Sept. 19, 1964 (78 Stat.

986; 43 U.S.C. secs. 1411–1418 (1964); Act of July 14, 1960 (74 Stat. 506; 43 U.S.C. secs. 1361–1364 (1964)).

*Subpart 2920—Principles and Procedures—General*

*Source:* The provisions of this subpart 2920 appear at 35 F.R. 9667, June 13, 1970, unless otherwise noted.

stipulations as may generally be applicable to the construction and *operation* of the trans-Alaska pipeline system (Emphasis added.)

The last sentence above makes the conditions upon which the application might be granted rather open ended and indicates that the requested permit will be used for "operation of the trans-Alaska pipeline" (a permanent use) as well as for construction, a temporary use. Basically, the application is for the use of Government lands for a "construction zone" of such "width [to be] requested at each point along the pipeline right-of-way" as Alyeska would "demonstrate to the authorized officer [to be a] . . . reasonably necessity." This amount of land, *in addition to the land included in the right of way,* which would be needed for construction purposes "will vary depending on the mode of construction, topography, soil types and conditions, amount of cut spoil, and utilization of construction techniques designed to minimize environmental disturbance." [16] Estimates of the amount of land needed accompanies the application in the form of alignment maps. The application also stated:

> [A]pproximately 85 per cent of the right-of-way (approximately 662 miles) will require the temporary use of widths ranging from 46 to 146 feet.[17] Approximately two-thirds of this distance (about 456 miles) will require temporary widths of 96 feet or less. . . . [G]reater widths will be necessary . . . at river crossings, road crossings, and in mountainous terrain. Temporary widths exceeding 246 feet [would] . . . comprise only about 28 miles of the 789-mile pipeline route, occurring primarily at river crossings and in particularly difficult terrain.

> [T]he total amount of land required for temporary use during construction

is estimated to be approximately 9,600 acres. Of this amount, however, only about 3,600 acres will be necessary for working area, the remainder being utilized for cut spoil and for the graded slopes which are necessitated by slope stability considerations. . . . The 3,600-acre temporary working àrea will ordinarily be approximately 46 feet in width, although the topography, the construction mode, and other special situations, such as road crossings, and river crossings, will require variations in the width of this space. The remaining "temporarily affected" area, approximately 6,000 acres, will, after proper grading, be revegetated and otherwise dealt with in order to assure slope stability, to control erosion, and to mitigate any adverse slope stability, to control erosion, and to mitigate any adverse aesthetic affects.

. . . With respect to the gravel working surface, Alyeska will adhere to the instructions of the Authorized Officer concerning its removal and/or maintenance. Alyeska recognizes that any authorization to use the space requested by this application will remain at all times revocable at will by the government, without cause or justification, and without giving rise to any claim against the government arising out of such revocation.

\* \* \* \* \* \*

> . . . All other space temporarily occupied pursuant to this permit will be rehabilitated in accordance with such stipulations as may generally be applicable to the construction of the trans-Alaska pipeline system and such further instructions as the Authorized Officer may deem appropriate.[18]

The application also included detailed descriptions and sketches describing and

16. Page 3 of attachment to letter of Feb. 4, 1972.

17. These widths will be in addition to the 54-foot permanent right of way to be acquired under 30 U.S.C. § 185.

18. Attachment to letter of February 4, 1972.

picturing the construction zone requirements for varying conditions, to wit: Below Ground Construction; Ditching Operation; Side-Cut Construction; Thru-Cut Construction; River Crossing Construction; Road Crossing Construction; Berm Construction [19]; Pile Bent Construction.[20]

The majority opinion holds that the use of special land use permits for such purposes, to the extent requested, "violates the agency's [Interior Department] own regulations governing the granting of special land use permits." [21] I disagree with this conclusion. The majority opinion bases this portion of its decision upon the contention that such permits would violate 43 C.F.R. § 2920.0–2(a) which restricts any permit to those "purposes not specifically provided for by existing law" and provides that revocable permits will not be issued "where the provisions of any law may be invoked." Under the reasoning of the majority on this point, section 28 of the Mineral Leasing Act is an "existing law" specifically providing for such purposes and represents a law that might "be invoked" by applicants for additional space and material for construction. However, on this point the majority opinion admits that its holding that Alyeska's request is invalid on these grounds is based upon the "previous analysis [that] . . . section 28 [of the Mineral Leasing Act] was violated."[22] And since this portion of the majority opinion rested on the erroneous interpretation of the legislative history, as pointed out above, it follows that this portion of the decision of the majority is likewise erroneous. Actually, for reasons pointed out above, it is clear that section 28 in nowise restricts the power of the Secretary to issue bona fide revocable permits for temporary construction purposes.

### 2. The Requirement of Revocability

A second ground asserted by the majority opinion in support of its conclusion that the agency's regulations would be violated rests upon the requirement of the departmental regulation that special land use permits must be revocable.[23] This requirement of revocability is also recognized in a number of Attorney General opinions. All parties, and the majority opinion, refer to an opinion by Attorney General Sargent in 1928 involving a revocable permit to build a railroad across the Benicia Arsenal Military Reservation.[24] That opinion permitted the Secretary of War to issue a revocable permit to the Southern Pacific Railroad to construct a section of railroad line consisting of two or more tracks constituting part of its main lines to be built and maintained across the Benicia Arsenal Military Reservation pending action by Congress on a permanent grant. The opinion recognized that the Secretary of War had "no power to grant a permanent right of way over the reservation, and at most can grant only a revocable permit, and that it will be necessary to apply to Congress for the grant of a permanent easement . . . ." [25]

[T]here is no express statutory authority for the grant of revocable licenses or permits for temporary use of Government property for railway purposes, but it has long been the practice for the Secretary of War to grant revocable licenses for the use of parts of military reservations, and the long-continued exercise of this power and the open use of Government reservations by such licensees without legislative objective from Congress implies the tacit assent of Congress to this custom.

35 Op.Att'y Gen. at 487.

---

19. Construction upon a narrow raised gravel ledge.

20. Construction upon raised pilings or piers.

21. Page 870, *supra.*

22. Page 871, *supra.*

23. Pages 871–875, *supra.*

24. 35 Op. Att'y Gen. 485 (1928).

25. *Id.* at 486–87.

Following this recitation the opinion notes that "where it will benefit the public interest, the Secretary of War may grant a revocable permit or license"[26] and suggests that

[T]he permit may not be granted if it appears that the permittee, because of the nature of the improvements which he proposes to erect, hopes and expects that the license will continue in force indefinitely. . . .

"It (referring to a revocable license) cannot be used as a basis for granting, under the guise of a temporary license, a substantially permanent right to maintain a railroad." [citing 22 Op.Att'y Gen. 240]

35 Op.Att'y Gen. at 487.

The Sargent opinion also notes that as far back as 1878 Opinions of the Attorney General have recognized that Government officials (Secretary of the Navy) could grant a revocable permit "pending application to Congress for grant of a permanent right."[27] It also distinguished the *West Point Chapel* opinion, cited here by the majority,[28] which involved a proposal to erect a Roman Catholic chapel on the military reservation at West Point, by pointing out that a revocable license was not involved there because the contract in question provided that after the building was erected the United States would take over the chapel and permanently maintain it. I find the *West Point* opinion to be inapplicable here for the same reasons that Attorney General Sargent found it to be inapplicable to *Benicia.*

It was also pointed out in the Sargent opinion that while some prior opinions indicated that revocable license could not be used as a guise for granting a substantially permanent right, there were instances, which he pointed out, where revocable licenses had been issued which contemplated structures of a permanent character, intended for long use, and which the licensees undoubtedly hoped

and expected would be allowed to remain indefinitely. In this respect the Sargent opinion observed:

The essential thing is to preserve unimpaired the title of the United States and its right at any time to occupy and use its property and to prevent any use by the licensee which would permanently damage or destroy the property for governmental use. If the permit is revocable at will by its terms, and if the structures which the licensee proposes to erect are capable of being removed in case of revocation, and if upon revocation the land may be left in suitable condition for Government use, the fact that the licensee expects that the United States may not soon find it to its interest to revoke the license has no real bearing on the legal situation.

35 Op.Att'y Gen. at 489.

Attorney General Sargent summarized his view of the relevant principles and set forth four conditions that must be met:

If an effort were made to evolve from the prior opinions of the Attorneys General a rule which may be reconciled with all of them, it would be that the Secretary of War has power to grant revocable permits for occupancy of parts of military reservations for railway purposes provided (1) the permits are made expressly revocable at will, (2) the structures which the licensee proposes to erect are capable of being removed in case of revocation, and the use to which the licensee proposes to put the land will not permanently damage or destroy it for Government use, (3) the granting of the permit and the use of the property under it will be of direct benefit to the United States.

In cases where it appears that the permittee intends to make substantial improvements the removal of which would cause him a great loss in case

---

26. *Id.* at 487.

27. 16 Op. Att'y Gen. 152 (1878).

28. Page 871, *supra;* 21 Op. Att'y Gen. 537 (1897).

of revocation of the permit, it is a matter of departmental policy whether a situation should be created by the issue of a permit which may afterwards embarrass the head of the department in the exercise of the power of revocation.

35 Op.Att'y Gen. at 489–90.

Relying on these principles, and the fact that the Secretary of War had previously determined that the change in the location of the railroad would be of military advantage and directly to the benefit of the United States because of the improvement in transportation facilities for the arsenal and for other purposes, the opinion held that it was permissible for the Secretary of War to issue a revocable permit for the construction and maintenance of the proposed railway lines with the express provision that the permit may be revoked at any time at the pleasure of the Secretary of War, that it shall expire by its own limits at some specified date not more than five years from its issue, that the right of occupancy will then cease unless the permittee has meanwhile obtained authority from Congress, and on the further conditions that stipulations be made for the removal of structures and for leaving the property in suitable condition for Government use. Under such circumstances the opinion concludes it could not be said that under the guise of a temporary license a substantially permanent right to maintain a railroad has been granted.

3. *The Application Here of the Four Conditions Prescribed in Benicia*

Applying the principles of *Benicia* to the case at hand, it is essential that the special land use permits be revocable in fact so that it may not be said that under the guise of a temporary license a substantially permanent right to maintain and operate a pipeline has been granted.

When the permits that are requested by Alyeska truly for *construction pur-* *poses* are evaluated I have no hesitation in finding that they are actually revocable in fact and that they satisfy the other requirements outlined above. To my mind it is clear that:

(1) The permits are made expressly revocable at will. The application so provides.

(2) The structures which the licensee proposes to erect are capable of being removed in case of revocation. It is unquestioned that every structure could be removed and the ground covered by the gravel pad could be restored. *See* discussion at p. 903, *infra*.

(3) The use to which the pipeline proposes to put the land outside the permanent right of way will not permanently damage or destroy it for Government use. Most of the land is open land that has never been put to any other use and it would be as capable of being used for such purposes after construction as before. The slope easements that are necessary for slope modification here are a necessary protection to the environment and one that the Secretary might order and insist upon. The Government acted similarly to protect the environment under the Act of March 3, 1875 (granting railroads rights of way through public lands) and *required* railroads to go outside the 200-foot statutory right of way and "clear and keep clear" timber for fire breaks.[29] I would thus find the authority to authorize slope easements, where necessary, to be within that grant of power conferred by 30 U.S.C. § 189 providing: "The Secretary of the Interior is authorized . . . to do any and all things necessary to carry out and accomplish the purposes of this chapter [the Mineral Leasing Act]. . . ." This was one of the original provisions of the Mineral Leasing Act, February 25, 1920, c. 85, § 32, 41 Stat. 450, the intent of which as declared in its title was to "promote the mining of . . . oil . . . ." 41 Stat. 437. Authorizing slope easements which are necessary to

---

29. *See* Chicago, M. & St. P. Ry. v. United States, 244 U.S. 351, 37 S.Ct. 625, 61 L.Ed. 1184 (1917) ; *see* Tr. 38–39, 44–45.

the construction of a pipeline would be in furtherance of this declared objective of the statute and would not prevent the future use of the affected areas. After all, the steep hills that would be involved here have limited use in their present posture and may be subject to more use after their slopes are modified.

Also, I find, contrary to the majority opinion, that the record does not support its conclusion that "the [gravel] pad cannot be removed without producing permanent and deleterious changes in the underlying land [and] . . . that it would be impossible to remove the pad and return the underlying land to a condition suitable for other uses." [30] In support of this conclusion the majority opinion refers to statements in the Impact Statement which recite some of the difficultes which would be created [31] but it overlooks the significant statement in the Impact Statement which follows and indicates that such lands could be restored:

> Intact [gravel] workpads and abandoned roads could be plowed and covered with a layer of loose, fine material with qualities of low erodability. Riprap and a layer of finer material similar to gold dredge tailings could be placed on exposed ice-rich permafrost and allowed to become vegetated naturally. *Such procedures would permit the reestablishment of native species.* [Emphasis added.]

Final Environmental Impact Statement —Proposed Trans-Alaska Pipeline, Vol. 1, p. 117 (1972). This belies the statement of the majority opinion that it would be "impossible" to restore the land in the permafrost areas.

(4) Also, I have no difficulty in finding that "the granting of the permit and the use of the property under it will be of direct benefit to the United States." The direct and unquestioned benefit to our national security, by making us less dependent upon foreign oil, the tremendous revenues it will produce for the upbuilding of the fledgling State of Alaska and its people, the assistance that North Slope oil will be to our economy by assisting in reducing our unfavorable balance of trade, and the assistance it will give to help alleviate our critical oil shortage which is becoming more serious every day, all stamp the Alaska Pipeline project as one of direct benefit to the United States and to its people. In fact, in my opinion, the Alaska pipeline is a national necessity and some way must be found to construct it as soon as possible.

Having said all this, I conclude that a special land use permit which was truly for *construction* purposes would meet all the legal standards of statutory, regulatory and decisional law and would be revocable in fact. I include in this conclusion the requested permits for camps, temporary access roads and pipe storage sites. Such uses are obviously temporary. I also include the space necessary for material sites which are used temporarily and which the Secretary by his supervision and direction can require to be so levelled and restored as to permit substantially the same use after such use as before.

However, as I interpret, Alyeska's application, I find that it does intend that a portion of the land covered by its application for the *revocable* permit will be put to *permanent* use in connection with the "operation of the . . . pipeline system." In this one respect my finding is substantially the same as that of the majority opinion, except it is not quite so far reaching. As I read the majority opinion, it applies its conclusion that the requested permits would be "nonrevocable in fact" to all the lands covered by the gravel pad which would be used for construction purposes; but I would only conclude that the permit was not revocable in fact with regard to those lands which *after* construction would be *necessary for the operation and maintenance of the pipeline.*

---

30. Page 874, *supra.*

31. Final Environmental Impact Statement —Proposed Trans-Alaska Pipeline, Vol. 1, pp. 115–117 (1972).

My analysis of this *permanent* need for the use of additional land in the "operation of the . . . pipeline" indicates that this use would generally include a strip of land that in some places might be less, but in most instances would not exceed, about 50 feet in addition to the 54-foot statutory right of way. It is this strip of about 50 feet, covered by a "gravel working surface," [32] that Alyeska places in a nebulous state by indicating in its application that it "will adhere to the instructions of the Authorized Officer concerning its removal and/or maintenance." [33] But the size of the pipeline, the nature of the terrain, the severe climatic conditions that exist over a large part of its intended route, and the almost complete absence of established highways adjacent to the pipeline over a great deal of its length, all combine to make it clear that a substantial strip of land *adjacent* to the pipeline right of way is a virtual necessity, not just for construction purposes, but for its continued *operation and maintenance* and that the application inferentially so states. *The need for this gravel strip, to this extent and for this purpose, is thus as permanent as the right of way and is intended to be so and thus it is not in fact temporary and revocable.*[34]

I recognize that revocable permits have been issued for the construction of railroads, street railways, a sewer, etc., but while some of these may seem to have been permanent uses they involved comparatively small projects extending for relatively short distances over Government lands of limited areas and their revocation would not have resulted in the destruction of the project. Actually those permits were merely matters of

---

32. Letter of Feb. 4, 1972, *supra*, p. 3 of attachment.

33. *Id.*

34. It is deducible from Alyeska's application for "Special Land Use Permit" of February 4, 1972 that the land area applied for comprises "approximately 9,600 acres" (p. 3). Of this "about 3,600 acres will be necessary for working area . . . . ."

The 3,600-acre temporary working area will ordinarily be approximately 46 feet in width, although the topography, the construction mode, and other special situations, such as road crossings, and river crossings, will require variations in the width of this space. (p. 4)

As to the remaining area of "approximately 6,000 acres," the application indicates this is a *"temporarily* affected" area and indicates it will be restored (p. 4). The application then makes the significant statement that:

After construction has been completed, no continuing interest in this additional space is or will be claimed by Alyeska. (p. 4)

The disclaimer of any "continuing interest in this additional space (6,000 acres)" indicates that Alyeska does have a "continuing interest" in the remaining 3,600 acres—the area covered by the gravel pad. With respect to this, the application states further:

With respect to the gravel working surface, Alyeska will adhere to the instructions of the Authorized Officer concerning its removal and/or maintenance. (p. 4)

It is also significant as bearing on the use Alyeska intended for the requested permits that its application stated it would accept such permits subject to all terms, conditions, regulations and stipulations "applicable to the construction and operation of the trans-Alaska pipeline system." This indicates a permanent use.

Alyeska's interest in this additional strip which adjoins its right of way is obvious when one studies the cross section sketches of construction methods to be employed. These indicate that a strip of about 50 feet minimum in width is necessary to accommodate the construction machinery necessary to dig the trench and to lay the pipeline in place. Such strip also serves the purpose of an access roadway along the pipeline. These are construction needs but the maintenance and operation needs may be similar. It is well known that pipelines may break at any place on the line and substantially the same equipment that was needed to construct the pipeline will be needed to repair it and this will necessitate a continuing need for the access strip which will be as permanent as the operation of the pipeline. It is thus concluded that the Alyeska application in fact involves what to all intents and purposes is a request for a *permanent* special land use permit.

temporary convenience, rather than of continuing necessity, which in my opinion illustrates the dividing line that distinguishes the permit here requested from those permits for projects extending over a few miles at the most, which are cited by Alyeska in support of their claim of validity.

Here we are talking about a strip of land containing a gravel pad that is upwards of 50 feet or more in width extending for 789 miles, much of it in what is actually an Arctic wilderness. To my mind, a special land use permit of that extent and degree of permanence cannot be justified upon the strength of an Attorney General's opinion that allowed a railroad to build a line of track as a short cut across a relatively small military reservation with the further condition that the permit would terminate after five years if Congress had not granted a permanent right of way in the interim.

I thus concur in the majority opinion to the extent that it holds that the requested special land use permits are invalid to the extent that they are intended to be used for operations and maintenance of the pipeline, but I would uphold their validity had they been requested solely for construction purposes. In so deciding I recognize that Alyeska must now go to Congress for an amendment to a law that never contemplated that a pipeline of this magnitude would be required to be built under the harsh conditions of soil and climate that exist in Alaska. That is regrettable because the construction of the pipeline is urgent and becomes more necessary with each passing day and legislation may further delay construction that is vital to our nation's welfare, but it is Congress that has the legislative power and not this court.

It is thus my conclusion that the Secretary of the Interior is not authorized to issue a special land use permit upon appellee's application for that strip of land upwards of 50 feet in width which is adjacent to the 54-foot right of way to the extent that it will actually be used in the *permanent operation and maintenance* of the pipeline. If a revocable permit were requested for bona fide construction purposes only, the Secretary would be authorized to issue it, but since it appears that the pending application is *not* for a revocable construction permit but for a permit to be used for construction *and* operation *and* maintenance, the permit applied for must be completely rejected.

## II. *Parts II, III and IV of the Majority Opinion*

With respect to Part II, I concur in the result reached and with the reasoning insofar as the pumping stations are concerned; however, with respect to the pipeline communication facilities that are not temporary but are part of the "permanent 'backbone' communications system" I would reach substantially the same result as the majority opinion by finding that such facilities were part of the pipeline, the same as a telegraph line is part of a railroad. I also concur with the results and the reasoning of Parts III and IV which relate to the rights of way of the State of Alaska for public highways, airports and the use of gravel, and to the Valdez Tank Farm.

## III. *Part V—The Sufficiency of the Environmental Impact Statement*

Finally, I dissent from the refusal of the majority to decide whether the Environmental Impact Statement is sufficient or not sufficient. This is a monstrous refusal to perform a judicial obligation with respect to a vital matter and in my opinion is completely unjustified. When the majority claims that this disposition of the case will "expedite" it; that it questions "whether resolution of the NEPA issues presented to [it] at this time will have any practical significance" (pp. 889, 890, *supra*), it is attempting to deny the obvious. The issue is presented to us, it is ripe for decision and the parties (as well as the nation) have a right to have it decided now in its present form. Since this portion of the majority decision also relies heavily

upon its misinterpretation of the legislative history involving section 28 of the Mineral Leasing Act, the decision is infirm in that respect and it should not be assumed that another court would follow that part of the decision in the event it undertakes to pass upon the sufficiency of the Environmental Impact Statement.

Moreover, there is little likelihood that the controlling environmental facts will change with the passage of time and hence the present is as good a time to decide the issue as the future. The argument that the Canadian alternative and Canadian studies may alter the situation is highly speculative and is insufficient to support a refusal of this court to pass on the issue before it. The calculation by the court as to the extent of the delay its opinion will cause may also prove to be unfounded. Because of the great importance of the matter Congress or the Supreme Court may act quickly and thus there would be no substantial change in the material facts affecting the issues surrounding the Impact Statement.

The majority opinion tells the parties that on this question they should come back another day. I believe such judicial insouciance to be indefensible. On a matter as important as this, are we going to compel the United States Government, the State of Alaska and our citizens to accept piecemeal decisions, send them away from our court uninformed on probably the most important issue in the case and compel them to come back again several years later only to be sent back again because the Impact Statement may, in their opinion, contain a deficiency it might claim exists now? Is this controversy of mammoth public concern to be another recurring *Three Sisters Bridge* situation where this court finds new obstacles each time the case comes up? [35]

In my view the Impact Statement adequately furnishes all the material necessary for a resolution of the issues.

The major challenge to the adequacy of the Impact Statement raised by appellants has been that its discussion of the alternatives to the Trans Alaska Pipeline System (TAPS) has not complied with the requirements of the National Environmental Policy Act (NEPA). NEPA directs not only that an agency must make a "detailed statement . . . on alternatives to the proposed action," [36] but also that the agency shall "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." [37] The Guidelines of the Counsel on Environmental Quality, promulgated to advise federal agencies concerning compliance with NEPA, state that these sections require

> [a] rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects. . . . Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects.[38]

Further, recent decisions in our circuit have developed guidelines to direct agency compliance with these sections. In Calvert Cliffs' Coordinating Committee v. A. E. C., 146 U.S.App.D.C. 33, 449 F. 2d 1109 (1971), we said the purpose of the requirement to discuss alternatives in the Impact Statement was

35. D.C. Federation of Civic Associations v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436 (decided April 6, 1970) ; 148 U.S. App.D.C. 207, 459 F.2d 1231 (decided Oct. 12, 1971) ; Supplemental Opinion and denial of rehearing, 148 U.S.App. D.C. 239, 459 F.2d 1263 (March 2, 1972), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290,

31 L.Ed.2d 489 (1972), and the end is not yet.

36. 42 U.S.C. § 4332(2)(C)(iii) (1970).

37. 42 U.S.C. § 4332(2)(D) (1970).

38. 36 Fed.Reg. 7724 (1971).

to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made.

146 U.S.App.D.C. at 38, 449 F.2d at 1114.

More recently in NRDC v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972) we spoke specifically to the scope of the alternatives requirement and the extent to which such alternatives must be discussed in the Impact Statement. There we adopted a rule of reason with respect to NEPA's requirements concerning discussion of alternatives, finding that there must be "a presentation of the environmental risks incident to reasonable alternative courses of action." [39] We noted that the discussion of the environmental effects of alternatives need not be exhaustive, but "[w]hat is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." [40] Implicit in this rule of reason approach is that the environmental effects of such reasonable alternatives need be discussed only reasonably. We stated there that in discussing alternatives, NEPA did not require " 'crystal ball' inquiry," and that the "statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite." [41]

Thus, as I see it, the inquiry for the court here is to determine whether the discussion of the alternatives in the Impact Statement presented sufficient information to permit the Secretary of the Interior to make a reasoned choice of alternatives insofar as environmental aspects are concerned, being mindful of the fact that the adequacy of the discussion of the environmental consequences of a particular alternative shall be judged in light of the reasonable feasibility of pursuing that alternative.

In this proceeding two alternatives have borne the brunt of objections—the alternative of building a trans-Canada pipeline, and the alternative of deferral, i. e., deferring a decision on the permit to build TAPS. In my opinion the discussion of each alternative in the Impact Statement is in sufficient compliance with the requirements of NEPA.

### A. The Canadian Alternative

In my view an examination of the record before us reveals that the Department of the Interior expended sufficient efforts to gather information concerning the environmental effects of a Canadian alternative to make a meaningful decision. The possibility of a Canadian alternative was mentioned in the draft Impact Statement issued in January, 1971, and thereafter testimony was taken from the public at hearings held in Washington and Alaska. When the study for the final Impact Statement was begun in early 1971, Task Force C, comprised initially of scientists from the Geological Survey and headed by the Director, was directed to study literature and available information concerning the environment along possible Canadian routes. Later, this study group was expanded to include experts in wildlife biology and land planning. This Task Force developed a description of the environment that would be affected by various trans-Canadian routes, and it analyzed the environmental impact of building pipelines along each route. Their report formed the basis for the discussion of the environmental impact of the Canadian alternative in the final Impact Statement.

In addition to this Task Force, the Department of the Interior requested in-

---

39. 458 F.2d at 834.

40. *Id.* at 836.

41. *Id.* at 837.

formation on a trans-Canadian pipeline from both Alyeska and the Candian government. Alyeska responded by furnishing the Department with seven studies it had conducted on Canadian routes between 1968 and 1971. Further, these applicants were requested by the Secretary to confer with the Canadian government concerning a Canadian pipeline, and the results of this conference were reported to the Secretary. The information received from the Canadian government appears to have been insubstantial.[42]

It is also my conclusion that the information actually present in the Impact Statement was sufficient to permit the Secretary of the Interior and the other parties specified by NEPA [43] to make a reasoned choice of alternatives, with respect to environmental aspects. The Impact Statement examined five oil pipeline alternative routes through Canada.[44] Each discussion of an alternative route contained a detailed description of many ecological elements in the area of that particular pipeline route, including: topography, drainage, vegetation, surficial deposits, permafrost, bedrock, seismicity, climate, fishery resources, and wildlife resources. Then each alternative contained an evaluation of the potential environmental impact that the area would experience during both construction and operation of the pipeline. Fi-

nally, the discussion of the Canadian alternatives ends with a summary of the environmental effects of each alternative and the potential natural hazards which the area would pose to a pipeline. Also, after discussion of rail and sea routes, all land and sea routes are compared in a table.[45] The Impact Statement also contained various discussions of alternative gas pipeline routes.[46]

The major objection voiced by the appellants is that the Impact Statement does not systematically examine the environmental advantages of the concept of a common corridor where both a gas pipeline and an oil pipeline would traverse Canada. While the common corridor concept could have been studied and analyzed more than it was, it is my conclusion that the Impact Statement's treatment of it was not impermissibly deficient. As mentioned above, the Impact Statement contained considerable discussion and comparison of both oil and gas pipelines across Canada. A common corridor approach is only a variation of the concept of a trans-Canadian pipeline—which alternative was discussed in detail. Though the common corridor approach is not neatly analyzed in one place, the elements of that approach are discussed so as to put all of the environmental facts, as well as they were known at that time,[47] sufficiently

42. On July 9, 1971 an *aide memoire* was transmitted to the Canadian government through the Department of State requesting information relevant to TAPS and its alternatives. The parties here disagree on the scope of this request. The Secretary of the Interior in his deposition and another official from the Department stated that this request was open-ended, and sought all relevant information. The appellants maintain that the request was much more limited, citing the deposition of the man in charge of drafting the final Impact Statement and who was involved in the discussions that led to the *aide memoire*. However, there is no dispute that at no time did the Canadian government furnish the Department with any technical information.

43. NEPA specifies that copies of the "detailed statement," *i. e.*, the Impact State-

ment, shall be made available to the President, the CEQ, and to the public. 42 U.S.C. § 4332(2)(C) (1970).

44. V Final Impact Statement (hereinafter cited as FIS) at 123–200.

45. *Id.* at 233–42.

46. I FIS at 81–84, 176–83, 226–27, 243–56; IV FIS at 492–503, 583–84, 603–04, 619; V FIS at 123–26.

47. There is considerable dispute among the parties over exactly what scientific information was available at the time the final Impact Statement was issued. Both appellants Wilderness Society and David Anderson maintain that there were a number of relevant Canadian government and private studies available. The appellees argue that at best only some of the studies were in the investigation stage, and that none of them was completed.

before the decision makers.[48] In my view a failure to organize the particular environmental effects and impact of a common corridor into one easily readable table, when such information is already present though not in cumulative form, cannot alone support a finding that the requirements of NEPA have not been met.[49] In this respect all one has to do is to consider the material for the oil pipeline and the gas pipeline together.

My conclusion that this alternative was sufficiently treated is also based upon an appraisal of the facts in the record relating to the feasibility of a common corridor, and the practical difficulties inherent in conducting an analysis of such a hypothetical corridor.[50] The factors which bear on the "reasonableness" of the Canadian alternative apply equally to a common corridor, which is but a variation of that alternative and are discussed below. While intuitively it would seem that it should not be too difficult to quantify the environmental advantages of a common corridor over the TAPS proposal, the contrary appears to be the case. An inherent limitation on the detail of such a quantification is the fact that neither the trans-Canadian oil pipeline, nor the trans-Canadian gas pipeline is even in the planning stage.[51] When the Department was comparing various trans-Canadian oil pipeline alternatives in preparing the Impact Statement it refrained from quantifying these various routes because

of a dearth of concrete information, due to the fact that such pipelines were unplanned.[52] It would seem to me to be unreasonable to require *more* exactness of the Department when additional uncertainties are introduced for comparison, *i. e.*, the environmental effects and savings of an unplanned oil pipeline *and* an unplanned gas pipeline in a common corridor. I thus find the Impact Statement to be sufficient on the only serious attack made by appellants—the claim that the Canadian alternatives were insufficiently covered. In addition there are other factors which indicate that the alternative of an oil (or oil and gas) pipeline through Canada is not a reasonable present alternative and these facts also bear on the sufficiency of the treatment actually given this alternative in the Impact Statement.

No person has applied to build an oil pipeline through Canada and there is no proof that Canada could adequately finance a 51% share of the tremendous construction cost that would be required (see discussion below). The route through Canada is uncharted and unknown but of necessity would be much longer. It would possibly cause greater damage to the environment and greatly increase the cost of the pipeline and the share of the cost that Canada would have to bear.

Moreover, requiring the pipeline to be routed through Canada would involve factors that might indicate the route

48. Subsequent to the issuance of the final Impact Statement, Secretary Morton requested the Deputy Undersecretary to prepare a memorandum (known as the "Horton Memorandum") presenting the common corridor in its most favorable light. This memorandum listed seven environmental advantages of the common corridor, and also assessed political, international, economic, and energy considerations. At oral argument it was not denied that "the facts [discussed in the Horton Memorandum, were] all from the Impact Statement." The memorandum is reproduced in the Supplemental Joint Appendix at 3–7.

49. The environmental impact of a common corridor is briefly alluded to on a number of occasions throughout the Impact State-

ment. *See, e. g.*, I FIS at 226, 243, 273; IV FIS at 492, 583, 603–04; V FIS at 125–26.

50. The Impact Statement considered five possible trans-Canadian oil pipeline routes, see V FIS at 123–200, though of course to date there has been no application to build such an oil pipeline. Neither has there been application for a gas pipeline across Canada, nor does the record disclose what route such a pipeline would take if it were built.

51. IV FIS at 492.

52. Deposition of Deputy Undersecretary Horton at 196–97. *See also* Deposition of Dr. Brew (the individual in charge of preparing the Final Impact Statement) at 26–7.

would be contrary to the national interest of the United States, particularly to our national security. What is needed now is a 48-inch pipeline for oil from the North Slope of Alaska and not a pipeline that can be compelled to share its throughput capacity with whatever oil may be discovered in the adjoining MacKenzie Basin in Canada. That might require another pipeline. Some of the same considerations which rule out a Canadian pipeline for oil, which is vital to the national interest and security of the United States, are of the same character as the considerations that induced Canada to build the Canadian Pacific as an all-Canadian railroad through the barren and unprofitable Laurentian shield north of Lake Superior.[53]

In addition United States law may prohibit the granting of right of way over our public lands for a pipeline that, because it also would run through Canada, would have to be owned and effectively *controlled* by Canada. The exact Canadian requirement in this respect is not known, but if Canada did require that it control a 51% interest in the Canadian portion of the pipeline, as Canada has indicated it would require,[54] a legal impediment might exist under our existing statutes. Actually, control of 51% of the Canadian portion would be effective control of 100% of the *entire* pipeline. *No law in the United States imposes a similar restriction on Canadians constructing a pipeline in the United States.* This 51% control requirement might bring into play the following statutes: The Mineral Leasing Act, 30 U.S.C. § 181,[55] provides that *deposits* of oil and gas shall be subject to disposition to *citizens* of the United States or to any *corporation organized under the laws of the United States or of any state.* This would permit Canadian citizens to *control* 100% of a United States corporation and to act through such corporation. This same

---

53. Van Horne, one of the builders of the Canadian Pacific, described the route north of Lake Superior as "200 miles of engineering impossibilities." Berton, The Impossible Railway (1972).

George Stephen's (one of the Directors of the Canadian Pacific during the construction era) 1882 letter to the Grand Trunk share-holders defended the Canadian Pacific route through British territory and described the route north of Lake Superior as:

[A] National enterprise which is regarded by the Canadian people as a means whereby they are to be rendered independent of United States railway lines . . . .

Gibbon, History of the Canadian Pacific 248 (1937).

An historical fact of present interest is that it was the purchase of Alaska by the United States in 1867 that led to the decision of the Canadian Confederation to build the Canadian Pacific Railway "to connect the seaboard of British Columbia with the railway system of Canada" as a device to stop British Columbia from being "snapped up" by the United States. The Report to the United States Senate on the Pacific Railways had stated that the opening of the Northern Pacific Railways "seals the destiny of the British Possessions west of the ninety-first meridian. They will be-

come so Americanized in interests and feelings that they will be in effect severed from the new Dominion, and the question of their annexation will be but a question of time:" History of the Canadian Pacific, *supra* at 177. The decision to build the Canadian Pacific Railroad was formulated in an agreement between the Government of the Dominion and the Province of British Columbia on July 7, 1870. After the Dominion Parliament accepted this agreement British Columbia entered the Canadian Confederation on July 20, 1871. History of the Canadian Pacific, *supra* at 157.

54. Secretary Morton testified before Congress: "Canadian authorities have indicated that they *must* control 51% of *any* system through their country" (J.A. 82). *See also,* Sec. of Interior's Statement of Reasons for Approval, (J.A. 34, 66). When a Canadian Cabinet Minister speaks on such a matter he is expressing government policy, since they operate on the parliamentary system.

55. 30 U.S.C. § 181 provides:
Deposits of . . . oil . . . shall be subject to disposition in the form and manner provided by this chapter to citizens of the United States, or to associations of such citizens, or to any corporation organized under the laws of the United States, or of any State or Territory thereof . . . .

statute, however, provides that citizens of another country, *whose laws or regulations deny similar or like privileges, to citizens or corporations of this country,* "shall not by stock ownership, stock holding, or stock control, own any interest in any lease acquired under the provisions of this chapter."

Another section of the Mineral Leasing Act, 30 U.S.C. § 185,[56] provides that the provisions of section 181 apply *mutatis mutandis* to oil and gas *pipelines.* Thus, since United States laws provide that rights of way for oil pipelines through public lands may only be granted by the Secretary of the Interior to applicants who possess the citizenship and nationality qualifications required by section 181, a Canadian insistence on 51% control of a pipeline through Canada might mean that a United States pipeline *controlled as to its throughput capacity by Canadian citizens* could not acquire a grant of *any* right of way in the United States because Canadian laws, customs and regulations do not permit a pipeline in Canada to be controlled by United States Citizens through a Canadian corporation. In the language of section 181, citizens and corporations of the United States would be denied the "similar or like privilege of" controlling pipelines in Canada.

Canadian control of the throughput capacity of the pipeline might also prevent the Secretary of the Interior from regulating the "use" of the pipeline and from controlling the "proportionate amounts" of oil from U.S. Government lands that the pipeline *must* carry. The statute imposes such powers and duties upon the Secretary.[57]

## B. The Alternative of Deferral

The main objection raised concerning the Impact Statement's treatment of the alternative of temporarily deferring approval of the TAPS permit is that this treatment does not systematically quantify and describe environmental studies that are presently planned or in progress, or that should be undertaken, that would be helpful to fill in the gaps of the present knowledge. Despite this objection, however, it is clear that the Impact Statement does refer to a number of studies which are presently taking place which would provide relevant information for the construction and operation of the pipeline.[58] Further, the Impact Statement on numerous occasions points out where knowledge on a certain issue is incomplete and refers to research, if any, which is under way.[59] In my opinion this treatment was sufficient to permit an informed decision on the environmental benefits of the alternative of deferral.

All these factors make it unnecessary, in my opinion, for the current Environmental Impact Statement to discuss further an oil pipeline through Canada; and with respect to the discussion of the Canadian alternatives and all other issues, I find the Environmental Impact Statement to be sufficient under the statute.

---

56. 30 U.S.C. § 185 provides:
 Rights-of-way through the public lands, including the forest reserves of the United States, may be granted by the Secretary of the Interior for pipeline purposes for the transportation of oil or natural gas *to any applicant possessing the qualifications provided in section 181 of this title,* to the extent of the ground occupied by the said pipe line and twenty-five feet on each side of the same under such regulations and conditions as to survey, location, application, and *use* as may be prescribed by the Secretary of the Interior and upon the express condition that such pipe lines shall be constructed, operated,

and maintained as common carriers and shall accept, convey, transport, or purchase without discrimination, oil or natural gas produced from Government lands in the vicinity of the pipe line *in such proportionate amounts as the Secretary of the Interior may, after a full hearing with due notice thereof to the interested parties and a proper finding of facts, determine to be reasonable* . . . . [Emphasis added.]

57. *Id.*

58. V FIS at 8–10.

59. Supporting Documents of Alyeska NEPA Brief, Vol. 3 at Tab. 21.

I respectfully dissent to the extent indicated above.

ROBB, Circuit Judge (concurring in part and dissenting in part):

I concur in Parts I, II, III and IV of the court's opinion. I agree with Judge MacKinnon that the environmental impact statement was sufficient and that we should pass upon this issue now.

WILKEY, Circuit Judge (concurring in part and dissenting in part):

I concur in Parts I, II, III and IV of the court's opinion. Regrettably, the would-be builders of the Alaska Pipeline sought from the courts rather than Congress clearly necessary changes in the statutory restrictions on the use of public lands.

I dissent from Part V of the court's opinion insofar as it relates to the Environmental Impact Statement. I agree with Judge MacKinnon that it was sufficient, as the District Court found, that to the extent that any alternatives were presented adequate consideration was given to them, and that this whole vital project would be expedited (in whatever form it eventually takes) by our so ruling now.